**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| WALL STREET THEATER COMPANY, INC. | : | Case No. 18-50132 |
| WALL STREET MASTER LANDLORD, LLC | : | Case No. 18-50133 |
| WALL STREET MANAGING MEMBER, LLC | : | Case No. 18-50134 |
| | : | |
| Debtors | : | (Joint Administration |
| | : | Requested) |
| _____ | : | |
| | : | |
| WALL STREET THEATER COMPANY, INC., et al | : | |
| | : | |
| Movant | : | |
| | : | |
| v. | : | |
| | : | |
| PATRIOT BANK, N.A. | : | |
| | : | |
| Respondent | : | February 4, 2018 |

**MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO USE**
**CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION**

Wall Street Theater Company, Inc. ("WSTC"), Wall Street Master Landlord, LLC

("WSML"), and Wall Street Managing Member, LLC ("WSMM")[1] hereby move (the "Motion")

for an order pursuant to 11 U.S.C. §§ 361, 362, and 363 and Fed. R. Bankr. P. 4001 and 9014 for

(a) an order authorizing the use of cash collateral and granting adequate protection on a

preliminary basis; (b) scheduling a final hearing on this motion; (c) after holding such final

hearing, for an order authorizing Debtors to use cash collateral and granting adequate protection

on a final basis; and (d) granting related relief.  In further support hereof, Debtors respectfully

state as follows:

---

[1] WSTC, WSML, and WSMM are collectively referred to as the "Debtors".  Non-debtor affiliates of Debtors are
Wall Street Master Tenant, LLC ("WSMT") and Wall Street Manger, LLC ("WSM").

## INTRODUCTION

1.      On February 4, 2018 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Code")[2]. Pursuant to §§ 1107(a) and 1108 of the Code, Debtors continue to operate their businesses and manage their properties, affairs and assets as debtors-in-possession.  No trustee, examiner, or committee has been appointed in these cases.

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court for these cases pursuant to 28 U.S.C. §§ 1408 and 1409.  The basis for the relief requested herein is 11 U.S.C. §§ 105, 361, 363, 503, and 507 and Fed. R. Bankr. P. 4001 and 9014.

3.      No Official Committee of Unsecured Creditors has yet been organized.

## BACKGROUND

**Corporate Structure**

4.      WSTC is a non-profit Connecticut corporation with a principal place of business located at 71 Wall Street, Norwalk, CT consisting of a historic theater facility (the "Property"). Suzanne Cahill serves as WSTC's president.

5.      WSML is a Connecticut limited liability company.  The management of WSML is vested in its sole manager, WSM.  WSML's member is WSMT.  WSML is lessor of the Property pursuant to a lease agreement entered into between WSTC and WSML on December 29, 2016 for a term of fifty-five (55) years (the "Ground Lease").

---

[2] Unless set forth herein, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

6.       WSMT is a Connecticut limited liability company.  The management of WSMT is vested in its sole member, WSM.  WSMT's members are Enhanced Capital HTC Fund I, LLC and WSM.  WSMT is sub-lessor of the Property pursuant to a lease agreement entered into between WSML and WSMT on December 29, 2016 for a term of nineteen (19) years (the "Master Lease").

7.       WSMM is a Connecticut limited liability company.  The management of WSMM is vested in WSTC, its sole manager.  WSMM's member is WSTC.  WSMM is a guarantor of that certain construction loan agreement dated December 29, 2016 between WSTC and WSML as borrowers, and Patriot Bank, N.A. as lender (the "Construction Loan Agreement").

8.       WSM is a Connecticut limited liability company.  The management of WSM is vested in WSMM, its sole manager.  WSM's member is WSMM.  WSM is also a guarantor of the Construction Loan Agreement.

9.       The complexity of the corporate structure is largely due to the need to have the ability to monetize tax credits (explained in detail below), which are an important asset and funding source of the Debtors.

**Lines of Business Activities**

10.      WSTC is a non-profit organization whose mission is to provide diverse programming and promote arts education, thereby enriching the cultural life of the greater Norwalk community.  In order to accomplish its mission, WSTC offers a variety of high-quality professional music, comedic and stage performances, including musical theater and plays, variety shows, rock, pop and jazz concerts, comedy shows, children's performances, and classical music and opera.

