UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

------------------------------------------------------------X
                                                            :   CHAPTER 11
In re:                                                      :
                                                            :   Case No. 18-50132
WALL STREET THEATER COMPANY, INC.                           :   Case No. 18-50133
WALL STREET MASTER LANDLORD, LLC                            :   Case No. 18-50134
WALL STREET MANAGING MEMBER, LLC                            :
                                                            :
         Debtor.                                            :   February 12, 2018
                                                            :
------------------------------------------------------------X

**SUPPLEMENTAL OBJECTION OF THE MORGANTI GROUP, INC.
TO THE MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTORS TO USE CASH COLLATERAL AND
<u>GRANTING ADEQUATE PROTECTION</u>**

The Morganti Group, Inc. ("Morganti"), a secured creditor and party-in-interest, by and through its undersigned counsel, McElroy, Deutsch, Mulvaney and Carpenter, LLP, hereby submits this supplemental objection to the above-captioned debtors' Motion for Interim and Final Orders Authorizing Debtors to Use Cash Collateral and Granting Adequate Protection (the "Motion"), and particular, the Debtors' proposal to pay a "Developers' Fee" as reflected in the budget attached to the Motion as Exhibit "A" (the "Budget").

<u>**INTRODUCTION**</u>

The Debtors and Patriot Bank, N.A. want this Court to believe that the payment of a million dollar development fee to the individual who is largely responsible for the financial distress that the Debtors are currently experiencing is necessary to avoid irreparable harm to these estates. The Debtors' and the Bank's position, however, is belied by the very documents that create the Development Fee. The Development Agreement, the Master Landlord

Operating Agreement and the Master Lease, defined *infra*, expressly provide for the deferral of the payment of any development fee with the caveat that such fee must be paid within eight (8) years from the date the project is complete and the theater operational. There is absolutely no requirement that the development fee be paid now or at any time in the immediate future. In fact, the documents provide that the development fee *may be* paid annually from its available cash flow from the payment of rent from its non-debtor affiliate, Wall Street Master Tenant, LLC. Given that there is no rent being paid to the Debtors, and because there is no "Available Cash" as defined in the Master Landlord Operating Agreement, the development fee is not required to be paid at this time. Moreover, any assertion that the failure to pay the development fee will result in recapture of certain "tax credits" lacks credibility; for, if this payment was critical to the Debtors' receipt of the tax credits and/or necessary to avoid recapture, then it would have been clearly required by the documents themselves – and the multitude of lawyers, accountants, and financial advisors that created this complex corporate structure and transaction would have made certain that all requirements necessary to protect the tax credits were in place including the payment of any such development fee. Finally, any argument that the tax credits are subject to recapture if the development fee is not paid now is not sustainable since, for purposes of the Internal Revenue Code, the appropriate inquiry is whether the subject expenditure was properly accrued – not paid.

## **PROCEDURAL HISTORY**

1.  On February 4, 2018 (the "Petition Date"), Wall Street Theater Company, Inc. ("WSTC"), Wall Street Master Landlord, LLC ("Master Landlord") and Wall Street Managing Member, LLC ("Managing Member") (collectively, the "Debtors") each filed

separate voluntary petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Connecticut.

2. On that same date, the Debtors filed their Motion seeking to use cash collateral in accordance with the 13-week cash flow Budget [ECF No. 4].

3. One of the line items in the Budget is the proposed weekly payment of $2,503 identified as a developer fee. As reflected on the annual budget attached to the Motion as Exhibit B, the Debtors propose to pay a total of $120,000 for the developer fee through December 31, 2018.

4. On February 7, 2018, Morganti filed an objection (the "Objection") to the Motion [ECF No. 20].

5. In its Objection, Morganti opposed, *inter alia*, the payment of the developer fee in the absence of the identity of the recipient of the fee as well as the necessity for same.

6. On February 8, 2018, the Court held a hearing on certain First Day Motions, including, the Debtors' proposed use of cash collateral.

7. At the hearing, Morganti challenged the payment of the developer fee as inappropriate and unnecessary and the Debtors took the position that such payment was necessary to prevent irreparable harm to the estates.

8. The Court ordered that all parties who wished to be heard on this issue to submit position papers (including any documentary support for their position) regarding the Debtors' use of cash collateral and the proposed payment of the developer fee by February 12, 2018.

# FACTUAL BACKGROUND

### A. The Development Agreement

9. On December 29, 2016, Master Landlord and Lockwood & Mead Real Estate, LLC (the "Lockwood") entered into that certain Amended and Restated Development Services Agreement (the "Development Agreement"). A true and correct copy of the Development Agreement is attached hereto as Exhibit A.

