# EXHIBIT B

# AMENDED AND RESTATED
# OPERATING AGREEMENT

## OF

## WALL STREET MASTER LANDLORD, LLC,

### a Connecticut limited liability company (the *"Company"*)

THE INTERESTS IN THIS COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT AND THE APPLICABLE STATE SECURITIES LAWS, OR THE COMPANY WILL HAVE RECEIVED AN OPINION OF COUNSEL (WHICH COUNSEL AND OPINION WILL BE SATISFACTORY TO THE COMPANY'S COUNSEL) THAT REGISTRATION OF SUCH SECURITIES  UNDER THAT ACT AND UNDER THE APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

THE INTERESTS IN THIS COMPANY ARE SUBJECT TO THE RESTRICTIONS AND PROVISIONS OF THIS AMENDED AND RESTATED OPERATING AGREEMENT AND MAY ONLY BE DISPOSED OF OR ENCUMBERED IN COMPLIANCE HEREWITH.

## AMENDED AND RESTATED

## OPERATING AGREEMENT OF WALL STREET MASTER LANDLORD, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT OF WALL STREET MASTER LANDLORD, LLC** (the "*Agreement*") is made effective to be effective as of December 29, 2016, by and between **WALL STREET MANAGER, LLC**, a Connecticut limited liability company ("*WSM*"); and **WALL STREET MASTER TENANT, LLC**, a Connecticut limited liability company ("*Master Tenant*").

**WHEREAS**, Wall Street Master Landlord, LLC, a Connecticut limited liability company (the "*Company*"), was formed pursuant to Articles of Organization filed on November 22, 2016, with the Connecticut Secretary of State (the "*Articles*");

**WHEREAS**, the parties desire to adopt this Agreement as the "*Operating Agreement*" of the Company under the Limited Liability Company Law (defined below) to provide for, among other things, (i) the admission of the Master Tenant into the Company, and (ii) the establishment of the rights and duties of the herein defined Manager and the herein defined Members; and

**WHEREAS**, this Operating Agreement shall supersede in its entirety the original Operating Agreement dated November 22, 2016, adopted by WSM, as initial member and manager;

**NOW, THEREFORE**, in consideration of the above premises, and of the terms, conditions and mutual covenants set forth below, the parties hereto agree as follows:

## ARTICLE I DEFINITIONS

*Accountant.* The term "Accountant" shall mean RubinBrown LLP, or such other firm of independent certified public accountants selected in accordance with Section 10.10 below.

*Additional Contribution.* The term "Additional Contribution" shall mean one or more additional Capital Contributions to the Company required from time to time upon the determination by the Manager in good faith that such additional Capital Contributions are necessary, as provided for in Section 4.5 hereof.

*Adverse Event.* The term "Adverse Event" shall mean an event wherein the Manager of the Company (a) becomes subject to an Event of Bankruptcy, or (b) is dissolved or liquidated or its organizing charter is forfeited.

*Affiliate.* The term "Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any partner, member, shareholder, manager, officer or director of the Person in question or Person performing a similar function for the Person in question. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

PB0002817

***Annual Operating Budget.*** The term "Annual Operating Budget" shall mean an annual budget for the operation of the Project for the Fiscal Year prepared by the Manager in accordance with Section 10.16 hereof.

***Architect.*** The term "Architect" shall mean Design Development Architect, PLLC, or such other architect licensed in the State as the Company may engage in connection with the rehabilitation of the Property.

***Applicable Law.*** The term "Applicable Law" shall mean the laws of the State including any applicable regulations or rules.

***Assignee.*** The term "Assignee" shall mean any Person who shall have acquired an Interest in the Company as a result of an Assignment, but who shall not be a Substitute Manager.

***Assignment.*** The term "Assignment" shall mean any sale, exchange, transfer, gift, bequest, inheritance or other disposition of an Interest in the Company, whether voluntary, by operation of this Agreement or by operation of law. Notwithstanding the foregoing, the term "Assignment" shall not include any sale, exchange, transfer, or other disposition of an Interest in the Company in favor of Project Lender, its nominees, successors, assignees, or any other party set forth in any of the Loan Documents or as a result of the foreclosure, sale, exchange, or other disposition of a Member's Interest by the Project Lender under the Pledge Agreements.

***Attorneys.*** The term "Attorneys" shall mean Reid and Riege, PC, or such other law firm selected in accordance with Section 10.10 below.

***Available Cash.*** The term "Available Cash" shall mean the aggregate amount of cash on hand or in bank, money market or similar accounts of the Company at any given time derived from any source (other than Capital Contributions and Liquidation Proceeds) which the Manager determines is available for distribution to the Members in accordance with and in the order of priority set forth in Section 8.1, provided that any applicable loan covenants after all current debt service obligations of the Company are satisfied after taking into account any amount required or appropriate to maintain a reasonable amount of Reserves.

***Bankruptcy or Event of Bankruptcy.*** The term "Bankruptcy" or "Event of Bankruptcy" means, as to a specified Person:

    (a)    the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and the continuance of any such decree or order is not dismissed within sixty (60) days; or

    (b)    the commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the

PB0002818

appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the taking of action by the Person in furtherance of any of the foregoing.

*Bona Fide Offer*.  The term "Bona Fide Offer" shall mean a written bona fide offer from a third party to purchase all (but not less than all) of a Member's Interest in the Company for cash, or cash and notes.

*Business Day*.  The term "Business Day" shall mean any day during which commercial banks in the State are open for business of the nature required for the implementation or administration of this Agreement, other than any legal state holiday observed in the State.

*Capital Account*.  "Capital Account" means the separate bookkeeping account established and maintained for each Member by the Company as authorized by Article V of this Agreement.

*Capital Contribution*.  "Capital Contribution" means, with respect to a Member, the total amount of cash and the net Fair Value of property contributed by such Member (or his predecessor in interest) to the capital of the Company.

*Certification Application:*  The term "Certification Application" means the Historic Preservation Certification Application for the improvements on the Project, provided for in Title 36 of the Code of Federal Regulations, Part 67.

*Closing Date*.  The term "Closing Date" shall mean date on which the closing of the purchase of a Member's Interest as provided for in Section 9.4 hereof.

*Code*.  The term "Code" shall mean the Internal Revenue Code of 1986, as amended, as in effect from time to time.

*Company*.  The term "Company" shall mean Wall Street Master Landlord, LLC, a Connecticut limited liability company, which Company is continued pursuant to this Agreement.

*Consent of the Master Tenant*.  The term "Consent of the Master Tenant" means the written consent of the Master Tenant and the Federal Investor.

*Debt Service*.  The term "Debt Service" shall mean any scheduled payment of principal, interest and/or other fees and expenses due and payable pursuant to the terms of the documents evidencing, securing or otherwise relating to the Loan.

*Depreciation*.  The term "Depreciation" shall mean the allowance for exhaustion, wear and tear, as provided in Section 167 of the Code.

*Developer*.  The term "Developer" shall mean Lockwood & Mead Real Estate, LLC, a Connecticut limited liability company.

*Development Agreement*.  The term "Development Agreement" shall mean that certain Development Services Agreement between the Company and the Developer.

PB0002819

*Development Fee.* The term "Development Fee" shall mean the aggregate fee due to Developer under the Development Agreement in the total amount of $1,042,019, payable as set forth in the Development Agreement.

*Fair Value.* "Fair Value" of an asset or property means its fair market value.

*Federal Historic Credit.* The term "Federal Historic Credit" shall mean the tax credit allowable pursuant to Section 47(a)(2) of the Code for qualified rehabilitation expenditures incurred in connection with the "certified rehabilitation" of a "certified historic structure."

*Federal Investor.* The term "Federal Investor" shall mean Enhanced Capital HTC Fund I, LLC, a Delaware limited liability company.

*Financial Projections.* The term "Financial Projections" shall mean the financial projections and accompanying budget prepared by the Accountant, dated on or about the date hereof, and approved by the Project Lender.

*Fiscal Year.* The term "Fiscal Year" shall mean shall mean the calendar year.

*General Contractor.* The term "General Contractor" shall mean The Morganti Group, Inc.

*Guarantor.* The term "Guarantor" means the Owner and Frank A. Farricker.

*Guaranty Agreement.* The term "Guaranty Agreement" means that certain Performance, Completion and Operating Deficit Guaranty dated as of the date hereof by the Guarantor for the benefit of Federal Investor.

*Gross Asset Value.* "Gross Asset Value" means, with respect to property, the property's adjusted basis for federal income tax purposes, except that:

    (a)    the initial Gross Asset Value of contributed property other than cash shall be the gross Fair Value of such property, as agreed by the Members as evidenced in this Agreement;

    (b)    the Gross Asset Values of all property shall be adjusted to equal its respective Fair Values as of the times of any Revaluation;

    (c)    the Gross Asset Value of any property distributed to any Member shall be adjusted to equal the gross Fair Value of such property on the date of distribution as determined by the distributee and the Manager; provided, however, if the distributee is an Affiliate with respect to the Manager, the agreement as to value shall require the consent of the remaining Members (excluding the distributee); and

    (d)    the Gross Asset Value of property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into

PB0002820

account in determining Capital Accounts pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(m).

*Ground Lease*. The term "Ground Lease" shall mean the Lease Agreement entered into by and between the Owner and the Company of even date herewith.

*Historic Approvals*. The term "Historic Approvals" means collectively, (i) the applicable Federal and State applications for the Project to be a "certified historic structure" as defined in Section 47(c)(3) of the Code, as approved by the United States Department of Interior-National Park Service, or certifying that the Project contributes to the historic significance of a registered historic district (collectively, the *"Part 1 Approval"*); (ii) Part 2 Federal historic preservation application and plans for rehabilitation of the Project submitted to and approved by the U.S. Department of Interior-National Park Service (the *"Part 2 Approval"*); and (iii) Request for Certification of Completed Work (Form 10-168c) submitted to and approved by the U.S. Department of Interior-National Park Service pursuant to Part 3 of the historic preservation application whereby the rehabilitation of the Project has been determined to constitute the "certified rehabilitation" of a "certified historic structure" (the *"Part 3 Approval"*).

*Historic Work*. The term "Historic Work" shall mean the restoration, preservation or maintenance of the historic property or any historic elements therein.

*Interest*. The term "Interest" means as to any Member, such Member's right, title and interest in and any and all assets, distributions, losses, profits and interests of the Company, whether cash or otherwise, and any other interests and economic incidents of ownership whatsoever of such Member in the Company.

*Investor Member*. The term "Investor Member" means Historic Equity, Inc., a Missouri corporation, as to WSM, and Enhanced Capital HTC Fund I, LLC, a Delaware limited liability company, as to the Master Tenant.

*Involuntary Transfer*. The term means, with respect to an Interest and despite the Transfer restrictions set forth in this Agreement, that the Interest (or a portion thereof) has been Transferred by operation of law (such as, without limitation, Transferred to a Member's trustee in Bankruptcy or Transferred to a guardian or conservator of an incompetent person or Transferred by court order, but not including Transfer upon death) or under levy of attachment or charging order or upon foreclosure of a pledge or security interest.

*Limited Liability Company Law*. The term "Limited Liability Company Law" means the Connecticut Limited Liability Company Act, as amended, as in effect from time to time.

*Liquidation Proceeds*. The term "Liquidation Proceeds" shall mean all Property at the time of liquidation of the Company and all proceeds thereof.

*Loan Documents*: The term "Loan Documents" shall mean those certain loan documents executed and delivered by the Company and the Owner (or any of one of them) in favor of Project Lender or by any guarantor of the obligations of the Company or the Owner to Project Lender, each as amended, restated, replaced, extended, supplemented, and/or otherwise modified

PB0002821

from time to time, including, without limitation, each Mortgage, each Subordination Agreement, and the Pledge Agreement.

*Loan*. The terms "Loan" shall mean that certain loan made by Patriot Bank, N.A., a national banking association, as lender, to the Company and the Owner, as borrowers, in the aggregate principal amount of $8,800,000, as such amount may be increased or decreased as set forth in the documents evidencing such loan, which is secured by, among other things, the Mortgage and the Pledge Agreement.

*Majority in Interest*. The term "Majority in Interest" means any Member or group of Members holding an aggregate of more than fifty percent (50%) of the Percentage Interests held by all Members. Whenever this Agreement provides that a Majority in Interest is to be determined by excluding a Member(s) or is to be determined out of only certain Members, then a Majority in Interest means any non-excluded Member or group of Members holding an aggregate of more than fifty percent (50%) of the Percentage Interests held by all of the non-excluded Members.

*Manager*. The term "Manager" shall mean Wall Street Manager, LLC, a Connecticut limited liability company, or any Person who shall become a Substitute Manager as provided in Section 12.4 hereof.