11.     WSTC also provides educational opportunities for children and adults to develop talents in the performing arts by offering classes and workshops including musical instrument instruction, theater and drama master classes, choral and voice lessons, visual arts classes and workshops, and ballroom and traditional dance classes.  WSTC further aims to enhance its community through mentoring programs for at-risk youth and delivery of community oriented lectures, discussions, and short performances.

12.     In February 2015, Debtors endeavored to renovate the Property with the intention of it becoming a non-profit cultural center for greater Fairfield County.  Said renovations involved significant construction including safety upgrades to both the interior as well as the exterior of the theater.

**The Construction Loan with Patriot Bank**

13.     Funding for renovations of the Property came, in part, from a construction loan of $8,800,000 (the "Loan") from Patriot Bank, N.A. ("Patriot") pursuant to a construction loan agreement (the "Construction Loan Agreement").  Pursuant to the terms of the Open-End Construction Mortgage Deed, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated December 29, 2016 (the "Security Agreement") made by WSTC and WSML (collectively, the "Mortgagors") in favor of Patriot, and as evidenced by Patriot's UCC-1 Financing Statements, the Loan is secured by, *inter alia*:

    a.     With respect to **WSTC**:

        i.     the Mortgagors' right, title and interest in the Property and Ground Lease;

        ii.     all additional lands, estates and development rights hereafter acquired by Mortgagors;

        iii.     any and all buildings, structures, fixtures, or additions to the Property;

    iv.       all machinery, equipment, fixtures appliances owned by Mortgagors now or hereafter located on the Property;

    v.       all awards or payments, including interest thereon, made with respect to the Property whether from the exercise of the right of eminent domain or for a change of grade or for any other injury to or decrease in the value of the Property;

    vi.       all leases and subleases affecting the use, enjoyment and/or occupancy of the Property, including the Ground Lease and Master Lease, together with any renewal of the same;

    vii.       all proceeds of and any unearned premiums on any insurance policies covering the Property;

    viii.       all tax refunds, including interest thereon, and tax abatements and the right to receive or benefit from the same, which may be payable or available with respect to the Property;

    ix.       all accounts receivable, utility or other deposits, intangibles, contract rights, interests, estate or other claims, both in law and in equity, which Mortgagors (or any one of them) now has or may hereafter acquire in the Property and all funds and deposit accounts and other accounts into which any funds of Mortgagors (or any one of them) are now or hereafter deposited to be held by, with, on behalf of or for the benefit of Patriot, including certain bank accounts maintained with Patriot;

    x.       all agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents and all rights respecting or pertaining to the operation and management of the Property;

    xi.       all proceeds from the sale of: (i) CFTCs[3] and GTCs[4] (as more fully explained below); and

    xii.       all of WSTC's -

---

[3] Defined under the terms of the Construction Loan Agreement as: "those Connecticut Film and Digital Media Infrastructure Tax Credits pursuant to CGS Chapter 208 Section 12-217kk, amended by 12-217kk-1 to 12-217kk13 which credits are estimated to equal U.S. $2,714,317.00."

[4] Defined under the terms of the Construction Loan Agreement as: "those Connecticut Green Building Tax Credits pursuant to CGS Chapter 208 Section 12-217mm, which credits estimated to equal U.S. $200,813.00."

1.      Present and future right, title and interest in and to its membership interest in WSMM; and

2.      Present and future right, title and interest as a member of WSMM, including the right to distributions (liquidating or otherwise) and allocations, capital contributions and the right to enforce WSMM's right to receive capital contributions,  books and records relating to such interests or WSMM and in all assets of WSMM, and certificates, options, securities, security entitlements and other investment property or financial assets that may hereafter be received, receivable or distributed in respect of, or exchange for, all or any of such interests, whether vested or contingent and whether now owned or hereafter acquired and any and all proceeds thereof, together with all additions, replacements and substitutions thereto all as set forth in that certain Pledge of Membership Interest and Security Agreement dated December 29, 2016.