10. Frank A. Farricker is the Manager of Lockwood. [Exh. A, p. 7].

11. Pursuant to the Development Agreement, Lockwood, as the developer, was to provide certain services to Master Landlord regarding the rehabilitation and renovation of a historic theater (the "Project") located at 71 Wall Street, Norwalk, Connecticut (the "Property") and owned by WSTC. [Exh. A., p. 1].

12. In accordance with the Development Agreement, Lockwood was to "oversee the development and construction/rehabilitation of the Project" and was to provide a number of services associated therewith including, but not limited to, negotiating any agreements for the construction of any improvements on the Property, coordination of professionals and consultants employed in connection with the construction of the Project, administering construction contracts on behalf of Master Landlord, participating in conferences and rendering advice regarding the development of economical, efficient and desirable design and construction procedures, applying for government permits, and performing all obligations of the Master Landlord with respect to the construction of the Project contained in any loan agreement or security agreement entered into in connection with any financing for the Project. [Exh. A, pp. 2-4].

13. In exchange for the services provided by Lockwood, it was to be paid a fee of $1,042,019 (the "Development Fee"). [Exh. A, pp.4-5]. Moreover, the entire Development Fee was deemed earned upon "Placement in Service" as defined in the Amended and Restated Operating Agreement of the Master Landlord dated December 29, 2016.

14. Pursuant to Section 3 of the Development Agreement entitled "Fees",

(A) The Development Fee shall be paid as follows:

(i) The entire amount of the Development Fee shall be deferred and shall be paid annually from the Landlord's Available Cash (as defined in the Landlord Operating Agreement). Notwithstanding the foregoing, the entire unpaid balance of the Development Fee shall be paid by the Landlord not later than eight (8) years after Placement in Service.

(B) Intentionally Omitted.

(C) If the Landlord fails to pay the Development Fee when due, the Developer shall notify the Landlord in writing of such default, in which event the Landlord shall have thirty (30) days from receipt of the notice to cure default. The Development Fee under this Section 3 shall be the only amount payable to the Developer for services performed pursuant to this Agreement. The Developer shall be entitled to reimbursement for its reasonable, out of pocket costs and expenses; provided, however, any expense in excess of $500 requires prior approval of the Landlord.

(i) At the sole election of the Developer, any Development Fee which for any reason has been deferred for payment, may be converted into a loan. Such loan will carry an interest rate of 7.5% and a term of three years, and shall be due in equal monthly installments. If the Landlord shall fail to pay the loan, the Developer may defer the debt payments until the maturity of the loan. The Landlord shall permit Developer to file a lien on the land records of Norwalk for any loan obligation incurred by this Agreement.

B. <u>The Master Landlord Operating Agreement</u>

15. On December 29, 2016, the Amended and Restated Operating Agreement of Wall Street Master Landlord, LLC (the "Master Landlord Operating Agreement") was entered into by and between debtor Wall Street Manager, LLC, and a non-debtor affiliate, Wall Street Master Tenant, LLC ("Master Tenant"). A true and correct copy of the Master Landlord Operating Agreement is attached hereto as Exhibit B.

16. Pursuant to the Master Landlord Operating Agreement, "Placement in Service" as used in the Developer's Agreement shall mean "achievement of placement in service pursuant to Section 47 of the Code." [Exh. B, p.8]. The "Code" is defined as the Internal Revenue Code of 1986, as amended. [Exh. B, p.3].

17. While Section 47 of the Internal Revenue Code uses the term "placed in service," the definition can be found in the Treasury Regulations. "Placed in Service" is defined in 26 CFR § 1.46-3(d), as "the taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity."

18. The Master Landlord Operating Agreement also defines "Available Cash" as "the aggregate amount of cash on hand or in the bank, money market or similar accounts of the Company at any given time derived from any source . . . which the Manager determines is available for distribution to the Members in accordance with the priority set forth in Section 8.1, provided that any applicable loan covenants after all current debt service obligations of the

Company are satisfied after taking into account any amount required or appropriate to maintain a reasonable amount of Reserves. [Exh. B, p.2].

19. The term "Manager" as used in the definition of Available Cash refers to the debtor Wall Street Manager, LLC. [Exh. B, p.6]. The term "Members" as used in the definition of Available Cash shall mean "the Manager and Master Tenant." [Exh. B, p.7].