*Market Value*. The term "Market Value" shall mean the gross fair market value of the non-liquid assets of the Company (undiminished by any liabilities with respect thereto) as determined by a qualified independent appraiser or appraisers selected by a Majority in Interest in good faith, as set forth in Section 9.4(b) hereof.

*Master Lease*. The term "Master Lease" shall mean the Master Lease Agreement entered into by and between the Company and Master Tenant of even date herewith.

*Master Tenant*. The term "Master Tenant" shall mean Wall Street Master Tenant, LLC, a Connecticut limited liability company.

*Master Tenant Operating Agreement*. The term "Master Tenant Operating Agreement" shall mean that certain Amended and Restated Operating Agreement of Wall Street Master Tenant, LLC, dated as of the date hereof.

*Material Default*. The term "Material Default" means:

      (a)    Any act by the Manager which constitutes intentional misconduct, gross negligence, fraud or acts outside the scope of the its authority and that constitutes a breach of its fiduciary duty (provided the same has a material, adverse impact on the Company, the Master Tenant or the Property); or

      (b)    upon the occurrence of any of the following:

          1)    the Manager shall have violated any other provision of this Agreement or any provision of any Applicable Law, provided the same has a material, adverse impact on the Company, the Master Tenant or the Property;

PB0002822

2)    the Manager shall have caused any Loan to go into default;

3)    the Manager shall have conducted its own affairs or the affairs of the Company in such manner as would:

      a)    cause the Company to fail to qualify as a limited liability company under the Limited Liability Company Law; or

      b)    cause the Company to be treated for federal income tax purposes as an association, taxable as a corporation;

4)    an event of Bankruptcy shall have occurred with respect to the Company or the Manager; or

5)    the managing member of the Master Tenant shall have been removed.

***Member(s)***.  The term "Member(s)" shall mean the Manager and Master Tenant, or any Person(s) who become(s) a Substitute Member pursuant to Section 9.2 hereof, including any Assignees.

***Mortgage***.  The term "Mortgage" shall mean that certain Open-end Construction Mortgage Deed, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated December 29, by the Owner and the Company, in favor of Patriot Bank, N.A., a national banking association, as the same may be amended, restated, replaced, extended, supplemented and/or otherwise modified from time to time.

***Offer***.  The term "Offer" shall mean a written description of the purchase price, payment terms and other terms offered by a proposed purchaser of a Member's Interest as set forth in Section 9.3 hereof.

***Operating Deficits***.  The term "Operating Deficits" shall mean for any period, the amount by which Company expenses exceed the sum of gross receipts collected by the Company from the Property (but excluding loans, casualty and condemnation proceeds, proceeds from the sale of any assets of the Company or any other transaction the proceeds of which are deemed capital under generally accepted accounting principles, and Capital Contributions).

***Operating Documents***.  The term "Operating Documents" shall mean the Master Lease, any Loan Documents, each Subordination Agreement and any other document with respect to the operation or financing of the Project to which the Company is a party.

***Other Members***.  The term "Other Members" has the meaning set forth in Section 9.3 hereof with respect to the Right of First Refusal to purchase a Transferring Member's Interest.

***Owner***.  The term "Owner" means the Wall Street Theater Company Inc., a Connecticut non-stock corporation.

***Percentage Interests***.  The term "Percentage Interests" shall mean percentage ownership interest in the Company of the Members as set forth on Exhibit A.

PB0002823

*Person.* The term "Person" shall mean an individual, a trust or estate, a partnership, a corporation, a limited liability company or other business entity or a custodian under the Uniform Gift to Minors Act.

*Placement in Service.* The term "Placement in Service" shall mean achievement of placement in service pursuant to Section 47 of the Code.

*Pledge Agreements.* The term "Pledge Agreements" shall mean (a) that certain Pledge of Capital Contributions and Security Agreement dated December 29, 2016 made by the Company in favor of Project Lender, (b) that certain Pledge of Membership Interest and Security Agreement dated December 29, 2016 made by WSM in favor of Project Lender, (c) those certain Pledges of Proceeds and Security Agreement dated December 29, 2016 made by the Company in favor of the Project Lender, and (d) that certain Pledge of and Assignment of Deposit Accounts dated December 29, 2016 made by the Company and Owner in favor of Project Lender, each as amended, restated, replaced, extended, supplemented and/or otherwise modified from time to time.

*Permitted Transfer.* The term "Permitted Transfer" means the sale, exchange, assignment, transfer, pledge, hypothecation or otherwise dispose of or encumber pursuant to, or as a result, the Loan Documents or otherwise transferred from a Member to Project Lender.

*Prime Rate.* The term "Prime Rate" means the annual rate of interest reported from time to time in *The Wall Street Journal* under the column "Money Rates" (or any successor column) as being the "Prime Rate."

*Principal Owner.* The term "Principal Owner(s)" of a Member means (i) if the Member is a grantor trust, the grantor of the trust if alive, or the primary beneficiary or beneficiaries of the trust if the grantor is deceased, and (ii) if the Member is an entity, the natural person that is the owner or controlling party of the entity or, if there is more than one owner, each natural person that is a twenty percent (20%) or more beneficial owner of the entity.

*Priority Return.* The term "Priority Return" means the priority return to be paid to the Master Tenant as set forth in the Financial Projections, equal to two percent (2.00%) of the Master Tenant's aggregate Capital Contributions.

*Project.* The term "Project" shall mean the renovation and rehabilitation of the Property in a manner that qualifies for the Federal Historic Credit, Connecticut State Historic Tax Credits, Connecticut Tax Credits for Infrastructure Projects in the Entertainment Industry, and Connecticut Green Building Tax Credits.

*Project Lender.* The term "Project Lender" shall mean each one of the following lenders: Patriot Bank, N.A., a national banking association, and its successors and/or assigns or any participant in the Loan.

*Property.* The term "Property" shall mean the certain historic building, including the land and any appurtenances thereto, located at 71 Wall Street, Norwalk, Connecticut.

PB0002824

*Recapture Event*. The term "Recapture Event" shall mean any event that triggers recapture of the Tax Credits pursuant to state or federal law or regulations.

*Registered Agent*. The term "Registered Agent" shall mean Reid and Riege, P.C., or such other agent as may be selected from time to time by the Manager, upon prior written notice to the Members.

*Reserves*. "Reserves" shall mean amounts set aside from time to time by the Manager in accordance with the Loan Documents and this Agreement.

*Revaluation*. "Revaluation" has the meaning set forth in the Tax Exhibit.

*Secretary's Standards*.   The term "Secretary's Standards" shall mean the Department of the Interior's "Standards for Rehabilitation" as set forth in Section 10.12 hereof.

*Selling Member*.  The term "Selling Member" has the meaning set forth in Section 9.4 hereof.

*State*. The term "State" shall mean the State of Connecticut.

*Subject Interest*.  The term "Subject Interest" has the meaning set forth in Section 9.3 hereof.

*Subordination Agreement*.  The term "Subordination Agreement" shall mean each Subordination, Non-Disturbance and Attornment Agreement by and among the Company, Master Tenant, certain other parties, if necessary, and each Project Lender, each as the same may be amended, restated, replaced, extended, supplemented, and/or otherwise modified from time to time.

*Substitute Manager*.  The term "Substitute Manager" shall have the meaning given in Section 12.4 hereof.

*Tax Credits*. The term "Tax Credits" shall mean the Federal Historic Credits, Connecticut State Historic Tax Credits, Connecticut Tax Credits for Infrastructure Projects in the Entertainment Industry, and Connecticut Green Building Tax Credits, and investment and other tax credits allowed by the Code and/or the State with respect to activities of the Company.

*Tax Exhibit*. "Tax Exhibit" means the additional definitions and provisions that are contained in Exhibit B attached hereto.

*Taxable Year*. The term "Taxable Year" shall mean the calendar year.

*Terminating Event*. The term "Terminating Event" shall mean the Bankruptcy or dissolution of a Manager, the Transfer of its Interest by the Manager, or the voluntary or involuntary withdrawal of the Manager from the Company. Involuntary withdrawal shall occur whenever the Manager may no longer continue as the Manager by law or pursuant to any terms of this Agreement.

PB0002825

*Title Company*. The term "Title Company" shall mean Connecticut Attorneys Title Insurance Company.

*Title Policy*. The term "Title Policy" shall mean that certain Policy of Title Insurance insuring the Project Lender, with all Endorsements and attachments thereto, and issued by the Title Company.

*Total Development Cost*. The term "Total Development Cost" shall have the meaning given in Section 2.4 hereof.

*Transfer*. The term "Transfer" or "Transferred" means (i) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, and (ii) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law or otherwise, including, without limitation, upon Bankruptcy, death, divorce, marriage dissolution or otherwise, but shall specifically exclude a Permitted Transfer.

*Transferring Member*. The term "Transferring Member" has the meaning given such term in Section 9.4 hereof.

*Valuation Date*.   The term "Valuation Date" has the meaning set forth in Section 9.4 hereof.

*WSM Operating Agreement*. The term "WSM Operating Agreement" shall mean that certain Amended and Restated Operating Agreement of Wall Street Manager, LLC, dated as of the date hereof.

## ARTICLE II THE COMPANY

Section 2.1. Name of Company. The name of the limited liability company constituted or continued pursuant to this Agreement shall be **Wall Street Master Landlord, LLC**.

Section 2.2. Term of Company. The term for which the Company shall exist shall be perpetual, unless terminated in accordance with Article 13 hereof.

Section 2.3. Principal Office. The principal office and place of business of the Company shall be at 71 Wall Street, Norwalk, Connecticut 06850, or at such other place or places within the State of Connecticut as may be selected from time to time by the Manager, upon prior written notice to the Members.

Section 2.4. Purposes. The character of the business of the Company and the purposes for which the Company is formed is (i) the renovation and rehabilitation of a historic building located at 71 Wall Street, Norwalk, Connecticut, in a manner that qualifies for Federal Historic Tax Credits, Connecticut State Historic Tax Credits, Connecticut Tax Credits for Infrastructure Projects in the Entertainment Industry, and Connecticut Green Building Tax Credits, (ii) the operation, management, and leasing, pursuant to the Ground Lease and the Master Lease, and otherwise dealing with the Project as a real estate development consisting of a theater and related uses, all in accordance with the Financial Projections, including, without limitation, a budget

PB0002826

indicating a total cost of the Project in the amount of $14,613,604 (the "*Total Development Cost*"), all subject to the provisions hereof. The Company shall have all powers necessary to accomplish such purposes.

Section 2.5. Registered Agent and Office. The Registered Agent and Registered Office of the Company is Reid and Riege, P.C., One Financial Plaza, 21st Floor, Hartford, Connecticut 06103, or such other agent or office in the State of Connecticut as may be selected from time to time by the Manager, upon prior written notice to the Members.

## ARTICLE III THE MEMBERS

Section 3.1. Manager. The Manager of the Company shall be Wall Street Manager, LLC, a Connecticut limited liability company, or any Person who shall become a Substitute Manager as provided in Section 12.4 hereof. All obligations and agreements of the Manager herein shall be the joint and several obligation of each Person and entity constituting the Manager. In the event there is more than one Manager, any one Manager may act on behalf of the Company.

Section 3.2. Members. The Members of the Company are the Manager and Master Tenant, and/or any Person(s) who become(s) a Substitute Member pursuant to Section 9.2 hereof. For purposes of this Agreement, references to Members shall be deemed to include Assignees, but Assignees shall have no right to vote hereunder as a Member and their Percentage Interests shall be ignored for all purposes of any votes or consents hereunder, except to the extent (a) such Assignee is Project Lender or any Person that takes a direct assignment or Transfer from Project Lender, or (b), if any, required by the Limited Liability Company Law or other Applicable Law.

## ARTICLE IV COMPANY CONTRIBUTIONS, LOAN AND GUARANTIES

Section 4.1.      Total Cash Contributions of Members.

(a)      The Members shall contribute cash to the capital of the Company in the aggregate amount specified in Exhibit A attached hereto.

(b)      WSM shall be obligated to fund its capital contribution of $8,936,563 as of the date hereof, and the remainder when WSM receives capital contributions from its Investor Member and proceeds of the sale of the Connecticut State Historic Tax Credits, pursuant to WSM's Operating Agreement dated as of the date hereof. The amounts of the WSM's Investor Member's capital contributions to WSM which are required to be funded to the Company and the proceeds of the sale of the Connecticut State Historic Tax Credits shall be as set forth in the WSM's Operating Agreement.

(c)      Master Tenant shall be obligated to fund to the Company capital contributions as and when the Master Tenant receives capital contributions from its Investor Member pursuant to the Master Tenant's Operating Agreement dated as of the date hereof. The amount of the Investor Member's capital contributions to the Master Tenant which are required to be funded to the Company shall be as set forth in the Master Tenant's Operating Agreement.