b.      With respect to **WSML**:

i.      See Section 12(a)(i) – (xi); and

ii.     All the collateral (as defined in that certain Pledge of Proceeds and Security Agreement dated December 29, 2016) including, without limitation, all of WSML's present and future right, title and interest in and to the proceeds from the sale of certain tax credits as defined in the Pledge of Proceeds and Security Agreements (i.e. the CFTCs, GTCs, and SHTCs5); and

iii.    All pledged capital contributions (as defined in that certain Pledge of Capital Contributions and Security Agreement dated December 29, 2016), and any and all proceeds thereof; and

iv.     All WSML's right, title and interest (but not obligations) in and to that certain Assignment of Collateral, Security Agreement and Fixture Filing (Master Tenant) dated December 29, 2016 made by Capewell Lofts LLC in favor of WSML, all rights and interests granted and encumbered by said assignment of collateral, and any and all Uniform Commercial Code Financing Statements filed in connection therewith; and a continuing lien, security interest,

---

[5] Defined therein as "those credits awarded by the State Historic Preservation Office located within the Department of Economic and Community Development pursuant to Section 10-416b of the Connecticut General Statutes, as amended (the 'C.G.S.') against certain statutorily imposed taxes under the C.G.S. equal to thirty percent (30%) of 'Qualified Rehabilitation Expenditures' for the 'Substantial Rehabilitation' of a mixed-used 'Certified Historic Structure', for the Project."

assignment, and pledge in and to all of the collateral described in said assignment of collateral.

c.    With respect to **WSMT**:

    i.    All fixtures and all tangible and intangible personal property of WSMT, whether now owned or hereafter acquired by WSMT including without limitation:

    1.    Any certificates and proceeds relating to FHTCs[6] and, if they are allocated to WSMT, the SHTCs earned by WSMT;

    2.    All equipment (including all machinery, tools and furniture), inventory (including all merchandise, raw materials, work in process, finished goods and supplies) and goods, whether now owned or hereafter acquired;

    3.    All replacement and working capital reserves, accounts, accounts receivable, other receivables, contract rights, chattel paper, electronic chattel paper, commercial tort claims, and general intangibles of WSTC (including without limitation, payment intangibles, goodwill, patents, copyrights, trademarks, research and development);

    4.    All instruments, documents, rights to proceeds of letters of credit, securities, investment property, bank deposits, deposit accounts, checking accounts and cash now or hereafter owned by WSMT;

    ii.    All WSMT's right, title and interest in and to all subleases, tenancies and other agreements, whether written or oral, with respect to any portion of the premises leased to WSMT pursuant to the Master Lease, and all rents, security deposits, and other payments of every kind to be paid to WSMT pursuant to any renewal or extension of the Master Lease or any agreements in substitution therefore;

    iii.    All WSMT's right, title, and interest in and to:

    1.    The capital contributions, deferred capital contributions, the additional credits deferred capital contributions, capital contribution accounts, capital proceeds and sale proceeds all as defined in the Amended and Restated Operating Agreement of WSMT (the "Master Tenant Operating

---

[6] Defined under the terms of the Construction Loan Agreement as "the historic preservation tax credits provided in Section 47 of the Internal Revenue Code of 1986, as amended estimated to equal U.S. $2,292,442.00."

Agreement") between Enhanced Capital HTC Fund I, LLC (the "Investor") and WSM dated December 29, 2016; and

2.     All moneys received or to be received by Debtor from the Investor and WSM under the Master Tenant Operating Agreement; and

3.     Any and all other funding agreements, promissory notes or other instruments evidencing the same; and

iv.     WSMT's revenues, income, proceeds, profits and other sums or benefits paid or payable to WSMT in connection with WSMT's operation of the Property.

d.     With respect to **WSM**:

i.     All the collateral as defined in that certain Pledge of Proceeds and Security Agreement dated December 29, 2016 including, without limitation, all of WSM's present and future right, title and interest in and to the proceeds from the sale of certain tax credits;

ii.     All WSM's present and future right, title and interest in and to its membership interest in each of WSMT and WSML and all present and future right, title and interest as a member of each of WSMT and WSML including, without limitation, the right to distributions and allocations, capital contributions, and the right to enforce each of WSMT and WSML's right to receive capital contributions, books and records relating to such interest or WSMT and WSML, respectively, and in all assets of each of WSMT and WSML and certificates, options, securities, security entitlements and other investment property or financial assets that may hereafter be received, receivable or distributed in respect of, or exchange for, all or any of such interests.

e.     With respect to **WSMM**:

i.     All WSMM's present and future right, title and interest in and to its membership interest in WSM, and all present and future right, title and interest as a member of WSM, including, without limitation, WSMM's right to distributions and allocations, capital contributions and the right to enforce WSM's right to receive capital contributions, books and records relating to such interests or WSM and in all assets of WSM, and certificates, options, securities, security entitlements and other investment property or financial assets that may hereafter be received, receivable or

distributed in respect of, or exchange for, all or any of such interests.