20. Section 8.1 of the Master Landlord Operating Agreement in turn provides for the distribution of Available Cash in the following order:

> (a) First, to the payment of, *inter alia*, operating expenses including taxes, utilities, debt service payments, and lease payments;
>
> (b) Second, to the payment of the Priority Return to Master Tenant;
>
> (c) Third, to the repayment of amounts due Members;
>
> (d) Fourth, to fund repayment of any Development Fee and
>
> (e) Fifth, to the Members in accordance with their Percentage Interests.

[Exh. B, pp.15-16].

21. Finally, Section 4.3 titled "Deferred Development Fee" provides that "[t]he Master Tenant agrees to assume payment of any deferred Development Fee, which shall be due and payable as set forth in the Development Agreement." [Exh. B, p.12].

### C. The Master Lease Agreement

22. On the same date that the Development Agreement was executed, Master Landlord entered into that certain Master Lease Agreement (the "Master Lease") with Master Tenant. A true and correct copy of the Master Lease is attached hereto as Exhibit C.

23. Pursuant to the Master Lease, Master Tenant leased the Property from Master Landlord for a period of nineteen (19) years at an initial base rent of $155,289.00. [Exh. C, pp. 11-13].

24. Section 2.2 of the Master Lease is entitled "Development Costs." (Exh. C, p.8). That section generally provides that Master Landlord shall "fund any and all amounts necessary to complete rehabilitation and construction of the Project", "pay any and all cost overruns payable under the Construction Contract", "pay all sums necessary to remedy any construction defects in connection with such rehabilitation" and "pay any and all development and other costs." [Exh. C, p.8].

25. Notably, however, Section 2.2 limits the payments made by Master Landlord as follows, "provided, however, that to the extent a portion of the developer's fee budgeted in the Project development budget is deferred and not paid as of Placement in Service, then Landlord may pay such deferred developer fee, with interest, compounded annually, from its available cash flow from the payment of Rent by Tenant as provided in this Lease, or other available funds of Landlord, from time to time, provided that the Landlord hereby agrees to pay all such deferred developer fee including any interest, no later than the 8th anniversary of Placement in Service, or such earlier time as may be required under applicable law if not sooner paid." [Exh. C, p.8].

## ARGUMENT

26. The Debtors have taken the position that the Development Fee must be paid on a weekly or monthly basis in order to preserve certain tax credits belonging to Master Landlord. However, the very documents that create the Development Fee (as well as the documents that

create this complex corporate structure to access the tax credits) do not, by their terms, provide for the monthly payment of the Development Fee. Nor is the Development Fee ultimately a liability of the Debtors. As such, the Debtors should not be permitted to pay the Development Fee as part of its use of cash collateral in these bankruptcy proceedings.

27. As set forth above, the Development Agreement which purportedly creates the obligation on the part of Master Landlord to pay Lockwood a million dollar Development Fee provides that the fee is earned upon Placement in Service.

28. Pursuant to the Master Landlord Operating Agreement, the Internal Revenue Code and the Treasury Regulations, the Property was Placed in Service in 2017 at the time the Project was completed and the theater became operational by holding productions, workshops and/or art exhibits, and the like.

29. As such, the Development Fee was earned in 2017. However, there is no requirement that the Development Fee be paid upon Placement in Service. To the contrary, the Development Agreement expressly provides that the fee *shall be deferred and paid annually* from Available Cash but not later than eight (8) years after Placement In Service. (emphasis added). [Exh. A, p. 4, §3(A)(i)].

30. Debtors have not demonstrated that there is Available Cash from which to pay this expense. Moreover, Section 8.1 of the Master Landlord Operating Agreement clearly describes the order of distributions to be made from Available Cash and provides that the Development Fee should not be paid until three other categories of expenditures are first satisfied. It is incumbent upon the Debtors to establish that the Debtors have paid all operating expenses of the Company as they come due as required by Section 8.1(a).

31.     Given the number of creditors to whom Master Landlord owes money, it is likely that Master Landlord has not paid all operating expenses let alone the payments required under Section 8.1(b) and (c).  Since the Debtors cannot even satisfy the first priority payments to be made under the operating agreement, i.e., the payment of all operating expenses, then it simply cannot make any payment with respect to the Development Fee which has fourth priority payment under the Master Landlord Operating Agreement.  [Exh. B, pp.15-16, §8.1(d)].

32.     The Development Agreement further provides that in the event, however, that the Development Fee is not paid from Available Cash, that the fee be paid not later than (eight) 8 years after Placement in Service – or before 2025 assuming a Placement in Service date of 2017.  Once again, there is simply no requirement that the Development Fee be paid weekly or monthly after it is earned.