PB0002827

Section 4.2.  Use Capital Contributions Proceeds.  The Manager represents that it will use the Capital Contributions substantially for the purposes set forth in the Financial Projections, including payment of the Loan, unless the consent of each Investor Member and Project Lender is obtained for a change in the application of funds.  The Manager shall be responsible for:

(a)    completing the Project on or before the date set forth in the Master Lease;

(b)    fulfilling all actions required of the Company to assure that the Company receives Part 3 Approval;

(c)    funding any costs with respect to completing the Project and delivering the Project to the Master Tenant pursuant to the Master Lease, including without limitation obtaining any certificates of occupancy and satisfying any requirements with respect to operating the Project. Any amounts paid by the Manager pursuant to this clause (c) shall be added to the Capital Contribution of the Manager; and

(d)    funding the return of a portion of the Manager's capital contribution as shown in Exhibit A, to be funded out of Master Tenant's final capital contribution to the Company (*"Borrower's Distribution"*) and the parties hereto consent to the collateral assignment of Borrower's Distribution to Project Lender.

Section 4.3.    Deferred Development Fee.  The Master Tenant agrees to assume payment of any deferred Development Fee, which shall be due and payable as set forth in the Development Agreement.

Section 4.4.    Procedures on Non-Payment.

(a)    In the event a Member does not make its Capital Contribution(s) as required under Section 4.1 hereof, the Manager shall provide notice to such Member and the Member shall have fifteen (15) days following receipt of such notice to cure its default. In the event such Member, following receipt of notice from the Manager, fails to cure such default within the time provided, (i) such payment shall bear interest at the long term Applicable Federal Rate (as set and published by the Internal Revenue Service) in effect on the date due, from the date due until paid, and (ii) the Manager may pursue any and all available remedies against the Member at law or in equity.

(b)    In the event of a dispute between a Member and the Manager and/or the Company as to the obligation to make, or the amount of, any Capital Contribution, such Member may (but shall not be obligated to) deposit the amount of such Capital Contribution in an escrow account at a bank or a title company acceptable to the Members, pending a resolution of such dispute. Upon resolution of such dispute (whether pursuant to a decision, judgment, decree or other order being issued by a court of competent jurisdiction, which decision, judgment, decree or other order has been final and not subject to further appeal) or pursuant to written agreement between the Member and the Manager and/or the Company, interest earned on the deposited amount of Capital Contribution shall be paid to the Company, if such amount of Capital Contribution is determined to be payable to the Company, or shall be returned to the Member, together

PB0002828

with the escrowed amount, if determined not to be payable. In the event that a Member so deposits the Capital Contribution, or any disputed portion thereof, in such an escrow account, such Member shall not be in default respecting the deposited amount under Section 4.4(a) hereof.

Section 4.5. <u>Additional Capital Contributions</u>. The Members recognize that the Company may require capital from time to time, in addition to that contributed in accordance with Section 4.1, in order to accomplish the purpose and business for which it is formed. The Members will be required to make one or more additional Capital Contributions to the Company from time to time upon the determination by the Manager in good faith that such additional Capital Contributions are necessary. Upon any such determination, the Manager will, by written notice, call for any such additional contributions to be made by the Members to the capital of the Company. Within thirty (30) days following the issuance of such a capital call, the Members will contribute, in cash, to the capital of the Company an amount (the "**_Additional Contribution_**") equal to the aggregate additional Capital Contribution to be made.

Section 4.6. <u>Return of Capital</u>. No Member shall be entitled to the return of all or any part of such Member's Capital Contribution prior to or upon termination of the Company or any interest on its Capital Contribution, except as otherwise expressly provided herein.

Section 4.7. <u>Loans and Guarantees From Members</u>.

(a) Any Member or Affiliate of a Member may make (but will not be obligated to make) a loan to the Company in such amounts, at such times and on such terms as may be approved in good faith by the Manager. Loans by any Member or an Affiliate of a Member to the Company will not be considered as contributions to the capital of the Company. The Company will repay all loans made by the Members and their Affiliates to the Company before distributions to the Members under Article VIII. If there are two (2) or more loans from the Members or their Affiliates to the Company at any time, such loans will be treated on a pari passu basis and all loan payments made by the Company on such loans will be made proportionately.

(b) Except as provided in this Agreement and except with respect to the Loan, no Member will be obligated to guarantee or cause any other Person to guarantee personally or provide any personal collateral to secure the obligations of the Company. If a Member or Affiliate of a Member personally guarantees or provides any personal collateral to secure the obligations of the Company, the Company may pay such Member or Affiliate a reasonable fee for such personal risk as may be approved in good faith by the Manager.

(c) A Member or an Affiliate of a Member who makes a loan to the Company will have no fiduciary or other duty to not declare a default or event of default or to not initiate any collection, enforcement or foreclosure actions or proceedings by it as a lender upon the occurrence of a default by the Company (even if such default by the Company could have been avoided or cured by an additional Capital Contribution or loan by such Member or an Affiliate of the Member).

PB0002829

Section 4.8. Company Management. The Manager hereby agrees that it shall continue to act as Manager of the Company, and shall fully and timely perform all its obligations as Manager hereunder and under any Applicable Law, in the absence of the occurrence of any Adverse Event, or any event resulting in removal for cause under Section 12.2 hereof and shall not voluntarily withdraw throughout the term of the Company as required by Article XII hereof.

## ARTICLE V CAPITAL ACCOUNTS

Section 5.1. Capital Accounts. A separate Capital Account will be established and maintained for each Member in accordance with the Tax Exhibit.

Section 5.2. No Liability for Restoration of Negative Capital Account. No Member shall be required to restore any deficit in such Members' Capital Account or bring such Members' Capital Account into parity with the Capital Account of other Members.

## ARTICLE VI PERCENTAGE INTERESTS

Section 6.1 Percentage Interests. For the purposes of this Agreement, "*Percentage Interests*" shall be the Percentage Interest of the Members as set forth on Exhibit A.

Section 6.2 Percentage Interests Adjustments. In connection with any adjustment of the Percentage Interests, the Manager or Substitute Manager, as applicable, shall cause an amendment to Exhibit A to be executed to set forth such adjustment.

## ARTICLE VII ALLOCATIONS

Section 7.1. Profits, Losses, and Distributive Shares of Tax Items. The Company's net income or net loss, as the case may be, for each taxable year of the Company, as determined in accordance with such method of accounting as may be adopted for the Company will be allocated to the Members for both financial accounting and income tax purposes as set forth in this Article VII, except as otherwise provided for herein or unless all Members agree otherwise.

Section 7.2. Allocations of Income and Loss. Except as otherwise provided in the Tax Exhibit and Section 7.3 and except in connection with a dissolution and liquidation pursuant to Article XIII, Income and Losses for any taxable year or other period shall be allocated among the Members in accordance with their respective Percentage Interests. In the case of a dissolution and liquidation pursuant to Article XIII, except as otherwise provided in the Tax Exhibit and Section 7.3, Income and Losses shall be allocated to the extent necessary to cause the Capital Account balance of each Member (as determined after reflection therein of allocations for such period under the Tax Exhibit) to equal (i) the amount that would be distributable to such Member under Section 13.3, if, on the last day of such taxable year, the Company sold all of its remaining assets for an amount equal to its respective Gross Asset Values (limited with respect to each Nonrecourse Liability to the Gross Asset Value securing that liability) and applied all remaining proceeds in accordance with Section 13.3 on the last day of such taxable year reduced by (ii) such Member's share of Company Minimum Gain (as defined in the Tax Exhibit) and Member Minimum Gain (as defined in the Tax Exhibit) immediately prior to the hypothetical sale. Notwithstanding the foregoing, any Income resulting from the Company's receipt of debt

PB0002830

forgiveness, donations, capital contributions, grants, subsidies or other similar items not reflected as income in the Financial Projections shall be allocated entirely to the Manager.

Section 7.3.    Allocations of Tax Credits: Depreciation.

(a)    The Company shall elect to treat the Master Tenant as having purchased the Project under former Code Section 48 and current Treasury Regulation Section 1.48-4. In connection therewith, the Federal Historic Credits shall be passed through to the Master Tenant.

(b)    The Company hereby allocates, with respect to depreciation generated by that certain historic building located at 71 Wall Street, Norwalk, Connecticut, as calculated using the straight line method of depreciation over a recovery period of 39 years under Section 168 of the Code as commercial real property, as follows: ninety percent (90%) to WSM, ten percent (10%) to Master Tenant.

Section 7.4. Special Tax Rules. Except as set forth in Section 7.3(b), the special tax rules set forth in the Tax Exhibit will override any other provision of this Article VII.

Section 7.5 Tax Withholding. Notwithstanding any other provision of this Agreement, the Manager is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any withholding, estimated tax or similar requirements established under any federal, state or local tax law, including, without limitation, withholding on any distribution to any Member and/or requiring that a Member pay to the Company any amount required by the Company to pay over to a governmental authority as a withholding, estimated tax or similar payment on behalf of such Member. For all purposes of this Article VII, any amount withheld on any distribution and paid over to the appropriate governmental body will be treated as if such amount had in fact been distributed to the Member. Each Member agrees to execute such consents and elections as may be required by the taxing authority of any state or local government in which the Company does business and generates taxable income so that the Company will not be required to withhold on the taxable income of the Company allocated to such Member for such state or locality.

## ARTICLE VIII DISTRIBUTIONS

Section 8.1. Distribution and Payment of Available Cash. Subject to any restrictions contained in the Loan Documents and the Limited Liability Company Law, the Manager shall cause the Company to distribute the amount, if any, of Available Cash in the following order:

(a)    *First,* to operating expenses of the Company as they come due, including but not limited to taxes, utilities, any required Debt Service payments, lease payments, management fees and required Reserves, provided that, in no event shall the amount in such Reserve exceed the amount equal to one (1) year of the Company's projected operating expenses;

(b)    *Second,* to payment of the Priority Return to the Master Tenant;

PB0002831

(c)      *Third*, to repayment of any amounts as they come due owing to Members pursuant to Section 4.7 hereof, provided, that, any amounts which are not paid shall accrue;

(d)      *Fourth*, to fund payment of any Development Fee; and

(e)      *Fifth*, from time to time, but no less frequently than once during each Fiscal Year of the Company, to the Members in accordance with their respective Percentage Interests.

Upon dissolution of the Company and liquidation of the Company pursuant to Article XIII, distributions shall be made pursuant to and in accordance with Section 13.3 hereof.

## ARTICLE IX ASSIGNMENT

Section 9.1.      Assignment. The rights of the Members to assign or transfer any Interests are as follows:

(a)      The Manager must consent to any assignment or transfer of Interests, except the Manager's consent shall not be required for the following transfers or assignments:

(i)      transfers or assignments of Interests by bequest or intestacy upon the death of an individual who is a Member so long as such transfer or assignment is to or for the benefit of the deceased Member's spouse and/or lineal descendants;

(ii)      transfers or assignments of Interests (A) to a revocable trust of which the Member is the grantor, the trustee and the primary beneficiary during the Member's lifetime, (B) from such revocable trust to the original Member, and (C) from such trust to the original Member's beneficiaries upon the death of the original Member;

(iii)      transfers or assignments of Interests in accordance with Section 9.3(d) hereof; or

(iv)      assignments, pledges, or transfers of Interests to Project Lender.

(b)      Assignments or transfers of Interests shall also be subject to the following:

(i)      If the approval of any lender is required pursuant to the terms of any indebtedness of the Company such approval must be delivered to or obtained by the Manager.

(ii)      Respecting transfer or assignment of Interest(s), (A) upon request of the Manager, the transferee shall submit financial statements of the transferee to the Manager, evidencing sufficient financial ability to undertake the obligations

PB0002832

which would be imposed on the transferee, and any document of assignment must be in a form reasonably acceptable to the Manager; (B) the transferor shall deliver to the Manager, as applicable, an opinion of counsel (or such other evidence as such Member may reasonably require) that such transfer (1) will not result in the Company being treated as an association taxable as a corporation for federal income tax purposes, and (2) may be effected without registration or qualification under any applicable federal or state securities laws, or confirming that any such registration or qualification, and any other required actions, have been taken in connection therewith; and (C) such transferee(s) shall execute an assignment instrument containing the transferee's agreement to be bound by all terms, conditions and provisions of this Agreement.

(iii)    Notwithstanding the foregoing, the provisions of this Section 9.1(b) shall not apply to any transfer of Interest to the Project Lender, provided that any subsequent transfer of Interest from the Project Lender to another Person (other than any Person that takes a direct transfer from Project Lender) shall be subject to this Section 9.1(b).

Section 9.2.    Assignees; Substitute Members.

(a)    Following any transfer of its entire Interest in the Company by a Member, until such time as the assignee(s) shall become a substitute member ("*Substitute Member*"), the assignor, in respect of the Interest assigned, shall retain the right to exercise all Members rights, consents and approvals hereunder.