**Use of Tax Credit Financing**

14.     Debtors also intended to generate additional funds for renovations of the Property as well as to pay-down Patriot's debt through receipt of tax credits awarded to entities meeting certain historical and/or environmental benchmarks.  Specifically, Debtors sought an award of the following tax credits (the "Tax Credits"):

   a.     State historic preservation tax credits ("SHTCs") under P.A. 14-217, Sec. 1665, C.G.S. § 10-416b awarded by the State Historic Preservation Office against certain statutorily imposed taxes under Connecticut General Statutes equal to thirty percent (30%) of the "Qualified Rehabilitation Expenditures" for the "Substantial Rehabilitation" of a mixed-used "Certified Historic Structure" (all as defined in the Connecticut General Statutes) estimated to equal $1,805,162.00;

   b.     Federal historic tax credits ("FHTCs") as provided in Section 47 of the Internal Revenue Code of 1986, estimated to equal $1,121,082.007;

   c.     Connecticut Green Building Tax Credits ("GTCs") pursuant to Conn. Gen. Stat. § 12-217mm, estimated to equal $187,031; and

   d.     Connecticut Film and Digital Media Infrastructure Tax Credits ("CFTCs") pursuant to Conn. Gen. Stat. § 12-217kk, amended by 12-217kk-1 to 12-217kk13, estimated to equal $490,000.00.

**Structuring Methodology and Flow of Funds**

15.     One purpose of this bankruptcy is to preserve the value of the Debtors' assets. Key assets of Debtors include access to the Tax Credits worth approximately $4.1 million (the "Tax Credits").

16.     Monetizing the Tax Credits requires the creation of a specific corporate structure. The process that generates the Tax Credits is the long-term lease between WSMLL and WSMT.

---

[7] The FHTCs are subject to a 5-year claw back period in the event WSTC no longer meets the eligibility requirements for an award of FHTCs.

17.     To accomplish this, WSTC entered into a ground lease with WSMLL.

18.     WSMLL then entered into a Master Lease Agreement ("Master Lease").

19.     When certain milestone are met, Tax Credits can be sold on a secondary market.

These sales result in the 99% member of WSMT, Enhanced Capital HTC Fund I, LLC

("Enhanced") investing funds into WSMT.  Those funds then flow through the structure to

permit the proceeds of the Tax Credits (the investments by Enhanced) to be used by WSTC.

**Events Leading to the Bankruptcy Filing**

20.     In February of 2015, WSTC entered into a construction contract with GTL

Construction, LLC ("GTL") for renovations of the Property.  Certain disputes arose among the

parties, and WSTC subsequently terminated GTL.

21.     Thereafter, on June 29, 2016, WSTC entered into a construction contract with The

Morganti Group, Inc. ("Morganti") whereby Morganti was to complete renovations of the

Property.  On December 29, 2016, WSTC assigned all rights, titles and interest it had in the

construction contract to WSML.  Disputes subsequently arose with respect to the quality of some

of Morganti's work, the scope and cost of change orders, and the timing of periodic payments.

22.     These disputes culminated on April 11, 2017 when Morganti notified WSTC that

Morganti believed WSTC had materially breached the terms of the construction contract by

failing to timely pay Morganti's interim invoices.  Morganti abandoned the project and refused

to return until paid in full.   Morganti further informed all its subcontractors that it would sue for

tortious interference if they provided information regarding payments, billings, and other

information to WSTC or WSML.

23.     On May 11, 2017, WSTC notified Morganti that it was in default and material

breach of the construction contract for abandoning the project and on May 30, 2017.  WSTC also

provided demand to Morganti to provide written evidence that Morganti had paid all

subcontractors and suppliers for work and materials for which it previously received payment

from Debtors.  Morganti refused.

24.     WSML and Morganti participated in a mediation but were unable to resolve their

disputes.  As such, Morganti filed a demand for arbitration, claiming it was owed $2,397,540.79

in damages as a result of WSML's alleged breach of the construction contract.  Said arbitration is

currently pending. WSTC has denied the material allegation in Morganti's claim and interposed

counterclaims.