33.     Not only does a plain reading of the Development Agreement indicate that the Development Fee must not be paid now, but the Master Lease also supports this conclusion.

34.      Section 2.2 of the Master Lease makes clear that Master Landlord "*may pay such deferred developer fee . . . from its available cash flow from the payment of Rent by Tenant or other available funds of Landlord.*" (emphasis added). [Exh. C, p.8].

35.     As evidenced by the Cash Collateral Budget attached to the Motion, there is no rent being paid by Master Tenant to Master Landlord.  Despite the fact that the Master Lease provides for payment of rent in the amount of $155,000 annually in 2017, it appears that Master Tenant is not paying any rent.  As such, there are no funds from which to pay any portion of the Development Fee as contemplated by the Master Lease.

36. Moreover, according to the Master Landlord Operating Agreement, it is the Master Tenant – not Master Landlord – who is ultimately responsible for the payment of the Development Fee. Section 4.3 expressly provides that Master Tenant agrees to assume payment of any deferred Development Fee owed by Master Landlord.

37. The language of the Development Agreement, the Master Landlord Operating Agreement, and the Master Lease makes clear that the Development Fee which arguably was earned in 2017 is not required to be paid until 2025. There is simply no justification to ignore the terms of the documents and permit the payment of $120,000.00 annually to Lockwood during these bankruptcy proceedings.

38. Finally, it is anticipated that the Debtors will construct a novel argument that the Treasury Regulations and/or the Internal Revenue Code provisions will result in recapture of the tax credits if the Development Fee is not paid at this time. The Debtors' argument fails for two reasons.

39. First, given the complexity of this transaction as structured in December, 2016 and the army of professionals who provided legal, financial, accounting and tax advice in conjunction therewith, that if the tax credits were somehow jeopardized by the non-payment of the Development Fee on a weekly, monthly or annual basis, then the multitude of agreements documenting this transaction would have unconditionally required such payment. The fact that the agreements and leases at issue do not, by their terms, require such payment at this time, but rather expressly permit the payment to be made at the end of eight (8) years leads to the unavoidable conclusion that the tax credits are not in jeopardy by virtue of the non-payment of the Development Fee.

40. Second, pursuant to Section 47(c)(2)(A) of the Internal Revenue Code, a qualified rehabilitation expense – which, in this case, includes the Development Fee – must be properly chargeable to a capital account. Amounts are chargeable to a capital account if they are properly included in computing the basis of the real property subject to rehabilitation. Treasury Regulation 1.48-12(c)(2) makes clear that amounts incurred for construction-related costs, including development fees, satisfy the "chargeable to capital account requirement" if they are added to the basis of the real property being depreciated under Section 168 of the Internal Revenue Code. Critically, for this purpose an expenditure is considered "incurred" on the date the expenditure would be considered incurred under the accrual method of accounting – not the cash basis method of accounting. Thus, all taxpayers are placed under the accrual method of accounting for purposes of computing the amount and timing of their qualified expenditures. Under the accrual method of accounting, the test is not the date of payment, but rather, the date upon which all events have occurred that establish the fact of the liability, and the amount of the expense is determinable with reasonable accuracy. As such, the Debtors' assertion that the tax credits are subject to recapture if the Development Fee is not paid now is simply untrue because this expenditure was properly accrued and actual payment of this expenditure is not currently required.

WHEREFORE, Morganti respectfully requests that the Court issue an Order denying the Debtors' request to pay any portion of that certain Development Fee to Lockwood and for

such other and further relief as this Court deems necessary and just.

                By: /s/ Kristin B. Mayhew
                     Kristin B. Mayhew – ct20896
                     McElroy, Deutsch, Mulvaney & Carpenter, LLP
                     30 Jelliff Lane
                     Southport, CT  06890-1436
                     Tel.:   (203) 319-4022
                     Fax:   (203) 259-0251
                     Email   kmayhew@mdmc-law.com

**CERTIFICATE OF SERVICE**

I, Kristin B. Mayhew, hereby certify that a copy of the foregoing Supplemental Objection of The Morganti Group, Inc. to the Motion for Interim and Final Orders Authorizing Debtors to Use Cash Collateral and Granting Adequate Protection was filed electronically with the Court on February 12, 2018. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system. Parties may access this filing through the court's CM/ECF System.

        /s/ Kristin B. Mayhew
        Kristin B. Mayhew

KBM/213626/0140/1487909v1
02/12/18-HRT/KLW