(b)    As regards transfers pursuant to Sections 9.1(a), 9.3 or 9.4, upon compliance with the requirements of Section 9.1(a) and (b), an appropriate amendment to this Agreement shall be prepared to evidence same.

(c)    Notwithstanding the foregoing, the provisions of this Section 9.2 shall not apply to any transfer of Interest to the Project Lender, provided that any subsequent transfer of Interest from the Project Lender to another Person (other than any Person that takes a direct transfer from Project Lender) shall be subject to this Section 9.2.

Section 9.3 Right of First Refusal. If at any time a Member ("*Transferring Member*") desires to Transfer all (but not less than all) of its Interest (the "*Subject Interest*") to a third party in accordance with a Bona Fide Offer, the following will apply:

(a)    The Transferring Member will give to each other Member(s) (collectively the "*Other Members*") a copy of the Bona Fide Offer and also a written description of the Subject Interest, the name of the proposed purchaser, the purchase price and payment terms and other terms offered by the proposed purchaser (such written information collectively, the "*Offer*").

(b)    The Other Members will have thirty (30) days from the receipt of the Offer to accept the purchase price and the terms set forth in the Offer, as buyer, by giving written notice thereof to the Transferring Member. Subject to Section 9.3(c) below, each Other Member will have the right to purchase a portion of the Subject Interest equal to (i)

PB0002833

a fraction the numerator which is the Percentage Interest of the Other Member and the denominator of which is the sum of the Percentage Interests of all of the Other Members who desire to purchase part of the Subject Interest or (ii) such other portion as will be agreed upon by all such Other Members who desire to so purchase.

(c)     If some or all of the Other Members agree to purchase all (but not less than all) of the Subject Interest, then the Transferring Member and the Other Members who are purchasing will close the purchase for the purchase price and upon the terms of the Offer within sixty (60) days after the Offer is made (or if later the closing date set forth in the Offer). If the purchase price set forth in the Offer includes any secured notes and/or third party guarantees, a pledge of the Subject Interest as collateral by the purchasing Other Members will be deemed equivalent to the collateral described in the Offer.

(d)     If the Other Members fail to agree to purchase all of the Subject Interest within the time period set out above, the Transferring Member will have the right (subject to compliance with the provisions of Section 9.1(b) and if the purchaser is to become a Substitute Member, subject to Section 9.2, to consummate the sale or conveyance of all of the Subject Interest so long as (i) the purchaser is the proposed purchaser named in the Offer, (ii) the price, payment and other terms are at least as favorable to the Transferring Member as those set forth in the Offer and (iii) the closing occurs on or before the date set forth in the Offer (but no more than one hundred twenty (120) days after the date of the Offer).

(e)     Any purchaser of a Subject Interest under this Section desiring to make a further sale or conveyance of any part of the Subject Interest will be subject to this Section.

(f)     Notwithstanding the foregoing, the provisions of this Section 9.3 shall not apply to any transfer of Interest to the Project Lender or any Person that takes a direct transfer from Project Lender.

Section 9.4 Purchase of a Member's Interest.

(a)     Upon the death, Involuntary Transfer, or dissolution of a Member or upon the death of the Principal Owner of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company (such Member together with its Assignee, legal or personal representative, or other applicable successor are herein called the "*Selling Member*"), a Majority in Interest (determined only out of the other Members by excluding Seller Member) will have the right to elect to cause the Company (or its assigns) to purchase the Selling Member's Interest as provided in this Section, and the Selling Member agrees, for itself and its legal representatives and assigns, to sell the Selling Member's Interest to the Company (or its assigns) if such election is made. Notice of the exercise of such election will be in writing and given to the Selling Member following the date of such event (the "*Valuation Date*") in accordance with subsection (c) below. The purchase price for any Interest to be purchased by the Company (or its assigns) in accordance with this Section will be

PB0002834

calculated by the Accountant and will be equal to the amount, if any, that the Selling Member would receive if the non-liquid assets of the Company were sold in their then current state for their Market Value as of the Valuation Date, the Company was dissolved and the proceeds from the hypothetical sale and all liquid assets of the Company as of the Valuation Date were distributed to the Members after payment of reasonable selling (including, without limitation, selling commissions) and liquidation expenses and all Company debts, liabilities and obligations as of such date. Should the purchase price be a negative amount, the purchase price will be One Dollar ($1.00).

(b)     For purposes of this Section, the *"Market Value"* of the non-liquid assets of the Company will mean the gross fair market value thereof (undiminished by any liabilities with respect thereto) as determined by a qualified independent appraiser or appraisers selected by a Majority in Interest in good faith within thirty (30) days following the Valuation Date. The appraisal will be completed and delivered by the appraiser(s) to the Accountant within seventy five (75) days following the Valuation Date. Any appraiser selected to appraise any real property of the Company will be duly licensed as such, and will have been actively engaged in the appraisal of real property in the general area in which the real property is located for a period of not less than five (5) years immediately preceding his or her appointment hereunder.

(c)     Within seven days after the Market Value of the non-liquid assets is determined (or, if applicable, within thirty (30) days after the other Members receive written notice of the Involuntary Transfer) the Accountant will determine the purchase price for the Selling Member's Interest and will give written notice thereof to the Selling Member and the other Members. The other Members will then have an additional ten (10) days in which to give to the Selling Member written notice of the election to have the Company (or its assigns) purchase the Selling Member's Interest and set the date on which the closing of the purchase will occur (the *"Closing Date"*), which date will not be less than fifteen (15) days or more than thirty (30) days from the date the purchase election notice is given.

(d)     At the closing, the Selling Member will execute and deliver to the purchaser such deeds, bills of sale, assignments and other instruments as will reasonably be requested by the purchaser to effect the transfer, as of the Valuation Date, of the Selling Member's Interest, free and clear of all liens, claims and encumbrances (other than this Agreement), and all of the Selling Member's other rights, title and interest in the Company and its assets. Unless otherwise agreed upon by the purchaser and the Selling Member, the purchaser will pay the purchase price to the Selling Member as follows:

(i)     An amount equal to ten percent (10%) of the purchase price will be paid to the Selling Member on the Closing Date in cash.

(ii)     The balance of the purchase price will be evidenced by a promissory note, dated as of the Closing Date, from the purchaser to the Selling Member providing for principal to be payable in twenty (20) consecutive equal quarterly installments, commencing three months after the Closing Date, and for accrued interest to be payable on each principal installment date. The interest rate

PB0002835

payable on the unpaid balance of the promissory note will be adjusted quarterly and for any given quarterly period will be an annual rate equal to the lesser of (a) the Prime Rate in effect on the first banking day of such quarter, or (b) the maximum rate permitted by law. Such promissory note will be secured by a security interest on the Interest acquired and will be due and payable in full upon any payment default of more than ten (10) days, or the commencement of distributions upon the liquidation of the Company, the sale or other disposition of all or substantially all of the Company's assets, or any cessation of the Business. The purchaser will have the right to prepay the promissory note, in whole or in part, from time to time, without penalty.

(e)      If the Company is the purchaser, the purchase price will be deemed a payment with respect to Company property under Section 736(b) of the Code to the extent of the Selling Member's interest in the fair market value of Company property other than unrealized receivables and good will and the remainder will be deemed a distributive share under Section 736(a) of the Code.

(f)      The Company will pay the fees and expenses of the Accountant and any appraiser(s) incurred in connection with the purchase of the Selling Member's Interest hereunder but the cost thereof will be taken into account by the Accountant in determining the purchase price of the Selling Member's Interest.

(g)      If the Company is the purchaser of an Interest, the Percentage Interests of the remaining Members will be increased proportionately as of the Valuation Date and Exhibit A will be amended accordingly.

(h)      Upon the purchase of a Selling Member's Interest in accordance with this Section, (i) the Company and the other Members will use their best efforts to cause any guarantee given by or collateral pledged by the Selling Member or its Affiliates to secure obligations of the Company to be released by the secured party and (ii) the Company will repay any loans made by the Selling Member and its Affiliates to the Company. In addition, the purchaser will indemnify and hold the Selling Member harmless from and against any and all loss, damage, liability or expense that the Selling Member may incur after the Closing Date under any liability, debt or obligation of the Company that was included (but only to the extent of such inclusion) by the Accountant as a Company liability, debt or obligation in determining the purchase price. Should any liability, debt or obligation become known that should have been accrued and included in the purchase price calculation but was not fully included by the Accountant in determining the purchase price, the Selling Member will pay to the purchaser, at the request of the purchaser, an amount equal to the amount (not to exceed in the aggregate the purchase price) of such liability, debt or obligation (but only to the extent it was not so included in the Accountant's determination) times the Selling Member's Percentage Interest that was purchased.

Section 9.5 Construction as to Trusts. If a trust is a Member, the Interest owned by such trustee will be subject to the provisions of this Agreement (including, without limitation, the obligation to sell such Interest upon the occurrence of events specified in this Agreement) as if

PB0002836

the grantor of such trust, in his or her individual capacity, were the Member. Thus, it is intended, that in the event of the death of the grantor of such trust, such event will trigger the obligations, rights, and duties of the parties to purchase and sell such Interest owned by the trust.

### ARTICLE X RIGHTS, DUTIES AND RESTRICTIONS OF MANAGER

Section 10.1. Company Management and Control. The Manager shall have full responsibility and exclusive and complete discretion in the management and control of the business and affairs of the Company for the purposes herein stated and shall make all decisions affecting the Company affairs and business, except as may be expressly restricted in this Agreement. The Manager shall manage and control the affairs and business of the Company to the best of its ability and shall use its best efforts to carry out the purposes of the Company as set forth herein. In addition, in exchange for its Company Interest herein, the Manager agrees to perform the following services:

(a) Members Admission. The Manager will perform services in connection with admission of the Members, as Members in the Company, including providing the Members with all relevant information; preparing a financial plan to admit the Members; conducting due diligence on behalf of the Company in connection with the admission of the Members; and preparing appropriate disclosure documents related to the admission of the Members in compliance with all federal, state and local securities laws.

(b) Project Operation. Following completion of the Project, overseeing the management and operation of the Project and the Company.

Section 10.2. Plan and Financial Projections. The Manager shall use its best efforts to achieve the development and operating budget set forth in the Financial Projections. The Manager represents and warrants, to the best of its knowledge and belief, that all Project information and assumptions set forth in the Financial Projections, including, without limitation, development budget costs, the level of the rents, utility costs and other operating expenses, depreciation, the lease-up period of the Project and the funding of Loan, are accurate and achievable.

Section 10.3. Tax-Exempt Use/Financial Statements. The Manager shall furnish copies of its financial statements to the Members upon request by it from time to time. If the Manager is or becomes a tax-exempt controlled entity as described in Section 168(h)(6) of the Code, the controlled entity must make an election pursuant to Section 168(h)(6)(F)(ii) of the Code requiring any gain recognized by a tax-exempt entity on any disposition of an interest in the controlled entity and any dividend or interest received or accrued by a tax-exempt entity from such controlled entity to be treated as unrelated business taxable income for purposes of Section 511 of the Code.

Section 10.4. Expenditures. Subject to Section 10.16 hereof, the Manager, on behalf of the Company, is hereby authorized to pay reasonable compensation for accounting, administrative, legal, technical, financial, management, consulting, or other services rendered to the Company, as approved from time to time in the Annual Operating Budget.

PB0002837

Section 10.5. <u>Potential Conflicts</u>. The Manager shall devote so much of its time to the business of the Company as is necessary or advisable for the conduct of such business. The Manager may engage in business ventures of any nature and description independently or with others, including but not limited to business of the character described in <u>Article II</u> hereof (or any part thereof), and neither the Company nor any other Member shall have any rights in and to such independent ventures or the income or profits derived therefrom. The Company may, from time to time, retain the services of the Manager, or firms or entities in which the Manager or its Affiliates have substantial interests, to render such services in connection with the development, investment, financing, supervision and/or management of the Company or Company property, upon such terms and conditions as the Manager may determine in its reasonable discretion; provided, however, any such dealings shall be on terms and for compensation not more favorable than those prevailing in arm's length transactions. The Manager shall not contract away its fiduciary duties under the common law of agency.

Section 10.6. <u>General Authority</u>. Except as may be expressly restricted in this Agreement, the Manager shall have all of the rights and powers permitted Managers of limited liability companies under the provisions of the Limited Liability Company Law consistent with the purposes of the Company, including, without limitation, the power and right to:

(a)     manage the Company;

(b)     execute such documents as it may deem necessary or appropriate for Company purposes, including but not limited to documents establishing signatory authority for Company bank accounts and other Company assets and activities;

(c)     subject to the provisions of the Master Lease, lease the Project in the normal course of business, and modify or amend such leases entered into by the Company;

(d)     perform or cause to be performed all of the Company's obligations under any agreement to which the Company is a party; and

(e)     sign checks on Company accounts and execute and/or accept any instrument or agreement incident to or connected with the Company business and in furtherance of its purposes (and any such instrument or agreement so executed or accepted by the Manager in its name shall be deemed executed and accepted on behalf of the Company by the Manager).