25.     Disputes arose as to the nature and obligations to the various subcontractors

engaged in the project, and, despite Debtors' best efforts to resolve all outstanding issues,

Debtors have been unable to complete renovations on the Property.  These setbacks have resulted

in delays with respect to awards of certain tax credits and, ultimately, necessitated the instant

bankruptcy filing.

26.     Morganti's mechanics' liens have placed the above structure to recognize the

benefits of the Tax Credits in jeopardy.  If Morganti is successful in foreclosing its mechanics'

lien, or burdening WSTC with debt it cannot pay, WSTC will be forced to close, resulting in

recapture of the Tax Credits, causing massive financial distress to Debtors, Enhanced, Patriot,

and others.

27.     Therefore, it is essential that (a) the Master Lease be preserved and (b) WSTC

continue to operate.  To achieve this, Debtors will be seeking an early hearing (in accordance

with an adversary proceeding commenced pursuant to Bankruptcy Code §§ 506(a, b, and d), to

value the Property, determine the secured status of Morganti's liens, and strip Morganti's liens.

## DEBTOR'S REQUEST TO USE CASH COLLATERAL

28.     Upon information and belief, the following parties-in-interest may claim an

interest in the Debtors' "cash collateral," as that term is defined by § 363(a):

e.      Patriot Bank, N.A.

29.     By this motion, Debtors seek (a) the scheduling, pursuant to Fed. R. Bankr. P.

4001, of a preliminary hearing on this motion (the "Interim Hearing") within three days of the

commencement of these Chapter 11 case; (b) at the Interim Hearing, the entry of an interim order

in the form attached hereto (the "Interim Order") authorizing Debtors to use cash collateral in

accordance with the budget annexed hereto as Exhibit A (the "Budget")[8] and granting adequate

protection to parties claiming an interest in Debtors' cash collateral; (c) the scheduling, pursuant

to Fed. R. Bankr. P. 4001, of a final hearing on this motion (the "Final Hearing") within

approximately twenty-one (21) days of the commencement of these Chapter 11 cases; (d) the

establishment of certain notice procedures for the Final Hearing; and (e) at the Final Hearing, the

entry of a final order (the "Final Order"; together with the Interim Order, the "Cash Collateral

Order") authorizing Debtors to use cash collateral in accordance with the  Budget and granting

adequate protection to parties claiming an interest in Debtors' cash collateral.

30.     Nothing contained herein shall in any way affect or impair the status of the

validity, perfection, amount and extent of Patriot's respective security interests in any of their

respective collateral, or Debtor's right to object to the validity, perfection, amount and extent of

such security interests.

31.     To the extent the above-described loans of the Patriot are secured by duly

perfected non-avoidable liens in Debtor's "cash collateral" as such term is defined under

---

[8] Attached hereto as Exhibit B, is a *pro forma* cash flow statement through December 31, 2018 providing further
detail concerning Debtors' operations.

§ 363(a), § 363(c)(2) requires that Patriot consent or this Court authorize Debtor's use of such property.

32.    By this Motion, Debtor seeks to use cash collateral on a <u>preliminary basis</u> from the date of the hearing on this Motion through <u>March 16, 2018</u> (the "Preliminary Cash Collateral Period") and on a <u>final basis</u> until December 31, 2018 to pay actual, necessary ordinary course operating expenses.

33.    Subject to the terms and conditions proposed herein, Debtors are requesting that the Court grant the following pursuant and subject to 11 U.S.C. §§ 361, 362, 363, 503 and 507, as adequate protection for any diminution in value of Patriot's collateral resulting from Debtors' use of cash collateral:

a.    To Patriot –

(1)    Debtors shall pay to Patriot as adequate protection monthly interest payment of $46,047.23 on the 1st of each month in accordance with the Budget (the "Adequate Protection Payments").

(2)    In exchange for the continued use of cash collateral by Debtors, and as further adequate protection for Patriot's interest therein, and in addition to the provisions of 11 U.S.C. § 552(b), Debtors propose to grant Patriot, in accordance with §§ 361(2), 363(c), and 363(e), senior security interests (the "Replacement Liens") in, and liens upon, to attach to the same validity, extent, and priority that Patriot possessed as to said liens on the Petition Date, but only to the extent the amount of their respective secured position erodes in value, all personal property and real estate now owned, or hereafter created or acquired or generated by Debtors, whether existing prior to the Petition Date or coming into being or in the possession of Debtors thereafter including, without limitation, all of Debtors' accounts, inventory, general intangibles,

trademarks, licenses, contract rights, insurance proceeds or refunds, tax refunds, chattel paper,

documents, instruments and securities, machinery, equipment, and all proceeds, products, rents

and profits of all of the foregoing, whether acquired through the use of cash collateral, or from

the extension of post-petition financing ("DIP Assets").  Notwithstanding anything else in the