Section 10.7. <u>Specific Authority and Responsibility</u>. In addition to the rights and powers set forth in <u>Section 10.6</u> hereof, and without limiting the generality thereof, the Manager shall have the following specific powers, rights, and duties in connection with the development and operation of the Company's interest in the Project, subject to <u>Section 10.8</u> hereof:

(a)     acquire the Project, finance, and insure the Company's interest in the Project for the Company in accordance with <u>Sections 10.9</u> and <u>10.11</u> hereof;

PB0002838

(b)     pursuant to the rights set forth in the Master Lease, rehabilitate the Project improvements as an historic structure consistent with the provisions of <u>Section 10.12</u> hereof.

(c)     lease, operate, and manage the Project; and

(d)     sell the Project to any third-party, subject to and in accordance with <u>Section 10.8</u> hereof.

Each Member and its designated agents, including without limitation any construction and management consultants, shall at all reasonable times have free access to and the right to inspect the Project and all records pertaining thereto, and the Manager shall cooperate with any such inspections and answer (in writing if requested) all inquiries relating thereto.

Section 10.8. <u>Limitation on Manager's right to sell the Property</u>. In the event that Manager determines that it is in the best interest of the Company to sell the Property, Manager shall obtain the prior approval of all other Members, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 10.9.   <u>Project Acquisition and Financing</u>.   The Company shall acquire the Project, free and clear of any liens and encumbrances against title and any beneficial interests therein, other than the Loan Documents and those matters set forth in a leasehold policy (or binding commitment) for title insurance delivered to the Members with an effective date as of the date hereof and approved by the Members with a policy limit of not less than the sum of the aggregate amount of debt secured by the Project plus all equity in the Project. In connection with the acquisition of the Project, the Manager shall cause all loans, grants, and other fundings of the Project as set forth in the Project Financial Projections to be closed at the time contemplated in the Project Financial Projections and the Manager shall comply with all Company closing checklist requirements of the Members.

Section 10.10. <u>Attorneys and Accountants</u>. Initially, the Company shall use RubinBrown LLP, as the Company's accountant, and Reid and Riege, PC, as the Company's attorneys, or such other firms of at least comparable ability, experience, and reputation as the Manager may designate, subject to the prior approval of Members, which shall not be unreasonably withheld or delayed.

Section 10.11. <u>Insurance</u>. The Manager shall obtain and maintain, or shall cause the applicable entity to obtain and maintain appropriate insurance on the Project.

Section 10.12. <u>Rehabilitation</u>. On behalf of the Company, the Manager shall rehabilitate the Project in accordance with (i) all applicable requirements of the Loan Documents and Company's organizational documents, (ii) all applicable requirements of all appropriate governmental entities, (iii) the application for certification and the Part 2 Approval; and (iv) the plans and specifications of the Project that have been or shall be hereafter approved by the Project Lender and any applicable governmental entities, as such plans and specifications may be changed from time to time; (v) the plans and documents submitted with respect to the Project to the U.S. Department of the Interior; (vi) any other conditions as the U.S. Department of the Interior may impose in order for it to certify that the rehabilitation of the historic building meets

PB0002839

the Department of the Interior's "Standards for Rehabilitation" ("***Secretary's Standards***"); (vii) all conditions imposed upon the Project with respect to Connecticut State Historic Tax Credits, Connecticut Tax Credits for Infrastructure Projects in the Entertainment Industry, and Connecticut Green Building Tax Credits, and (viii) the terms of the Master Lease, including without limitation the plans and specifications for the rehabilitation or construction thereof, submitted to and approved by the Members and approved by the U.S. Department of Interior in connection with the Part 2 Approval of the Project by such parties, and shall timely submit the materials necessary to obtain the Part 3 Approval of the U.S. Department of Interior. The Manager shall cause to be kept all records of such rehabilitation or construction costs, other development costs and the dates of Placement in Service so that the Company will be able to claim all available tax benefits in connection therewith. Any change in the designation of the contractor or architect for the Project or any modification of the construction documents previously submitted to and approved by the Members will require the prior written approval of the Members.

Section 10.13. Operations. Manager shall use commercially reasonable efforts to operate the Project in a manner that satisfies, and shall continue to satisfy, all restrictions applicable to the Project and projects generating Tax Credits and which shall be in conformity with the description of the Project set forth in Part 2 of the Certification Application.

Section 10.14. Compliance with Loan Documents.

(a)    Manager will cause the Company to comply with all of the material terms and conditions of the Loan Documents and the Project Documents.

(b)    Manager shall furnish to the other Members, within ten (10) Business Days of receipt thereof, a copy of any notice of default under any of the Project Documents or any of the Loan Documents given to the Company or the Manager.

Section 10.15. Intentionally Omitted.

Section 10.16. Annual Operating Budget. In addition to the financial reports required under Section 14.3 hereof, the Manager shall prepare, for the review and approval of the Members, the Annual Operating Budget. Commencing on November 1, 2017, and for each year thereafter by no later than November 1, the Manager shall prepare a proposed Annual Operating Budget for the next Fiscal Year which shall be submitted to the Members for their review and approval. The Members shall have thirty (30) days to notify the Manager that it does not approve part or all of the proposed Annual Operating Budget and the reasons therefore set forth in writing providing Manager with sufficient detail to respond timely, and in such event the Manager and the Members shall negotiate in good faith to reach agreement on a new Annual Operating Budget, provided that until such issues are resolved the current year's Annual Operating Budget shall be used for the following year, increased annually by the percentage increase in the Consumer Price Index for All Urban Consumers, U.S. City Average for All Items (1982-84 = 100), as published by the Bureau of Labor Statistics of the U.S. Department of Labor. If during the term of this Agreement said Index shall not be published, such other available index as shall be designated by the Members which is comparable in effect to that Index presently published by the Bureau of Labor Statistics shall be used in lieu thereof.

PB0002840

Except where specified to the contrary in this Agreement or any Loan Documents, all funds of the Company shall be invested in the name of the Company by the Manager, under such terms and conditions (including signatories) as the Members shall approve, provided that such investments shall be limited to (a) financial institutions whose deposits are insured by an agency of the U.S. Government (such as the Federal Deposit Insurance Corporation) and where the instrument's or account's maturity does not exceed the lesser of one year or the time period within which the funds are anticipated to be needed by the Company; or (b) direct obligations of the U.S. Government (such as U.S. Treasury Bills) where the instrument's maturity does not exceed the lesser of one (1) year or the time period within which the funds are anticipated to be needed by the Company; or (c) such other investments approved by the Members.

Section 10.17. <u>Governmental Requirements</u>.

(a)    Manager shall take all actions and make all elections to comply with the provisions found Sections 48 and 50 of the Code and the regulations promulgated thereunder, including Treasury Regulation §1.48-4(a), in order to pass through the Federal Historic Credits attributable to the Project to Master Tenant, as lessee under the Master Lease pursuant to and in accordance with Section 50(d)(5) of the Code.

(b)    Manager shall prepare and submit to the Secretary of the Treasury or the Internal Revenue Service (or any other governmental authority designated for such purpose), on a timely basis, any and all annual reports, information returns and other certifications and information requested by any such governmental authority in connection with the Company's (and its Members') qualifications for Tax Credits and any Recapture Event or the imposition of penalties or interest on the Company or any of its Members for failure to comply with the requirements of the Code or any other Applicable Laws relating to the Tax Credits.

(c)    Manager shall take all actions necessary in order to obtain the final certification of rehabilitation for completed work and certification from the U.S. Department of the Interior that the actual rehabilitation and construction of the Project meets the Department of the Interior's "Standards for Rehabilitation", was carried out in a manner consistent with the historic nature of the historic building within the applicable time period.

Section 10.18. <u>Restrictions on Authority: Master Tenant Consent</u>. Notwithstanding any provision of this Agreement to the contrary, the Company shall not take, and the Manager shall not be empowered or authorized to take or cause the Company to take, any of following actions without the Consent of the Master Tenant:

(b)    Sell, refinance or otherwise dispose of the assets of the Company, grant or refinance any mortgage or other indebtedness of the Company.

(c)    Intentionally Omitted.

(d)    Incur debt in excess of Fifty Thousand Dollars ($50,000) in the aggregate at any one time outstanding on the general credit of the Company.

PB0002841

(e)     Acquire any real property in addition to the Property.

(f)     Make any filing to begin Bankruptcy proceedings on behalf of the Company.

(g)     Make application(s) for or accept any grant funds on behalf of the Company regardless of the source of the grant.

(h)     Pledge or assign any of the Master Tenant's Capital Contribution or the proceeds thereof, except to Project Lender as collateral for the Loan which is expressly permitted without any further consent.

(i)     Cause the Company to settle, compromise, mediate or otherwise relinquish any claim (actual or prospective), or to release, waive or diminish any material Company's rights in any litigation or arbitration matter involving a claim in excess of Ten Thousand Dollars ($10,000).

(j)     Change the nature of the Company's business.

(k)     Dissolve and wind up the Company.

(l)     Permit the merger or termination of the Company.

(m)     Issue additional interests in the Company; modify Master Tenant's interest in Company; or admit additional members to the Company other than Project Lender or any other Person taking by, through, or under the Pledge Agreements.

(n)     Materially modify the approved plans or the budget, or cause the property to be developed in a manner that is not consistent with the approved plans and the budget.

(o)     Sell, transfer or assign any portion of the Manager's interest, except to Project Lender, or withdraw as Manager.

(p)     Amend the Development Agreement.

(q)     Amend, modify, terminate or otherwise change the terms of any other agreement or document between the Company and Master Tenant.

(r)     Materially change any accounting method or practice of the Company in any manner that would adversely impact the Investor Member or the Company.

(s)     Take any action which would cause the termination of the Company for federal income tax purposes or dissolution of the Company for state law purposes.

(t)     Give or withhold any approval, consent, or vote, exercise or refrain from exercising any right, waive any condition or requirement or otherwise take or forego any action provided for in this Agreement which would have a material adverse impact on the Master Tenant.

PB0002842

Section 10.19. <u>Reliance on Authority</u>. Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not the Manager, or any designee of the Manager, has exceeded its authority in executing any contract, lease, mortgage, note, settlement, deed, or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

Section 10.20. <u>Scope of Liability</u>. The Manager shall not be liable to the Members for the return or repayment of the capital of the Members, subject, however, to the Manager's obligations under <u>Section 13.5</u> hereof.

Section 10.21. <u>Indemnification Provisions</u>.

(a)    <u>Manager</u>. The Manager shall defend, indemnify, and save harmless (i) the Company and each Member from any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) incurred by reason of any demands, claims, suits, actions, or proceeding arising out of the Manager's gross negligence, fraud, willful   misconduct, malfeasance, material breach of any representation, warranty, covenant, or agreement set forth in this Agreement that continues beyond any applicable notice and cure periods, breach of fiduciary duty, or if a judgment by a court of competent jurisdiction is obtained against the Manager in connection with actions performed outside the scope of the authority of the Manager pursuant to this Agreement, and (ii) the Members from any liability incurred by them for Company obligations in excess of its Capital Contributions.

(b)    <u>Members</u>. Except as specifically set forth in this Agreement, no Member or Affiliate of a Member shall have any liability to the Company or to any Member for any loss suffered by the Company that arises out of any action or inaction of such Member or such Affiliate if such Member or Affiliate, in good faith, determined that such course of conduct was in the best interest of the Company and such course of conduct did not constitute negligence or misconduct of such Member or such Affiliate. To the full extent permitted by Applicable Law, each Member and its Affiliates shall be indemnified by the Company from and against any adverse consequences sustained by it in connection with the Company, provided that the same were not the result of negligence or misconduct on the part of such Member or such Affiliate and were the result of a course of conduct which such Member or Affiliate, in good faith, determined was in the best interest of the Company. Any indemnity under this Section shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

Section 10.22. <u>Manager's Fiduciary Responsibilities</u>. The Manager shall have a fiduciary responsibility to the Members for the safekeeping and use of all Company property, whether or not in its immediate possession or control, and shall not use or dispose of Company property in any manner except for the Company's exclusive benefit. The Manager shall not contract away its fiduciary duties under the common law of agency.

Section 10.23. <u>Intentionally Omitted</u>.

ARTICLE XI

REPRESENTATIONS AND WARRANTIES

PB0002843

Section. 11.1 Representations, Warranties, and Covenants Relating to the Property and the Company. As of the date hereof and continuing during the term of the Company, the Manager hereby represents, warrants, and covenants to the Company and the Members as follows:

(a)     The Rehabilitation shall be completed by the Company in a timely and workman-like manner in strict accordance with the requirements of:

(i)     the Operating Documents;

(ii)    all applicable governmental entities;

(iii)   the Certification Application and the Part 2 Approval;

(iv)    the approved plans and specifications; and

(v)     the Loan Documents.