Interim Order to the contrary, nothing therein shall grant Patriot a Replacement Lien in claims

and/or causes of action arising under Chapter 5 of Title 11, 11 U.S.C. § 501 *et seq.*

(3)    The liens of Patriot and any Replacement Liens, and any priority to which

Patriot may be entitled or become entitled under § 507(b) of the Bankruptcy Code shall forever

be subject to: (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the

Clerk of the Court; (ii) liens for taxes owed to governmental entities, including sales and

withholding taxes to the extent such liens have priority over the liens and Replacement Liens of

the Secured Creditors under applicable non-bankruptcy law; (iii) the allowed administrative

claims of attorneys and other professionals retained by Debtors in this Chapter 11 case pursuant

to § 327 and accrued during the Preliminary Cash Collateral Period and subsequent cash

collateral periods in the amounts of: $125,000 for Debtors' proposed counsel Green & Sklarz,

LLC (inclusive of its prepetition retainer) and $30,000 for Debtors' proposed financial advisor

RJ Reuter, LLC (inclusive of its prepetition retainer) and $15,000 for Debtors' proposed special

counsel, Hinkley Allen & Snyder LLP (inclusive of its remaining prepetition retainer); and (iv)

amounts due and owing to Debtors' employees for post-petition wages, accrued during all cash

collateral periods not to exceed the priority amount of said claims pursuant to § 507(a)(4)

(collectively, items (i) through (iv) are referred to as the "Carve Outs").

34.    Debtors submit that the use of cash collateral on the terms and conditions set forth

herein is necessary to preserve and maximize the value of Debtors' estate.  Debtors submit that

unless the use of cash collateral is authorized in the amounts and for the purposes specified herein, its estate will suffer immediate and irreparable harm.

35.     Adequate protection is not expressly defined in the Bankruptcy Code, except by the implications of the examples of adequate protection listed in § 361. *Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.*), 16 F.3d 552, 564 (3d Cir. 1994). The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and to protect the secured creditor from diminution in the value of its collateral during the reorganization process. *In re Continental Airlines, Inc.,* 154 B.R. 176, 180-81 (Bankr. D. Del. 1993).

36.     Thus, the Adequate Protection Payments and Replacement Liens as described above are intended to preserve Patriot's position at the time of the bankruptcy filing.

37.     Without the use of cash collateral, Debtors will be unable to pay the necessary operating expenses to maintain and protect its business operations thereby resulting in loss to its going concern value to the detriment of Debtors, their creditors, and the estate.

38.     Consistent with the above requirements, courts repeatedly have recognized that the use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and, thus, maximize the value of an estate for all interested parties. *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (In re George Ruggiere Chrysler-Plymouth, Inc.*), 727 F.2d 1017, 1019 (11th Cir. 1984) (approving use of cash collateral over objection of secured parties after nothing that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated"); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1398-99 (10th Cir. 1987).

39.    The entry of an order authorizing preliminary use of cash collateral and providing

adequate protection will minimize disruption of Debtors' business operations, permit Debtors to

pay necessary expenses, and is in the best interests of Debtors, their creditors, and the estate.

**WHEREFORE**, Debtors requests that this Court enter an order, pursuant to § 363(c)(2)

and Fed. R. Bankr. P. 4001(b)(1) granting the preliminary relief sought herein for the use of cash

collateral; and for such further and other relief as this Court deems just and proper.

<div style="margin-left:40%">

THE DEBTORS:
WALL STREET THEATER COMPANY, INC.
WALL STREET MASTER LANDLORD, LLC
WALL STREET MANAGING MEMBER, LLC


By:    /s/ Jeffrey M. Sklarz
       Jeffrey M. Sklarz (ct20938)
       Lauren McNair (ct30167)
       Green & Sklarz, LLC
       700 State Street, Suite 100
       New Haven, CT 06511
       (203) 285 -8545
       Fax: (203) 823-4546
       jsklarz@gs-lawfirm.com
       lmcnair@gs-lawfirm.com

</div>