(b)     The cost certification submitted by Company will be true and correct in all material respects, including without limitation, the computation of qualified rehabilitation basis for the Project.

(c)     The Architect and/or historic preservation consultant hired to work on the Property has expertise in the area of historic preservation and compliance with the Secretary's Standards.

(d)     At the time of commencement of construction and as of the date hereof, the Property is or will be properly zoned for the uses contemplated herein, and upon completion it will have, in good faith, applied to obtain all required permits, consents, permissions, and licenses for the operation of the Property, and the Property conformed and conforms to all Applicable Law.

(e)     All appropriate public utilities, including sanitary and storm sewers, water, gas, and electricity, are currently or will be available to the Property and will be operating properly for all units in the Property at the time of first occupancy of such units.

· (f)     Good and marketable leasehold interest in the Property is held solely by the Company, free and clear of any liens, charges or encumbrances other than the Loan Documents and matters set forth in the Title Policy, and mechanics' or other liens which have been bonded or insured against in such manner to preclude the holder of such lien or such surety or insurer from having any recourse to the Property, the Company or the Manager for payment of any debt secured thereby.

(g)     At the time of execution of this Agreement, and at all times thereafter the Company was, is, and will continue to be a limited liability company, duly organized and validly existing under the Applicable Law and had, has, and shall continue to have full power and authority to finance, operate, maintain, lease, and sell the Property in accordance with the terms of this Agreement, and had taken and shall continue to take all

PB0002844

action under the Applicable Law that are necessary to protect the limited liability of the Master Tenant, and to enable the Company to engage in its business. The consummation of all transactions contemplated herein and with respect to the Historic Work to be performed by the Manager and/or its Affiliates does not and will not result in any material breach or violation of, or default under, the organizational documents and authorizing resolutions of the Manager and/or its Affiliates or, to the knowledge of Manager, any agreements by which the Manager and/or its Affiliates or any of their respective property is bound, or, to the knowledge of Manager, under any Applicable Law, administrative regulation, or court decree. Except as disclosed in writing to Master Tenant and Federal Investor, from and after the date of formation of the Company, the Manager has not pledged or otherwise encumbered any Interest in the Company and no third party has any interest therein. The organizational documents and authorizing resolutions of the Manager submitted to the Master Tenant and Federal Investor on or prior to the date hereof are true, correct and complete and have not been amended.

(h)     Intentionally Omitted

(i)     Except as provided to the Project Lender, neither the Manager nor any affiliate shall become personally liable on or in respect of, or guarantee, any promissory note or a mortgage or any other indebtedness of the Company (other than for obligations to trade creditors or others incurred in connection with day to day operation of the Project).

(j)     No event has occurred that has caused, and the Manager has not acted in any manner that will cause: (i) the Company to be treated for federal income tax purposes as an association taxable as a corporation; (ii) the Company to fail to qualify as a limited liability company under the Act; (iii) the Company to fail to be duly qualified to conduct its business the State of Connecticut; or (iv) the Master Tenant to be liable for Company obligations.

(k)     To the best of Manager's knowledge, all consents or approvals of any governmental authority, or any other person, necessary in connection with the transactions contemplated by this Agreement or necessary to admit the Master Tenant to the Company, have been obtained by the Manager and the Company has taken all action under the laws of the State of Connecticut and has complied with all filing requirements necessary under the Act for the preservation of the limited liability of the Master Tenant.

(l)     Intentionally Omitted

(m)     No Event of Bankruptcy has occurred with respect to the Company, the Manager or any of the Manager's Affiliates and no such entity is insolvent or unable to pay its debts in the ordinary course.

(n)     Except as set forth in the UCC, lien and judgment searches provided by Manager to the Master Tenant and to the Federal Investor prior to the date of this Agreement, no litigation, action, investigation, event, or proceeding is pending against the Company, the Manager and/or the Project. Further, to the best of its knowledge (after

PB0002845

due inquiry) no such litigation, action, investigation, event or proceeding is threatened, that, if adversely resolved, would: (i) have a material adverse effect on the Company, the Manager, the Master Tenant or the Project; (ii) have a material adverse effect on the ability of the Manager to perform its obligations under this Agreement, any loan with any Project Lender with respect to the Project, the Master Lease and/or with respect to the Historic Work, as applicable; (iii) have a material adverse effect on the financial condition of the Manager or the Company; or (iv) constitute or result, if true, in a material breach of any representation, warranty, covenant, or agreement set forth in this Agreement, the Master Lease, any documents with respect to any loan with a Project Lender for the Project and/or with respect to the Historic Work.

(o)     To the best of Manager's knowledge, no default (or event that, with the giving of notice or the passage of time or both, would constitute a default) has occurred and is continuing under any documents with respect to any loan with any Project Lender for the Project, the Master Lease and/or with respect to the Historic Work, or any other contract, agreement, or instrument to which the Company, the Master Tenant or the Manager is subject, and such documents are in full force and effect.

(p)     As of the date hereof, there are no outstanding loans or advances from the Manager to the Company, and the Company has no unsatisfied obligation to make any payments of any kind to the Manager or its affiliates, except for the Development Fee.

(q)     Amounts paid to the Manager and/or its Affiliates for services in accordance with such agreements as may be entered into from time to time after the date hereof in accordance with the terms of this Agreement shall be reasonable in relation to the value of services provided and relate solely to the services to be actually rendered to the Company pursuant to the applicable agreements.

(r)     The Company has not made any elections under the Code without the Consent of the Master Tenant and Federal Investor that would affect the amount, timing, availability, or allocation of any Tax Credits.

(s)     No portion of the Property constituting qualified rehabilitation expenses ("*QREs*") was placed in service by the Company prior to the date of this Agreement and the QREs incurred in connection with the rehabilitation of the Property and Historic Work shall constitute "new section 38 property" to the Company under the Code.

(t)     The development sources and uses set forth in the Financial Projections contain all development costs of which Manager is aware and all operating income and expenses set forth therein are consistent with Manager's operating information and assumptions, and such income, expenses and development uses do not omit to state items known to Manager.

(u)     To the best knowledge and belief of the Manager, no circumstances now exist that would materially and adversely affect the reasonable likelihood of achieving the objectives and the benefits set forth in the Financial Projections. All of the Property information and assumptions in the Financial Projections, including, without limitation,

PB0002846

Property budget costs, rents, utility costs and other operating and maintenance expenses, and depreciation are accurate and achievable.

(v)     The Project will meet all requirements to qualify for the Federal Historic Credits as a "certified historic structure," as set forth in Section 47(a)(2) of the Code, the Company will be entitled to Federal Historic Credits in and for the calendar year 2016 based on the Total Development Costs set forth in the Financial Projections, and the Historic Work and rehabilitation of the Project will be in strict accordance with all of the requirements imposed by the Historic Approvals, the historic standards and guidelines of the U.S. Department of Interior-National Park Service, or pursuant to Applicable Law.

(w)     Manager shall deliver, within thirty (30) days of the date hereof, or such additional time as is reasonably necessary, such additional time not to exceed fifteen (15) days, that certain Subordination Agreement.

(x)     Intentionally Omitted.

(y)     The Project will meet all requirements to qualify for the Connecticut State Historic Tax Credits, Connecticut Tax Credits for Infrastructure Projects in the Entertainment Industry, and Connecticut Green Building Tax Credits, the Company will be entitled to such Tax Credits in and for the calendar year 2016 based on the Total Development Costs set forth in the Financial Projections, and the Historic Work and rehabilitation of the Project will be in strict accordance with all of the requirements imposed by the applicable state law.

The Manager shall be solely responsible for the representations, warranties, and covenants hereunder, and shall not assert as a defense in any action by the Company and the Manager, that the Members may have relied on other parties in connection with matters addressed therein.

## ARTICLE XII WITHDRAWAL, REMOVAL, BANKRUPTCY, DISSOLUTION, DEATH OR INCAPACITY OF A MEMBER

Section 12.1. No Voluntary Withdrawal. Each of the Members (including the Manager) hereby covenants that such Member will not voluntarily withdraw from the Company without the consent of all other Members except as the result of a sale or transfer as may be permitted under Article IX hereof, but will carry out such Member's duties and responsibilities hereunder until the purposes of the Company are fulfilled and the Company is dissolved, wound up, and terminated. No Member or Members shall have the right to cause dissolution of the Company, except as may be specifically provided in this Agreement.

Section 12.2. Removal by Master Tenant.

(a)     Subject to any required approval of the Project Lender, in the event that a Material Default occurs, the Master Tenant may at its election (or shall at the election of the Federal Investor), proceed to exercise its rights under this Section 12.2 by giving notice of such Material Default to the Manager (except in the case of a Terminating

PB0002847

Event with respect to a sole Manager, in which case no such notice shall be required and the rights of the Master Tenant set forth in this Section shall be immediately exercisable). If such default is not cured within ten (10) Business Days following such notice (or cured within a reasonable time in the event that it is impossible to cure such default within such ten (10)-day period, provided that the Manager is diligently and in good faith seeking to cure such default and there has been no assignment of or institution of proceedings to foreclose any mortgage), the Master Tenant may elect to become, or have its designee become, an additional Manager with any or all of the rights and privileges of the Manager, including, without limitation, the right to directly enforce the Company's rights under this Agreement or the Master Lease, and to give any notices or file any objections permitted or required to be given or filed by the Company. Upon such election by the Master Tenant, the Master Tenant or its designee shall automatically become and shall be deemed to be the Manager. If the Master Tenant or such other Person shall become an additional Manager as herein stated, its interest in the Company shall not be increased as a result thereof. In the event of the admission of the Master Tenant or such Person as a Manager pursuant to this Section 12.2, and if there are then any other Managers, the Master Tenant or such other Person shall have managerial rights, authority and voting rights of fifty one percent (51%) on any matters to be decided or voted upon by the Managers or the Manager, as the case may be, and the rights and authority of the remaining Members or the Manager, as the case may be, shall be deemed to be equally divided among them. In such case, however, the original Manager shall continue to be liable for all its obligations under this Agreement, provided that the Manager shall have no liability for actions of the Master Tenant that are not permitted under this Agreement.

(b)  In addition to the foregoing, the Master Tenant may elect to remove the Manager from the Company by paying the Manager an amount equal to the sum of (i) any fees earned through the date of removal due to the Manager, (ii) an amount equal to one hundred percent (100%) of the Manager's positive Capital Account balance, if any, following a deemed sale of the Project and any other Company assets and a deemed liquidation of the Company (but prior to any deemed distributions upon liquidation), and (iii) the principal balance and any accrued but unpaid interest on any loans made to the Company that were permitted to be made under this Agreement, minus an amount equal to any loss or damage suffered by the Company or the Master Tenant as a result of the Material Default creating the right of the Master Tenant to remove the Manager pursuant to the provisions of this Section 12.2.

(c)  For purposes of this Section 12.2, the net proceeds from the deemed sale discussed above shall be equal to the Fair Market Value of the Project plus the Fair Market Value of all other Company property, including but not limited to cash and cash equivalents, as encumbered by the Company's remaining obligations under the Operating Documents. "Fair Market Value" shall be determined as follows: As soon as practicable and in any event within thirty (30) days following the notice from the Master Tenant to the Manager of its election to remove the Manager, the Manager and the Master Tenant shall select an independent appraiser. In the event the parties are unable to agree upon an independent appraiser within such thirty (30)-day period, the Manager and the Master Tenant each shall select an independent appraiser. If the difference between the two (2) appraisals is within ten percent (10%) of the lower of the two appraisals, the Fair Market

PB0002848

Value shall be the average of the two (2) appraisals. If the difference between the two (2) appraisals is greater than ten percent (10%) of the lower of the two (2) appraisals, then the two (2) appraisers shall jointly select a third appraiser whose determination of Fair Market Value shall be deemed to be binding on all parties. If the two (2) appraisers are unable jointly to select a third appraiser, either the Manager or the Master Tenant may, upon written notice to the other, apply to the presiding judge of a court of competent jurisdiction in Fairfield County, Connecticut for the selection of the third appraiser who shall then participate in such appraisal proceeding, and who shall be selected from a list of names of independent appraisers submitted by the Manager and the Master Tenant. Each list of names of independent appraisers shall be submitted within ten (10) days after the date on which the appraisal proceeding is invoked, or will be disregarded and the appraiser shall be selected from the list provided. The appraisals shall take into account any legal provisions affecting the Project (including those set forth in any of the Operating Documents and in the Code, if applicable) and any increase in real property taxes owed by the Company that are triggered by the removal. Any transfer taxes owed by the Company that are triggered by the removal shall be paid by the removed Manager. The Company shall pay the cost of any appraiser(s) selected pursuant to this Section 12.2.

(d)      In the event of the removal of any Manager pursuant to the provisions of this Section 12.2, any amounts due to the Manager pursuant to the provisions of Section 12.2 above shall be payable from the first available distributions of Available Cash pursuant to Section 8.1 prior to any other distributions or payments of Available Cash to the Members under Section 8.1 hereof. The obligation of the Company to make such payments shall be evidenced by a negotiable nonrecourse non-interest bearing promissory note issued by the Company and secured solely by a security interest in the Interest(s) of the continuing Member(s).

(e)      Upon receipt of payment by the Manager of any and all amounts due to it under the provisions of this Section 12.2, the Company and its remaining Members shall be completely released from all liability to the Manager and its Affiliates generally and to any others to whom any distribution, loan, fee or other payments are to be made under this Agreement, or otherwise. Concurrently with, and as a condition to, such payment, the Manager shall provide the Company and the Master Tenant (the "*released parties*") with additional written releases from the Manager (and any affiliates to whom obligations of any kind are owed by any of the released parties or any of their affiliates) confirming such releases. In addition, upon the removal of any Manager, such Manager shall be relieved of all of its future obligations to the Company (including, but not limited to, its obligation to make any loans), and the Company shall provide the removed Manager with a written release confirming such release. Notwithstanding the foregoing, the removal of a Manager shall not relieve such Manager from any liabilities to the Master Tenant hereunder from any action or omission to act of the Manager prior to its removal.

(f)      Each Member hereby irrevocably appoints the Master Tenant (with full power of substitution) as the attorney-in-fact of such Member for the purpose of executing, acknowledging, swearing to, recording and/or filing any amendment to this

PB0002849

Agreement and the Articles necessary or appropriate to effectuate the provisions of this Section 12.2.

Section 12.3. <u>Adverse Events Affecting Manager; Continuation of the Company</u>. If a Manager of the Company suffers and Adverse Event, and at that time at least one (1) other Manager of the Company remains, or one or more Substitute Managers are appointed pursuant to Section 12.4 hereof, then the Company shall not terminate.

Section 12.4. <u>Substitute Manager(s)</u>. Subject to Master Tenant's rights under <u>Section 12.2</u>, if a Manager of the Company at any time withdraws or is removed from the Company, or suffers an Adverse Event, and at that time such Manager was the last remaining Manager of the Company, then the Members shall have the right to appoint one or more new Managers as "Substitute Manager(s)". Upon and after the appointment of the Substitute Manager, the relationship of the Members shall be governed by the provisions of this Agreement as so amended, the Company shall be continued, and the Substitute Manager(s) shall have all of the management rights, duties, responsibilities, authority, and powers provided the Manager in this Agreement.

## ARTICLE XIII DISSOLUTION AND TERMINATION

Section 13.1.    <u>Dissolution</u>.  The Company shall be dissolved upon the happening of any one of the following events:

(a)    the expiration of the term of the Company, if any;

(b)    the specification in a written consent executed by all Members;

(c)    the sale, exchange or other disposition, or condemnation, of all or substantially all of the property of the Company;

(d)    the withdrawal or removal of the last remaining Manager of the Company and the failure of the Members to appoint one or more new Managers as provided in Section 12.4 hereof; or

(e)    such other events as shall result in dissolution of the Company under the Limited Liability Company Law.

Section 13.2. <u>Who Shall Wind Up Company</u>. If the Company is dissolved pursuant to any provision of this Agreement except <u>Section 13.1(d)</u>, the Manager shall wind up the affairs of the Company. If the Company is dissolved pursuant to <u>Section 13.1(d)</u>, the Members shall appoint a representative to wind up the affairs of the Company.

Section 13.3. <u>Winding Up</u>. Upon dissolution of the Company, all assets of the Company shall be sold as promptly as is consistent with obtaining reasonable Fair Value for such assets. All cash on hand and the proceeds of the sale of all of the assets of the Company shall·be applied and distributed in the following order of priority:

PB0002850

(a)      to the payment of the debts and liabilities of the Company to Persons other than Members and their Affiliates, including the expenses of liquidation, dissolution and termination;

(b)      to the setting up of any reserves which are deemed reasonably necessary or appropriate by the Manager (or the representative of the Members in charge of winding up, as the case may be) for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to a bank, as escrow-holder, to be held by it for the purpose of disbursing (under the direction of the Manager or the representative of the Members in charge of winding up, as the case may be) such reserves in payment of such liabilities and obligations and, at the expiration of such period as the Manager or such representative may deem advisable, for distribution in the manner hereinafter provided;

(c)      to the payment of debts and liabilities to any Manager or its Affiliates (other than those on account of Capital Contributions);

(d)      the remaining proceeds to the Members in liquidation of their interests in accordance with their respective positive Capital Accounts.

Section 13.4. Termination of the Company. Following the distribution of the Company's assets in accordance with Section 13.3 of this Agreement, the Company shall terminate and the manager (or representative) will file the necessary documents to dissolve the Company under the Limited Liability Company Law.

ARTICLE XIV FISCAL MATTERS

Section 14.1. Books. Appropriate books of account shall be maintained under the supervision of the Manager, which shall reflect all the business and transactions of the Company. Such books shall be kept in accordance with generally accepted accounting principles on an accrual basis, except as otherwise provided in this Agreement. All Members shall have the right to examine, inspect and copy, at their own expense, such books of account, at all reasonable times, at the principal place of business of the Company, upon five (5) business days' prior notice.

Section 14.2. Fiscal Year and Taxable Year. The Fiscal Year and Taxable Year of the Company shall the calendar year.

Section 14.3.  Tax Returns. The Manager shall instruct the Accountant to prepare and file all required federal, state and local income tax returns for the Company. The Manager shall cause to be sent to the Members (or to a third party designated by any Member) in draft form by March 15, and in final form by March 30, a report which shall include all necessary tax reporting information regarding the Company required by the Members for preparation of their respective federal, state and local income or franchise tax or information returns and a copy of the Company's federal, state and local income tax or information returns for the Fiscal Year.

Section 14.4. Federal Income Tax Election.  In the event of a transfer of an interest in the Company as described in Section 743 of the Code, the Manager may, and shall if requested by

PB0002851

any Member, elect, pursuant to Section 754 of the Code and pursuant to corresponding provisions of applicable state and local tax laws, to adjust the basis of the assets of the Company pursuant to Sections 734 and 743 of the Code.

Section 14.5. Designation of Tax Matters Member. The Manager is hereby designated as the "Tax Matters Member" under Section 6231(a)(7) of the Code, to manage administrative tax proceedings conducted at the Company level by the Internal Revenue Service with respect to Company matters. Any Member has the right to participate in such administrative proceedings relating to the determination of Company items at the Company level. Expenses of such administrative proceedings undertaken by the Tax Matters Member will be paid for out of Company assets. Each other Member who elects to participate in such proceedings will be responsible for any expenses incurred by such Member in connection with such participation. Further, the cost of any adjustments to a Member and the cost of any resulting audits or adjustments of a Member's tax return will be borne solely by the affected Member.

## ARTICLE XV AMENDMENTS TO THE AGREEMENT

This Agreement may be amended only with the consent the Master Tenant and each of its members and, so long as the Loan remains outstanding, the prior written consent of the Project Lender. Notwithstanding the foregoing, each Member hereby consents to (a) administrative amendments and changes approved by the Manager, (b) amendments approved by the Manager to cure any ambiguity or correct any typographical error, (c) any other non-material amendments approved by the Manager, provided any such amendments would not impact the Master Tenant. This Agreement supersedes any and all prior oral or written agreements, commitments or other understanding among the parties respecting the subject matter of this Agreement, and constitutes the entire agreement among the parties.

## ARTICLE XVI MISCELLANEOUS

Section 16.1. Binding Effect. Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Members and their respective heirs, personal representatives, successors and assigns.

Section 16.2. Captions. The captions in this Agreement are for convenience and reference only and shall in no way affect the meaning or interpretation of any of the provisions of this Agreement.

Section 16.3. Counterparts. This Agreement, and any amendment hereto, may be signed in any number of counterparts, and signature to any one counterpart shall be deemed signature to all other counterparts, which when taken together shall constitute one agreement.

Section 16.4. Notice. Any notices, requests or other documents required or permitted to be delivered to a Member hereunder shall (i) be given at the addresses set forth on Exhibit A attached hereto and (ii) be deemed to have been given for all purposes hereof when delivered, either by personal delivery, by Federal Express (or similar overnight delivery) or by facsimile transfer (with a hard copy simultaneously sent by first class mail, postage prepaid) or on the second business day after the deposit of the same in the United States mail, postage prepaid, first class, registered or certified mail, return receipt requested, and addressed to the Member to

PB0002852

whom such notice, request, information or other document is being given at the address specified herein for such Member, unless such Member has designated a new address by notice to the other Members, in which event at such new address.

Section 16.5. <u>State and Other Filings By Manager</u>. The Manager shall take all appropriate actions requisite for the perfection and continuation of the Company as a limited liability company pursuant to the Limited Liability Company Law, and shall take all similar appropriate action in connection with any amendment to this Agreement.

Section 16.6. <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut.

Section 16.7. <u>Partnership Classification</u>. The Members intend for the Company to be classified as a partnership for Federal income tax purposes continuously from the date of its formation forward. Therefore, the Manager will not take any actions which would impair the Company's continued classification as a partnership; this includes, without limitation, the filing of any elections to be treated as anything other than a partnership for federal income tax purposes. Treas. Reg. §301.7701-1, 2 and 3.

Section 16.8. <u>Single Asset Status</u>. The Company is, and shall be, a single asset, single purpose entity.

Section 16.9   <u>Liability of the Members or Managers</u>.   Except as expressly provided in this Agreement, no Member or Manager shall be liable for the liabilities of the Company and such liabilities shall be limited to the fullest extent permitted by the Limited Liability Company Law, including without limitation, those set forth in Section 34-133 therein and other provisions of Applicable Law.

[SIGNATURE PAGE FOLLOWS]

PB0002853

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated above.

### MANAGER:

WALL STREET MANAGER, LLC, a Connecticut limited liability company

By: Wall Street Managing Member, LLC, a Connecticut limited liability company, its Manager

By: Wall Street Theater Company Inc., a Connecticut non-stock corporation, its Manager

By: _____
Suzanne J. Cahill, President

### MASTER TENANT:

WALL STREET MASTER TENANT, LLC, a Connecticut limited liability company

By: Wall Street Manager, LLC, a Connecticut limited liability company, its Managing Member

By: Wall Street Managing Member, LLC, a Connecticut limited liability company, its Manager

By: Wall Street Theater Company Inc., a Connecticut non-stock corporation, its Manager

By: _____
Suzanne J. Cahill, President

PB0002854

## EXHIBIT A

### LIST OF MEMBERS AND CAPITAL CONTRIBUTIONS

| Name and Address | Percentage Interest | Total Capital Contributions |
|---|---|---|
| Wall Street Manager, LLC<br>71 Wall Street<br>Attn: Suzanne J. Cahill<br>E-mail: suzanne@wallstreettheater.com<br><br>*With a Copy to*:<br><br>Reid and Riege, P.C.<br>One Financial Plaza<br>Hartford, CT 06103<br>Attn: Christopher J. Rixon<br>Email: crixon@rrlawpc.com | 90.00% | $9,241,011 |
| Wall Street Master Tenant, LLC<br>71 Wall Street<br>Attn: Suzanne J. Cahill<br>E-mail: suzanne@wallstreettheater.com<br><br>*With a Copy to*:<br><br>Reid and Riege, P.C.<br>One Financial Plaza<br>Hartford, CT 06103<br>Attn: Christopher J. Rixon<br>Email: crixon@rrlawpc.com | 10.00% | $1,862,755 |

PB0002855

## EXHIBIT B

## TAX EXHIBIT

1.     As used in this Exhibit, the following terms will have the following meanings, unless the context otherwise specifies:

"*Adjusted Capital Account Deficit*" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i) increased for any amounts such Member is unconditionally obligated to restore and the amount of such Member's share of Company Minimum Gain and Member Minimum Gain after taking into account any changes during such year; and (ii) reduced by the items described in Treasury Regulation §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"*Company Minimum Gain*" will have the same meaning as partnership minimum gain set forth in Treasury Regulation § 1.704-2(d). Company Minimum Gain will be determined, first, by computing for each Nonrecourse Liability any gain which the Company would realize if the Company disposed of the property subject to that liability for no consideration other than full satisfaction of such liability and, then, aggregating the separately computed gains. For purposes of computing gain, the Company will use the basis of such property which is used for purposes of maintaining Capital Accounts under Section 5.1 hereof. In any taxable year in which a Revaluation occurs, the net increase or decrease in Company Minimum Gain for such taxable year will be determined by: (1) calculating the net decrease or increase in Company Minimum Gain using the current year's book value and the prior year's amount of Company Minimum Gain, and (2) adding back any decrease in Company Minimum Gain arising solely from the Revaluation.

"*Income*" and "*Loss*" mean, respectively, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a), except that for this purpose (i) all items of income, gain, deduction or loss required to be separately stated by Code Section 703(a)(1) will be included in taxable income or loss; (ii) tax exempt income will be added to taxable income or loss; (iii) any expenditures described in Code Section 705(a)(2)(B) (or treated as Code Section 705(a)(2)(B) expenditures in accordance with Treasury Regulation § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing taxable income or loss will be subtracted; and (iv) taxable income or loss will be adjusted to reflect any item of income or loss specifically allocated in Article VII.

"*Member Minimum Gain*" will have the same meaning as partner nonrecourse debt minimum gain as set forth in Treasury Regulation § 1.704-2(i)(3). With respect to each Member Nonrecourse Debt, Member Minimum Gain will be determined by computing for each Member Nonrecourse Debt any gain which the Company would realize if the Company disposed of the property subject to that liability for no consideration other than full satisfaction of such liability. For purposes of computing gain, the Company will use the basis of such property which is used for purposes of maintaining Capital Accounts.   In any taxable year in which a Revaluation occurs, the net increase or decrease in Member Minimum Gain for such taxable year will be

PB0002856

determined by: (1) calculating the net decrease or increase in Member Minimum Gain using the current year's book value and the prior year's amount of Member Minimum Gain, and (2) adding back any decrease in Member Minimum gain arising solely from the Revaluation.

"*Member Nonrecourse Debt*" will have the same meaning as partner nonrecourse debt set forth in Treasury Regulation § 1.704-2(b)(4).

"*Member Nonrecourse Deductions*" will have the same meaning as partner nonrecourse deductions set forth in Treasury Regulation § 1.704-2(i)(2). Generally, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a fiscal year equals the net increase during the year in the amount of Member Minimum Gain (determined in accordance with Treasury Regulation § 1.704-2(i)) reduced (but not below zero) by the aggregate distributions made during the year of proceeds of a Member Nonrecourse Debt and allocable to the increase in Member Minimum Gain, determined according to the provisions of Treasury Regulation § 1.704-2(i).

"*Nonrecourse Deduction*" will have the same meaning as nonrecourse deductions set forth in Treasury Regulation § 1.704-2(b)(1). Generally, the amount of Nonrecourse Deductions for a fiscal year equals the net increase in the amount of Company Minimum Gain (determined in accordance with Treasury Regulation § 1.704-2(d)) during such year reduced (but not below zero) by the aggregate distributions made during the year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Treasury Regulation § 1.704-2(c) and (h).

"*Nonrecourse Liability*" means a Company liability with respect to which no Member bears the economic risk of loss as determined under Treasury Regulation § 1.752-1(a)(2).

"*Revaluation*" means the occurrence of an event described in clause (x), (y) or (z) of Section 2 below in which the book basis of Property is adjusted to its Fair Value.

2.     **Capital Accounts**.   Each Member's Capital Account will be (a) increased by (i) the amount of money contributed by such Member, (ii) the Fair Value of property contributed by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752), (iii) allocations to such Member, in accordance with Article VII, of Company income and gain (or items thereof), and (iv) to the extent not already netted out under clause (b)(ii) below, the amount of any Company liabilities assumed by the Member or which are secured by any property distributed to such Member; and (b) decreased by (i) the amount of money distributed to such Member, (ii) the Fair Value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752), (iii) allocations to such Member, in accordance with Article VII, of Company loss and deduction (or items thereof), and (iv) to the extent not already netted out under clause (a)(ii) above, the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the assignee will succeed to the Capital Account of the assignor to the extent it

PB0002857

relates to the transferred interest, except as otherwise provided in the written transfer agreement between the assignor and assignee.

In the event of (w) an additional capital contribution by an existing or an additional Member of more than a de minimis amount or a distribution of property which results in a shift in Percentage Interests, (x) the distribution by the Company to a Member of more than a de minimis amount of property (other than cash), (y) a distribution of Property in exchange for an Interest, or (z) the liquidation of the Company within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(g), the book basis of the Company Property will be adjusted to Fair Value and the Capital Accounts of all the Members will be adjusted simultaneously to reflect the aggregate net adjustment to book basis as if the Company recognized gain and loss equal to the amount of such aggregate net adjustment.

If Property is subject to Code Section 704(c) or is revalued on the books of the Company in accordance with the preceding paragraph in accordance with Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, the Members' Capital Accounts will be adjusted in accordance with Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations for allocations to the Members of depreciation, amortization and gain or loss, as computed for book purposes (and not tax purposes) with respect to such property.

The foregoing provisions of this <u>Section 2</u> and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Treasury Regulation § 1.704-1(b) and Treasury Regulation § 1.704-2, and will be interpreted and applied in a manner consistent with such Treasury Regulations. To the extent necessary to comply with Treasury Regulation § 1.704-1(b)(2)(ii)(d), a Member's Capital Account will be reduced for the adjustments and allocations set forth in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) and (6). In the event a Majority in Interest determines that it is prudent or advisable to modify the manner in which the Capital Accounts, or any increases or decreases thereto, are computed in order to comply with such Treasury Regulations, such Majority in Interest may cause such modification to be made without the consent of all the Members, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company. In addition, a Majority in Interest may amend this Agreement in order to comply with such Treasury Regulations as provided in <u>Section 3(j)</u> below.

3.   **Special Rules Regarding Allocation of Tax Items**. Notwithstanding the provisions of <u>Article VII</u>, the following special rules will apply in allocating the net income or net loss of the Company:

(a)   <u>Section 704(c) and Revaluation Allocations</u>. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, and notwithstanding any subsequent repeal or modification thereof, income, gain, loss and deduction with respect to any property contributed to the capital of the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Fair Value at the time of contribution. In the event of the occurrence of a Revaluation, subsequent allocations of income, gain, loss and deduction with respect to such property will take account of any variation between the adjusted basis of such property to the

PB0002858

Company for federal income tax purposes and its Fair Value immediately after the adjustment in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Allocations in accordance with this Section 3(a) are solely for income tax purposes and will not affect, or in any way be taken into account in computing, any Member's Capital Account, distributions or share of income or loss, in accordance with any provision of this Agreement.

(b)    Minimum Gain Chargeback. Notwithstanding any other provision of Article VII, if there is a net decrease in Company Minimum Gain during a Company taxable year, each Member will be allocated items of income and gain for such year (and, if necessary, for subsequent years) in an amount equal to that Member's share of the net decrease in Company Minimum Gain during such year (hereinafter referred to as the "*Minimum Gain Chargeback Requirement*"). A Member's share of the net decrease in Company Minimum Gain is the amount of the total decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding taxable year. A Member is not subject to the Minimum Gain Chargeback Requirement to the extent: (1) the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing or other change in the debt instrument causing it to become partially or wholly recourse debt or a Member Nonrecourse Liability, and the Member bears the economic risk of loss for the newly guaranteed, refinanced or otherwise changed liability; (2) the Member contributes capital to the Company that is used to repay the Nonrecourse Liability and the Member's share of the net decrease in Company Minimum Gain results from the repayment; or (3) the Minimum Gain Chargeback Requirement would cause a distortion and the Commissioner of the Internal Revenue Service waives such requirement.

A Member's share of Company Minimum Gain will be computed in accordance with Treasury Regulation § 1.704-2(g) and as of the end of any Company taxable year will equal: (1) the sum of the nonrecourse deductions allocated to that Member up to that time and the distributions made to that Member up to that time of proceeds of a Nonrecourse Liability allocable to an increase of Company Minimum Gain, minus (2) the sum of that Member's aggregate share of net decrease in Company Minimum Gain plus his aggregate share of decreases resulting from revaluations of Company Property subject to Nonrecourse Liabilities. In addition, a Member's share of Company Minimum Gain will be adjusted for the conversion of recourse and Member Nonrecourse Liabilities into Nonrecourse Liabilities in accordance with Treasury Regulation § 1.704-2(g)(3). In computing the above, amounts allocated or distributed to the Member's predecessor in interest will be taken into account.

(c)    Member Minimum Gain Chargeback. Notwithstanding any other provision of Article VII, if there is a net decrease in Member Minimum Gain during a Company taxable year, any Member with a share of that Member Minimum Gain (determined under Treasury Regulation § 1.704-2(i)(5)) as of the beginning of the year will be allocated items of income and gain for such year (and, if necessary, for subsequent years) equal to that Member's share of the net decrease in Member Minimum Gain. In accordance with Treasury Regulation § 1.704-2(i)(4), a Member is not subject to the Member Minimum Gain Chargeback requirement to the extent the net decrease in

PB0002859

Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Debt due to a conversion, refinancing or other change in the debt instrument that causes it to be partially or wholly a nonrecourse debt. The amount that would otherwise be subject to the Member Minimum Gain Chargeback requirement is added to the Member's share of Company Minimum Gain.

(d)     Qualified Income Offset.   In the event any Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation §1.704.1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases such Member's Adjusted Capital Account Deficit, items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) will be specially allocated to such Member in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation under this Section 3(d) will be made if and only to the extent such Member would have an Adjusted Capital Account Deficit after all other allocations under Article VII have been made.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period will be allocated to the Members in proportion to their Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deduction will be allocated to the Member who bears the risk of loss with respect to the loan to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation § 1.704-2(i).

(g)     Curative Allocations. Any special allocations of items of income, gain, deduction or loss in accordance with Sections 3(b), (c), (d), (e), (f) and (h) will be taken into account in computing subsequent allocations of income and gain in accordance with Article VII, so that the net amount of any items so allocated and all other items allocated to each Member in accordance with Article VII will, to the extent possible, be equal to the net amount that would have been allocated to each such Member in accordance with the provisions of Article VII if such adjustments, allocations or distributions had not occurred.

(h)     Loss Allocation Limitation. Notwithstanding the other provisions of Article VII, unless otherwise agreed to by all of the Members, no Member will be allocated Loss in any taxable year which would cause or increase an Adjusted Capital Account Deficit as of the end of such taxable year.

(i)     Share of Nonrecourse Liabilities. Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulation § 1.752-3(a)(3), each Member's interest in Company profits is equal to its respective Percentage Interest.

(j)     Compliance with Treasury Regulations. The foregoing provisions of this Section 3 are intended to comply with Treasury Regulation §§ 1.704-1, 1.704-2 and

PB0002860

1.752-1 through 1.752-5, and will be interpreted and applied in a manner consistent with such Treasury Regulations. In the event it is determined by a Majority in Interest that it is prudent or advisable to so amend this Agreement in order to comply with such Treasury Regulations, such Majority in Interest is empowered to amend or modify this Agreement without the consent of all the Members, notwithstanding any other provision of this Agreement.

(k)     General Allocation Provisions. Except as otherwise provided in this Agreement, all items that are components of Income or Loss will be divided among the Members in the same proportions as they share such net income or net loss, as the case may be, for the year. For purposes of determining the Income, Loss or any other items for any period, Income, Loss or any such other items will be determined on a daily, monthly or other basis, as determined by the Members using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(l)     Allocation of State Tax Credits. One hundred percent (100%) of the Connecticut State Historic Tax Credits shall be allocated to WSM.

(m)     Gain from Sale of Certain State Tax Credits. One hundred percent (100) of the gain from the sale of the Connecticut Tax Credits for Infrastructure Projects in the Entertainment Industry and the Connecticut Green Building Tax Credits generated by the Project shall be allocated to WSM.

(n)     Special Allocation of Taxable Income. Notwithstanding the foregoing, any taxable income resulting from: (i) receipt of contributions (including income arising from re-characterization of any capital contribution, debt or financing); and/or (ii) income arising from the sale of Connecticut State Historic Tax Credits generated by the Project, shall be allocated 100% to WSM, and the Manager shall cause the Accountants to prepare and file federal and state income tax returns that are consistent with this allocation provision.

### REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.

PB0002861

# Exhibit E

## Certificate of Legal Existence

Attached

23850.005/660343.3

PB0002862

Office of the Secretary of the State of Connecticut

I, the Connecticut Secretary of the State, and keeper of the seal thereof, DO HEREBY CERTIFY, that articles of organization for

WALL STREET MASTER LANDLORD, LLC

a domestic limited liability company, were filed in this office on November 22, 2016.

Articles of dissolution have not been filed, and so far as indicated by the records of this office such limited liability company is in existence.

_____

Secretary of the State

Date Issued:  December 20, 2016

Business ID: 1222862                    Standard          Certificate Number: 2016384603001

Note: To verify this certificate, visit the web site http://www.concord.sots.ct.gov

PB0002863