# EXHIBIT C

## MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT (this *"Lease"*) is made and entered into as of this 29th day of December, 2016, between Wall Street Master Landlord, LLC, a Connecticut limited liability company, having an address at 71 Wall Street, Norwalk, Connecticut 06850 (*"Landlord"*), and Wall Street Master Tenant, LLC, a Connecticut limited liability company, having an address at 71 Wall Street, Norwalk, Connecticut 06850 (*"Tenant"*).

### RECITALS

Landlord has a leasehold interest in certain improved real property (the *"Land"*) located in Norwalk, Connecticut and more particularly described on Exhibit A attached hereto, pursuant to that certain Lease Agreement, dated on or about the date hereof by and between Wall Street Theater Company Inc., a Connecticut non-stock corporation (*"Wall Street"*), as landlord and fee owner, and Landlord, as tenant;

Landlord intends to rehabilitate and develop a certain historic building located on the Land, located at 71 Wall Street, Norwalk, Connecticut 06850 (the *"Building"*), and appurtenant structures and other improvements, if any, located on the Land, into a performance theater; and

Landlord desires to lease the Project (as defined herein) to Tenant, and Tenant desires to lease the Project from Landlord, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements of the parties hereto, as are hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party hereto, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Project;

SUBJECT TO the operation and effect of the Permitted Encumbrances (as defined herein);

TO HAVE AND TO HOLD the Project unto Tenant, its successors and permitted assigns, for and during the Term (as defined herein);

ON THE TERMS AND SUBJECT TO THE CONDITIONS that are hereinafter set forth:

Section 1.      Definitions. As used herein, the following terms have the following meanings:

*"Additional Rent"* has the meaning given it in Section 4.1(b) hereof.

*"Alterations"* has the meaning given it in Section 8.1 hereof.

*"Award"* has the meaning given it in Section 12.2 hereof.

*"Bankruptcy"* is deemed, for any Person, to have occurred either:

PB0002261

     (a)    if and when such Person applies for or consents to the appointment of a receiver, trustee or liquidator of such Person or of all or a substantial part of its assets; files a voluntary petition in bankruptcy or admits in writing its inability to pay its debts as they come due; makes an assignment for the benefit of its creditors; files a petition or an answer seeking a reorganization or an arrangement with its creditors or seeks to take advantage of any insolvency law; or files an answer admitting the material allegations of a petition filed against such Person in any bankruptcy, reorganization or insolvency proceeding; or

     (b)    if an order, judgment or decree is entered by any court of competent jurisdiction adjudicating such Person a bankrupt or an insolvent, approving a petition seeking such a reorganization, or appointing a receiver, trustee or liquidator of such Person or of all or a substantial part of its assets; or there otherwise commences with respect to such Person or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or similar law, and if such order, judgment, decree or proceeding continues unstayed for any period of ninety (90) consecutive days after the expiration of any stay thereof.

"***Base Rent***" has the meaning given it in Section 4.1(a) hereof.

"***Building***" has the meaning set forth in the Recitals.

"***City of Norwalk***" means the City of Norwalk, a political subdivision of the State of Connecticut

"***Code***" means the Internal Revenue Code of 1986, as amended through the date hereof.

"***Commencement Date***" has the meaning given it in Section 3.1 hereof.

"***Completion***" has the meaning given it in Section 2.5 hereof.

"***Construction Contract***" has the meaning given it in Section 2.1(a) hereof.

"***Contractor***" has the meaning given it in Section 2.1(a) hereof.

"***Department***" has the meaning given it in Section 2.1(c) hereof.

"***Developer***" means Lockwood & Mean Real Estate, LLC, a Connecticut limited liability company.

"***Development Agreement***" means that certain Amended and Restated Development Services Agreement between the Landlord and the Developer dated on or about the date hereof, pursuant to which the Developer shall perform development services with respect to the Project.

2

Master Lease Agreement
Wall Street Theater
#130177066

PB0002262

*"Environmental Laws"* means any and all federal, state or local laws pertaining to health, safety, or the environment now or at any time hereafter in effect, and any judicial or administrative interpretation thereof (including but not limited to any judicial or administrative order, consent decree or judgment relating to the environment or Hazardous Substances or exposure to Hazardous Substances) including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Superfund Amendments and Reorganization Act of 1986, as amended, the Resource, Conservation and Recovery Act of 1976, as amended, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Oil Pollution Act of 1990, as amended, the Safe Drinking Water Act, as amended, the Hazardous Materials Transportation Act, as amended, the Toxic Substances Control Act, as amended, and any other environmental or health conservation or protection laws.

*"Environmental Site Assessment"* means That certain Phase I Environmental Site Assessment Report for 71 Wall Street, Norwalk, CT, dated December 15, 2016, prepared by Payne Environmental, LLC (Payne Proj # 15.106/002).

*"Equipment"* means all apparatus, machinery, devices, fixtures, appurtenances, equipment and other personal property now or hereafter located on or within the Project, necessary for the proper operation and maintenance of the Project and owned by Landlord (other than any such items owned by Tenant, any management company or maintenance company employed by Tenant at the Project), including but not limited to any and all awnings, shades, screens and blinds; asphalt, vinyl, composition and other floor, wall and ceiling coverings; partitions, doors and hardware; elevators, escalators and hoists; heating, plumbing and ventilating apparatus; gas, electric and steam fixtures; chutes, ducts and tanks; oil burners, furnaces, heaters, incinerators and boilers; air-cooling and air-conditioning equipment; washroom, toilet and lavatory fixtures and equipment; engines, pumps, dynamos, motors, generators, electrical wiring and equipment; tools, building supplies, lobby decorations and window washing hoists and equipment; garage equipment and gardening and landscaping equipment; recreational furniture and equipment; refrigerators, dishwashers, disposals, ranges and other kitchen appliances and all additions thereto and replacements thereof.

*"Event of Default"* has the meaning given it in Section 14.1 hereof.

*"Federal Historic Tax Credits"* means the Federal Historic Tax Credits under Section 47 of the Internal Revenue Code of 1986, as amended.

*"Federal Part 1 Application"* has the meaning given it in Section 2.1(c) hereof.

*"Federal Part 1 Approval"* has the meaning given it in Section 2.1(c) hereof.

*"Federal Part 2 Application"* has the meaning given it in Section 2.1(c) hereof.

*"Federal Part 2 Approval"* has the meaning given it in Section 2.1(c) hereof.

*"Force Majeure"* means any strike, lock-out or other labor troubles; governmental restrictions or limitations; failure or shortage of electrical power, gas, water, fuel oil, or other

3

PB0002263

utility or service; riot, war, insurrection or other national or local emergency; accident, flood, fire or other casualty; adverse weather condition; other act of God; or other cause similar or dissimilar to any of the foregoing and beyond the reasonable control of the person in question.

*"Hazardous Substances"* means any substances or materials subject to regulation under or defined as such in any Environmental Laws.

*"Historic Credit Recapture Period"* has the meaning given to it in the Tenant Operating Agreement.

*"Historic Requirements"* has the meaning given it in Section 2.1(c) hereof.

*"Historic Tax Credits"* means the Federal Historic Tax Credits and the State Historic Tax Credits.

*"Land"* has the meaning set forth in the Recitals.

*"Land Records"* means the real estate records maintained by the Town Clerk for the City of Norwalk, Connecticut.

*"Landlord"* means Wall Street Master Lanlord, LLC, a Connecticut limited liability company, and its successors and assigns as holder of a leasehold interest in the Property.

*"Leasehold Estate"* means the leasehold estate in the entire Project held by Tenant under this Lease.

*"Legal Requirements"* has the meaning given it in Section 5.2(h) hereof.

*"Mortgage"* means collectively any mortgage, deed of trust or other form of security instrument secured by an interest in the Project, including but not limited to any mortgages executed and recorded in connection with the Project Loan; provided that such mortgage or other form of security instrument has been recorded in the Land Records or filed in such other place as is, under applicable law, required for such instrument to give constructive notice of the matters set forth therein.

*"Mortgagee"* means each Person from time to time that is the holder of a Mortgage, including, without limitation, Project Lender.

*"Operating Expenses"* has the meaning given it in Section 6.4 hereof.

*"Part 3 Approval"* means that certain Request for Certification of Completed Work (Form I0-l68c) to be submitted to and approved by the U.S. Department of Interior-National Park Service pursuant to Part 3 of the historic preservation application whereby the rehabilitation of the Building has been determined to constitute the "certified rehabilitation" of a "certified historic structure."

4

PB0002264

*"Partial Taking"* has the meaning given it in Section 12.4 hereof.

*"Patriot Lender"* means Patriot Bank, N.A., a national banking association.

*"Patriot Loan"* means that certain Construction Loan Agreement by and between the Patriot Lender, Landlord and Wall Street dated as of December 29, 2016, as well as any other refinancings thereof consented to by Tenant and Tenant's members in accordance with Section 13.4(b) hereof, secured by a Mortgage encumbering the Project.

*"Permitted Encumbrances"* means the mortgage executed in connection with the Patriot Loan, this Lease, easements and rights-of-way, covenants and restrictions, and other matters of record, existing as of the date hereof, or set forth in Tenant's leasehold title insurance policy having an effective date on or after the date hereof.

*"Person"* shall mean a natural person(s), a trustee, a corporation, a partnership, a limited liability company and any other form of legal entity.

*"Placed in Service"* or *"Placement in Service"* means the occurrence of the events necessary to establish placement in service of the Building for purposes of Section 1.48-12(f)(2) of the Treasury Regulations, such that the QREs are placed in a condition or state of readiness for an intended use in the Master Landlord's trade or business. Landlord and the Tenant agree and acknowledge that there shall be one "Placement in Service" for the entire Building.

*"Plans and Specifications"* has the meaning given it in Section 2.1(b) hereof.

*"Project"* means, collectively, the Land, the Building, together with all appurtenant structures and other improvements on the Land, if any, and the Equipment, and any and all rights, alleys, ways, waters, privileges, roads, improvements, appurtenances and advantages, to the same belonging or in any way appertaining.

*"Project Lender(s)"* means and refers to any lender making Project Loans to the Landlord, including any loans advanced after the date hereof, including, without limitation, Patriot Lender.

*"Project Loan(s)"* means and refers to any loan or loans made by a Project Lender to the Landlord, including any loans advanced after the date hereof, including, without limitation, Patriot Loan.

*"QRE"* means "qualified rehabilitation expenditure" as such term is defined in Code Section 47(c)(2).

*"Rent"* means all Base Rent and all Additional Rent.

*"Restoration Proceeds"* has the meaning given it in Section 12.4(a) hereof.

*"SHPO"* has the meaning given it in Section 2.1(c) hereof.

5

PB0002265

"*SNDA*" means and refers to that certain Subordination, Nondisturbance and Attornment Agreement, dated as of the date hereof, by and among Wall Street, Landlord, Tenant, Patriot Lender and Tenant Investor Member, together with any other SNDAs entered into after the date hereof pursuant to Section 2.8.

"*State Historic Tax Credits*" means the Connecticut Historic Rehabilitation Tax Credit pursuant to Conn. Gen. Stat. Section 10-416c.

"*State Part 4 Approval*" means that certain Connecticut Historic Rehabilitation Tax Credit Part 4 Application: Request for Certification of Completed Rehabilitation (Form ITC-300d) to be submitted to and approved by the SHPO whereby the rehabilitation of the Building has been determined to constitute the "certified rehabilitation" of a "certified historic structure."

"*Sublease*" has the meaning given it in Section 2.9 hereof.

"*Taking*" has the meaning given it in Section 12.1 hereof.

"*Target Completion Date*" has the meaning given it in Section 2.3 hereof.

"*Taxes*" has the meaning given it in Section 6.1 hereof.

"*Tenant*" means Wall Street Master Tenant, LLC, a Connecticut limited liability company, and its successors and permitted assigns, as holder of the Leasehold Estate.

"*Tenant Investor Member*" means Enhanced Capital HTC Fund I, LLC, a Delaware limited liability company, together with its successors and/or assigns.

"*Tenant Operating Agreement*" means that certain Amended and Restated Operating Agreement of Tenant between Wall Street Manager, LLC, a Connecticut limited liability company, and Tenant Investor Member, as investor member, dated on or about the date hereof.

"*Tenant's Award*" has the meaning given it in Section 12.2 hereof.

"*Term*" has the meaning given it in Section 3.1 hereof.

"*Termination Date*" has the meaning given it in Section 3.1 hereof.

"*Total Taking*" has the meaning given it in Section 12.3 hereof.

"*Transfer*" has the meaning given it in Section 13.1 hereof.

"*Wall Street*" has the meaning set forth in the Recitals.

Section 2.    Rehabilitation of Project.

6

PB0002266

2.1.    Requirements. Landlord shall cause the Project to be rehabilitated in accordance with the following (collectively, the *"Rehabilitation Requirements"*):

(a)    the terms and conditions of (i) that certain Standard Form of Agreement Between Owner and Contractor (as amended, the *"Construction Contract"*), between Wall Street and The Morganti Group, Inc. (the *"Contractor"*), dated June 29, 2016, and (ii) that certain Assignment and Assumption Agreement between Landlord and Wall Street, dated as of the date hereof, which (together with all change orders executed prior to the effective date of this Lease) has been delivered to and approved by Tenant and Tenant Investor Member prior to the date hereof, and which Landlord represents and warrants constitutes the entire agreement between Landlord and Contractor with respect to the rehabilitation of the Project;

(b)    the design plans and specifications (the *"Plans and Specifications"*) received by Landlord from Design Development Architect, PLLC, a New York professional service limited liability company, dated March 30, 2016 and May 31, 2016 and labeled "Issued for Permit 3/30/16", which may not be materially supplemented, modified or amended in any manner which would affect the Historic Requirements, without the prior notice to and approval of Tenant and Tenant Investor Member, which shall not be unreasonably withheld; provided that any changes which could affect or impair the Historic Requirements shall require the approval of Tenant and Tenant Investor Member in their respective sole discretion;

(c)    the United States Secretary of Interior's Standards for Rehabilitation and the requirements of the designated State Historic Preservation Officer (as such term is defined in 36 C.F.R. Part 67) for the State of Connecticut (the *"SHPO"*);

(i)    the Federal Historic Preservation Certification Application - Part 1 Evaluation of Significance (the *"Federal Part 1 Application"*), and the Federal Historic Preservation Certification Application - Part 2 Description of Rehabilitation (the *"Federal Part 2 Application"*), to be submitted, to the United States Department of the Interior, National Park Service (the *"Department"*);

(ii)    the approval by the Department of the Federal Part 1 Application (the *"Federal Part 1 Approval"*), and the approval by the Department of the Federal Part 2 Application (the *"Federal Part 2 Approval"*);

(iii)    the Connecticut Historic Rehabilitation Tax Credit - Part 1 Determination of Historic Structure Status (the *"State Part 1 Application"*), the Connecticut Historic Rehabilitation Tax Credit - Part 2 Request for Approval of Proposed Rehabilitation Plan (the *"State Part 2 Application"*), the Connecticut Historic Rehabilitation Tax Credit – Part 3

7

PB0002267

Application: Request for Preliminary Certification and Reservation of Tax Credits (*"State Part 3 Application"*), to be submitted, respectively, to the SHPO;

(iv)    the approval by the SHPO of the State Part 1 Application (the *"State Part 1 Approval"*), the State Part 2 Application (the *"State Part 2 Approval,"*), and the State Part 3 Application (the *"State Part 3 Approval,"* and together with the Federal Part 1 Application, Federal Part 2 Application, Federal Part 1 Approval, Federal Part 2 Approval, State Part 1 Application, State Part 2 Application, State Part 3 Application, State Part 1 Approval, and State Part 2 Approval, collectively, the *"Historic Requirements"*); and

(v)    the Legal Requirements, including, without limitation, the requirements of applicable local building, fire, health and safety codes, and Americans with Disabilities Act requirements.

2.2.    Development Costs. Landlord shall fund any and all amounts necessary to complete rehabilitation and construction of the Project in accordance with the Rehabilitation Requirements pursuant to Section 2.1 above or otherwise necessary in order to achieve Completion, Placement in Service, Part 3 Approval and State Part 4 Approval; to pay any and all cost overruns payable under the Construction Contract and any and all abatement contracts in connection with such rehabilitation and construction and for which a budget contingency does not exist; to pay all sums necessary to remedy any construction defects in connection with such rehabilitation and construction if such defects are not cured by the Contractor prior to Completion; and to pay any and all development and other costs, to the extent in excess of amounts and contingencies therefor being financed by the proceeds of the Patriot Loan and Rent received hereunder, and any capital contributions to Landlord by its members, in any case arising during such rehabilitation and construction through and including Completion, Placement in Service of the Project, Part 3 Approval and State Part 4 Approval; provided, however, that to the extent a portion of the developer's fee budgeted in the Project development budget is deferred and not paid as of Placement in Service, then Landlord may pay such deferred developer fee, with interest, compounded annually, from its available cash flow from the payment of Rent by Tenant as provided in this Lease, or other available funds of Landlord, from time to time, provided that the Landlord hereby agrees to pay all such deferred developer fee including any interest, no later than the 8th anniversary of Placement in Service, or such earlier time as may be required under applicable law if not sooner paid.

2.3.    Completion Date. Landlord shall achieve Completion of the entire Project on or before December 31, 2016 (the *"Target Completion Date"*), other than any Part 3 Approval and/or State Part 4 Approval then pending (provided all applications therefor have been filed), subject to extension upon the occurrence of any event constituting Force Majeure (and solely during the pendency thereof). Landlord shall keep Tenant informed as to the progress of rehabilitation and shall immediately notify Tenant in writing of any

8

PB0002268

change to the Target Completion Date. Landlord shall use its best efforts and all due diligence to cause the rehabilitation of the Project to reach Completion on or before the Target Completion Date.

2.4. <u>Landlord's Agreements</u>. Landlord shall cause the Contractor to warrant that the Project will be free from defects in workmanship and materials for twelve (12) months after Completion. Landlord shall also obtain all customary and available other warranties and guaranties from the Contractor, subcontractors and materialmen. Landlord shall fully enforce, at its cost and expense, for the benefit of Tenant, all of its rights under all construction and architectural agreements, any and all documents evidencing the Rehabilitation Requirements, any payment and performance bonds, completion assurance agreements and all other warranties and guaranties applicable to the Project. Tenant will notify Landlord within the warranty period specified above of any physical defects at the Project of which Tenant becomes aware. Further, Landlord hereby agrees that it shall promptly apply for and use its best efforts and all due diligence to obtain the Part 3 Approval and State Part 4 Approval within twelve (12) months of Completion.

2.5. <u>Completion</u>. The term *"Completion"* shall mean lien-free completion of the entire Project, including receipt by the Master Tenant and Tenant Investor Member of evidence of the following:

(a) an AIA certificate of payment for Payment (AIA G702) from each contractor covering one hundred percent (100%) of the contract sum;

(b) an AIA certification of substantial completion (AIA G704), certifying that the Project has been fully completed in accordance with the Plans and Specifications (as modified by any approved change orders), the requirements of applicable local building, fire, and health and safety codes, Fair Housing Act requirements and Americans with Disabilities Act requirements, the Development Agreement, the Construction Contract and the Rehabilitation Requirements; and

(c) issuance of unqualified permanent certificates of occupancy for the Building or conditional certificates of occupancy which only contain conditions or qualifications which in the reasonable judgment of Tenant and Tenant Investor Member do not affect the intended use of the Project, provided that funds are escrowed to fully complete such conditions, in an amount and with an escrow agent acceptable to Tenant and Tenant Investor Member for all work described in or required under the Historic Requirements;

At such time as Landlord believes the Project to be complete, Landlord shall notify Tenant, and Landlord and Tenant, together with the Project independent inspecting architect and any inspection advisor of Tenant or Tenant Investor Member, shall jointly inspect the Project and list any items that remain to be completed, and Landlord shall diligently pursue completion of the same. In addition, Tenant shall have ten (10) days after such inspection within which to notify Landlord in writing of any other punchlist items that have not been properly completed, and, upon Landlord's confirmation,

9

PB0002269

Landlord shall also diligently pursue completion of any such items. Completion shall not be deemed to occur until all punchlist items (other than tenant finish of unleased space) have been completed to the reasonable satisfaction of Tenant or funds are available to complete same, pursuant to Section 2.5(b) above.

2.6.   Tax Credit Election. Landlord shall elect (the "*Election*"), pursuant to Section 48(d) of the Code (as in effect on the day prior to the enactment of the Revenue Reconciliation Act of 1990), by reference from Section 50(d) of the Code, to pass-through to the Tenant the Federal Historic Tax Credits relating to the Building. Landlord agrees to file all applicable elections and take any and all other action reasonably necessary under the Code in order that Tenant will be entitled to claim one hundred percent (100%) of the Federal Historic Tax Credits generated by the rehabilitation of the Project, and Tenant shall cooperate with Landlord in making such election or taking any such other action.

Subject to the terms and conditions of this Lease, the Landlord shall file the Election, which shall be substantially in the form attached hereto as Exhibit C, on or before the due date (including any extensions of time) of the Tenant Investor Member's federal income tax and information returns for the year ending 2016, if applicable based on Placed in Service, and for each other year in which QREs with respect to the Building are Placed in Service, which is expected to occur by December 31, 2016.

Except as otherwise provided herein, Tenant in its capacity as tenant under this Lease expressly waives and relinquishes in favor of Landlord any rights to claim the benefit of or to use any state tax credits and Tenant agrees to execute and deliver to Landlord any election form required to evidence Landlord's right to claim such state tax credits or depreciation benefits on improvements made or property installed by Landlord; provided, however, that in connection with any claim or use of such other credits or benefits, Landlord shall not take any position inconsistent with the Federal Historic Tax Credits being passed through to Tenant pursuant to the provisions herein. Landlord and Tenant agree that Tenant shall be entitled to any investment tax credits or depreciation attributable to repairs, alterations, additions, capital expenditures and/or improvements made by or property installed by Tenant and paid for by Tenant following the Commencement Date (as defined below).

2.7   QLIPs. In the event any portion of the Building is classified as qualified improvement property as defined in Code Section 168(k)(3) and subject to additional first-year depreciation pursuant to Code Section 168(k)(1), the Landlord shall, by the due date (including extensions) of the federal tax return for the taxable year in which any such qualified improvement property is Placed in Service, make an election in accordance with Code Section 168(k)(7), in a manner pursuant to Treas. Reg. Section 1.168(k)-1(e)(3), not to deduct additional first-year depreciation for such qualified improvement property.

2.8   Subordination. It is anticipated that Landlord will execute and deliver one or more Mortgages to Project Lenders in connection with the Project Loans. Landlord

10

Master Lease Agreement
Wall Street Theater
#130177066

shall cause any Project Lender now or hereafter holding a Mortgage to enter into a SNDA, in substantially the form attached hereto as Exhibit D, with Landlord, Tenant, and Tenant Investor Member.  With respect to any Project Loan and any amendment, modification, or extension thereto, or any replacement or refinancing thereof, if requested by a Project Lender or Landlord, the Tenant shall subordinate its interest in this Lease to the Mortgage and to any and all advances made thereunder and to the interest thereon, upon satisfaction of the following conditions:

    a)    the execution and delivery of a SNDA by such Project Lender in substantially the form attached hereto as Exhibit D; and

    b)    the replacement financing or refinancing, as the case may be, meets the other parameters established in Section 5.1(e) of the Tenant Operating Agreement; and

    c)    delivery of such other information as may be reasonably requested by Tenant and/or Tenant Investor Member.

    2.9    Related-Party Sublease.  Pursuant to a Sublease Agreement (the *"Sublease"*) from the Tenant to the City of Norwalk, to be entered into after the date heerof, Tenant shall lease the Project to the City of Norwalk, commencing concurrent with the Commencement Date and shall otherwise be governed by the terms of the Sublease.

Section 3.    Term.

    3.1.    Original Term. This Lease shall be for a term (the *"Term"*) commencing on the day before the Project is Placed in Service (the *"Commencement Date"*), and terminating at 11:59 p.m. central time on the day immediately before the nineteenth (19th) anniversary of Placement in Service, pursuant to Section 47 of the Code (the *"Termination Date"*).

    3.2.    Confirmation of Commencement and Termination. Landlord and Tenant shall, upon either's request therefor, confirm in writing by instrument in recordable form the Termination Date.

    3.3.    Possession. Landlord agrees to and shall provide possession of the Project to Tenant upon Placement in Service, free and clear of all rights to possession or use by any tenants or other Person other than Tenant, and any rights under Permitted Encumbrances.

    3.4.    Surrender. Tenant shall, at its expense, at the expiration of the Term or any earlier termination of this Lease, promptly yield up to Landlord the Project, in reasonable order and repair, ordinary wear and tear, and (subject to Sections 11 and 12 hereof) damage by casualty or condemnation excepted; remove therefrom Tenant's signs, goods and effects and any machinery, trade fixtures and equipment used in conducting Tenant's

11

PB0002271

trade or business and not part of the Project or otherwise owned by Landlord; and repair any damage to the Project caused by such removal. Upon such expiration or termination (whether by reason of an Event of Default or otherwise), Tenant shall thereafter have no right at law or in equity in or to any or all of the Project, or to repossess any of same, or in, to or under this Lease, and Landlord shall automatically be deemed immediately thereupon to have succeeded to all of the same, free and clear of the right, title or interest therein of Tenant; and Tenant hereby waives any and all rights of redemption that it may otherwise hold under any applicable law.

3.5.    Holding Over.

(a)    Nothing in this Lease shall be deemed in any way to permit Tenant to use or occupy the Project after the expiration of the Term or any earlier termination of this Lease. If and only if Tenant continues to occupy the Project after such expiration or termination after obtaining Landlord's express, written consent thereto:

(i)    such occupancy shall (unless the parties hereto otherwise agree in writing) be deemed to be under a month-to-month tenancy, which shall continue until either party hereto notifies the other in writing at least thirty (30) days before the end of any calendar month, that the party giving such notice elects to terminate such tenancy at the end of such calendar month, in which event such tenancy shall so terminate; and

(ii)    such month-to-month tenancy shall be on the same terms and subject to the same conditions as those set forth in this Lease, except that if Landlord gives Tenant written notice, at least thirty (30) days before the end of any calendar month during such month-to-month tenancy, that such terms and conditions (including any thereof relating to the amount and payment of Rent) shall, after such month, be modified in any manner specified in such notice, then such tenancy shall, after such month, be on the said terms and subject to the said conditions, as so modified.

(b)    If Tenant continues to occupy the Project after the expiration of the Term or any earlier termination of this Lease without having obtained Landlord's express, written consent thereto, then, without altering or impairing any of Landlord's rights under this Lease or applicable law, Tenant hereby agrees to pay to Landlord for each calendar month or portion thereof after such expiration of the Term or such earlier termination of this Lease, until Tenant surrenders possession of the Project to Landlord, immediately on demand by Landlord, as a use and occupancy fee for the Project, the sum of (i) one hundred fifty percent (150%) of the last monthly installment of the Base Rent, plus (ii) any Operating Expenses and other payments that Tenant is required to pay under this Lease, computed on a daily basis; and Tenant shall surrender possession of the Project to Landlord immediately on Landlord's having demanded the same. Nothing in this Lease shall be deemed in any way to give Tenant any right to remain in possession of

12

PB0002272

the Project after such expiration or termination, regardless of whether Tenant has paid any such Rent to Landlord.

3.6.    Title to and Alterations of Building. Notwithstanding any provision in this Lease to the contrary, at all times during the Term of this Lease, the Project and all alterations and additions thereto, and the Equipment, shall be owned by Landlord, and, except as set forth in Section 2.6 hereof, Landlord alone shall be entitled to all of the tax attributes of ownership, including, without limitation, the right to claim depreciation, amortization and cost recovery deductions, and all other state and federal tax credits and other attributes of ownership, except for the Federal Historic Tax Credits.   At the expiration or earlier termination of the Term, or any portion thereof, in accordance herewith, Tenant shall peaceably leave, quit and surrender the Project in the manner required under Section 3.4 hereof.   Upon such expiration or termination, the Project (other than any personal property, trade fixtures and equipment owned by any management company or maintenance company employed by Tenant, and any personal property, trade fixtures and equipment owned by Tenant at the Project) shall become the sole property of Landlord at no cost to Landlord, subject to the Permitted Encumbrances and other matters of record, excepting encumbrances placed on the Project by Tenant without Landlord's consent, and shall be in reasonable condition, normal wear and tear and casualty and condemnation losses excepted.

Section 4.    Rent.

4.1.    Amount. As rent for the Project, Tenant shall pay to Landlord:

(a)    Base Rent. Base Rent in the amounts shown on the Rent Schedule attached hereto as Exhibit B, payable monthly in monthly installments. The Base Rent is due and payable to Landlord for each calendar month of the Term, in advance, on the first day of each such calendar month, in lawful currency of the United States of America, by delivering or mailing it to Landlord's address for notice set forth in Section 17 hereof, or to such other address or in such other manner as Landlord from time to time specifies by written notice to Tenant. The Base Rent for any partial month (including but not limited to the month of the Commencement Date) shall be prorated based upon the actual number of days of the Term during such month. Landlord and Tenant acknowledge and agree that the Base Rent payable hereunder constitutes a reasonable fair market rent for the Project.

(b)    Additional Rent. This Lease is what is commonly called a "net lease," it being understood that Landlord shall receive the Base Rent set forth in Section 4.1(a) hereof free and clear of any and all charges, costs and expenses for which Tenant is responsible pursuant to Section 6.4 hereof. During the Term, all of such charges, costs and expenses when due shall constitute additional rent hereunder (the "*Additional Rent*"), even though not necessarily payable to Landlord, and upon the failure of Tenant to pay any of such Additional Rent in accordance with the terms of this Lease, Landlord shall have the same rights and

13

PB0002273

remedies as otherwise provided in this Lease for the failure of Tenant to make any other payment of Base Rent (subject to Section 14.4 and subject to Tenant's right to cure such failure upon receipt of written notice from Landlord as set forth in Section 14.2(b)(1) of this Lease). Nothing herein contained shall obligate Tenant for the payment of any expenses payable by Landlord herein or any income or franchise taxes payable by Landlord of the type described in Section 6.4.

4.2.   Debt Service Payments. Tenant (a) may elect, at its option, from time to time, upon written notice to Landlord, or (b) shall, upon receipt of written notice from Landlord, make the debt service payments and installments of reserves required by Mortgagee(s) due for any month or months of the Term under any Mortgage(s) directly to the applicable Mortgagee(s), which payments will be deemed to constitute Base Rent payments hereunder, and which payments shall reduce, dollar for dollar, the Base Rent due and payable to Landlord for such period.

4.3.   Tax on Lease. If federal, state or local law now or hereafter imposes any tax, assessment, levy or other charge (other than any income tax) directly or indirectly upon Landlord with respect to (a) this Lease or the value thereof, (b) Tenant's use or occupancy of the Project, (c) the Base Rent, Additional Rent or any other sum payable under this Lease, or (d) this transaction, Tenant shall pay the amount thereof as Additional Rent to Landlord upon demand, unless Tenant is prohibited by law from doing so, in which event Landlord may, at its election, pay such amounts.

Section 5.   Use of Project.

5.1.   Nature of Use. Tenant shall, pursuant to the Sublease, further lease the Project to Guarantor, with the Project to be used and operated as a performance theater, in compliance with any and all applicable governmental laws, rules, regulations and ordinances. Tenant shall not use or allow the Project to be used for any unlawful purpose, or for any purpose that would violate any recorded covenant or restriction affecting the Project or that would affect the historic character of the Building.

5.2.   Representations, Warranties and Covenants of Landlord. As an inducement to Tenant to enter into and proceed under this Lease, Landlord warrants and represents to Tenant as follows, which warranties, representations and covenants are true and correct as of the date of this Lease:

(a)   Landlord has good and marketable leasehold interest in the entire Project, subject only to the Permitted Encumbrances, and has the right, power and authority to enter into this Lease and to lease the Project to Tenant in accordance with the terms, provisions and conditions contained in this Lease, and no other party has any right or option to or in connection with the Project;

(b)   there is no litigation or action, pending or, to Landlord's knowledge, threatened, affecting the Project;

14

PB0002274

(c)     Landlord has received no written notice, and has no knowledge, nor has Landlord been otherwise advised, of any pending or threatened condemnation relating to all or any part of the Project;

(d)     Landlord has received no written notice, and has no knowledge of the intention of any party holding an easement affecting the Project or any part thereof to expand the exercise of any such easement beyond the scope of the present exercise thereof (as by replacing or expanding existing facilities, conduits (including underground or overhead wires, cables or pipes) or systems for sewers, water, electric, gas, cable and other utilities), other than any upgrades and replacements forming part of the Project prior to Completion;

(e)     the entry by Landlord into this Lease with Tenant, and the performance of all of the terms, provisions and conditions contained herein, will not, or with the giving of notice or the passage of time, or both, would not, violate or cause a breach or default under any agreement relating to the Project to which Landlord is a party or by which it is bound, including, without limitation, the Permitted Encumbrances;

(f)     other than as previously disclosed to Tenant, there is no tenant, lessee or other occupant of the Project having any right or claim to possession or use of the Project, and possession of the Project shall be delivered free of the rights or claims of any tenants, occupants or other parties in possession of, or claiming any right to possession or use of, the Project;

(g)     there are no unpaid special assessments of which Landlord has received notice for sewer, sidewalk, water, paving, gas, electrical or utility improvements or other capital expenditures, matured or unmatured, affecting the Project;

(h)     there are no outstanding notices of, nor, to Landlord's knowledge, any violations of any applicable laws, ordinances, notices, orders, rules, regulations and requirements of applicable federal, state and municipal governments and all departments, commissions, boards and officers thereof affecting any portion of the Project, including, without limitation, the Historic Requirements and Environmental Laws (collectively, the *"Legal Requirements"*), other than matters to be corrected prior to Completion;

(i)     Landlord is not obligated under any contract, lease or agreement, oral or written, with respect to the ownership, use, operation or maintenance of the Project, except for obligations of Landlord under those contracts respecting the rehabilitation and development of the Project and operating agreements which are disclosed in writing to Tenant and Tenant Investor Member;

15

PB0002275

(j)     Landlord shall pass-through the Federal Historic Tax Credits to the Tenant; and

(k)     to the best of Landlord's actual knowledge, based on review of the Environmental Site Assessment, neither the Project nor any part thereof has been used for the disposal of refuse or waste, or for the generation, processing, manufacture, storage, handling, treatment, transportation or disposal of any Hazardous Substances, and no Hazardous Substances are located on or beneath the Project, other than as set forth in the Environmental Site Assessment and any supplemental reports, which Hazardous Substances Landlord shall cause to be fully remediated or encapsulated in accordance with applicable Environmental Laws prior to Completion.

Section 6.     Taxes and Operating Expenses.

6.1.     Taxes. Landlord shall bear the full expense of any and all real property or other taxes, payments in lieu of taxes, special assessments, use or occupancy taxes, metropolitan sewer district charges or other assessments or charges levied against any or all of the Project, arising or accruing prior to Completion and thereafter Tenant shall bear any such expense levied and payable with respect to any calendar or tax year or other period falling wholly or partly within the Term (all of which are hereinafter referred to collectively as "*Taxes*"), and shall deliver to the other party a copy of the receipted bill for such Taxes from time to time upon such party's request therefor.

6.2.     Delivery of Bills and Notices. Landlord shall deliver to the Tenant, promptly after such party's receipt thereof, the originals of any and all bills for Taxes and notices of assessments or reassessments made or to be made for the purpose of levying any Taxes. If the Project is not now treated as a separate tax lot by the assessing authority, Landlord shall use its reasonable efforts promptly hereafter to have the Project so treated.

6.3.     Proceedings to Contest. Landlord may, without postponing payment thereof, as aforesaid, bring proceedings to contest the validity or the amount of any Taxes, or to recover any amount thereof paid by Landlord; provided that, prior thereto Landlord notifies Tenant in writing that Landlord intends to take such action. Landlord shall indemnify and hold harmless Tenant against and from any expense arising out of any such action. Tenant shall, upon written request by Landlord, cooperate with Landlord in taking any such action, provided that Landlord indemnifies and holds harmless Tenant against and from any expense or liability arising out of such cooperation.

6.4.     Operating Expenses. Tenant will pay (or cause to be paid) directly to the providers of such services all costs and expenses attributable to or incurred in connection with the operation, marketing, leasing and occupancy of the Project, including without limitation all energy sources for the Project, such as propane, butane, natural gas, steam, electricity, solar energy and fuel oil; all water, sewer and trash disposal services; in connection with the operations of the Buildings; and from and after Completion, Tenant

16

PB0002276

will pay (a) all normal maintenance of the Project including, without limitation, all Equipment and (b) all casualty, liability and rent loss insurance premiums relating to the Project, for the period from and after Completion and required by Tenant Investor Member and all Taxes for the period from and after Completion, (collectively, the *"Operating Expenses"*). Landlord shall be solely responsible for, and Tenant shall have no obligation to undertake and Tenant shall have no liability with respect to the costs and expenses of, any and all capital improvements and capital repairs to the Project (whether structural or non-structural), reasonably necessary or required by any governmental or quasi-governmental authority having jurisdiction over the Project or otherwise, all Taxes, all builder's risk, all risk casualty and comprehensive general liability insurance required pursuant to Section 7 below, or by any mortgage lender, naming both Landlord and Tenant as named insureds thereunder, arising or accruing for the period prior to Completion and all construction-related Operating Expenses arising prior to Completion. Further, Landlord shall fully and timely fund all insurance premiums prior to Completion.

Section 7.    Insurance.

7.1.    Insurance to Be Maintained. The following insurance shall be maintained throughout the Term, as follows:

(a)    commercial general public liability insurance with respect to the Project, including public liability, and contingent liability, all to the extent applicable and customary in the area in which the Project is located, with coverage amounts of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, with umbrella coverage of not less than $2,000,000 per occurrence and $2,000,000 in the aggregate, or in such greater amounts as Landlord may reasonably determine in accordance with prudent business practices to be maintained by Landlord prior to Completion and by Tenant thereafter; and

(b)    following Completion, special form casualty insurance (at least as broad as ISO Form CF 1030) for the replacement cost of the Project, including fire, other hazard (including vandalism and malicious mischief), and extended coverage, and such other coverage as Tenant and Landlord shall reasonably determine in accordance with prudent business practices, to be maintained and paid by Tenant.

(c)    prior to Completion, builder's risk insurance, insuring for all risk of physical loss or damage (excluding the perils of earthquake and flood) to the building being rehabilitated, fixtures, materials, supplies, machinery and equipment to be used in such rehabilitation, scaffolding, falsework, fences, forms, etc., trailers and temporary structures incidental to the rehabilitation, foundations and underground work, sidewalks and paving, personal property of others for which Landlord or Tenant may be liable and personal property of the Landlord used to maintain or service the Project rehabilitation, whether located at the site or elsewhere, including while in transit to be maintained and paid by Landlord. The construction site shall be specifically scheduled on the policy as a covered

17

PB0002277

location. The limits of the policy will be at least the estimated replacement value of the completed Project plus the value of other property insured. Coverage and limits shall be extended to include soft costs or additional costs made necessary by a delay in completion of construction, such as debt service payments, design professional fees, Taxes, insurance premiums and similar costs.

7.2.   Insureds. Each such policy shall name Landlord as named insured thereunder, and Tenant and Tenant Investor Member as an additional insured and each Mortgagee as mortgagee and loss payee, as their respective interests shall appear.

7.3.   Insurer. All insurance required and all renewals of insurance shall be issued by companies of recognized responsibility licensed to issue such policies and otherwise transact business in the State of Connecticut and otherwise reasonably acceptable to Landlord, Tenant and Tenant Investor Member. All insurance policies will expressly provide that such policies will not be canceled or altered without thirty (30) days' prior written notice to Landlord, Tenant, Tenant Investor Member and any other insured thereunder. Such insurance will, to the extent obtainable, provide that no act or omission of Tenant or Landlord, as applicable, that would otherwise result in forfeiture or reduction of the insurance will affect or limit the obligation of the insurance company to pay the amount of any loss sustained by the other party, and contain a waiver by the insurer of its rights of subrogation against Tenant. Upon issuance, each insurance policy or duplicate or certificate of such policy shall be delivered to Landlord.

7.4.   Evidence. As of the Commencement Date, Landlord shall deliver to Tenant an original or a signed duplicate copy of each such policy or certificate therefor (using Acord 27, or Acord 25S modified to require delivery of thirty (30) days' notice of termination to Landlord, Tenant and Tenant Investor Member), and thereafter shall deliver such certificates of coverage and policies not less than thirty (30) days prior to expiration or other change in coverage of the insurance then applicable. All commercial general liability and casualty policies maintained by Landlord will be written as primary policies, or as blanket policies with per project amounts assigned.

7.5.   Waiver of Recovery. Notwithstanding any provision in this Lease to the contrary, each of Landlord and Tenant hereby waives any right of recovery against the other for any liability, claim of liability or expense covered by the policies of insurance required under Section 7.1 hereof for which the insurers under the applicable insurance policies have waived subrogation as contemplated in Section 7.3 hereof.

18

PB0002278

Section 8.    Alterations.

8.1.    Alteration of Project. Tenant shall not make any improvements, additions, alterations or changes (structural and non-structural) (sometimes collectively referred to herein as "*Alterations*") to the Project without the prior written consent of Landlord and Patriot Lender (if required pursuant to the terms of the Patriot Loan or any related loan documents), accompanied by such plans and specifications and other information as Landlord may require, which will include evidence acceptable to Landlord that such Alterations are in compliance with all applicable Legal Requirements. Any consent of Landlord would also be subject to the following conditions:

(a)    no Alterations shall be made that would impair the structural soundness of the Building;

(b)    no Alterations shall be undertaken that are prohibited by, or would cause the Project, Tenant or Landlord to be in breach or violation of any Legal Requirements or, as regards Landlord, in any breach or violation of the requirements of a Mortgagee;

(c)    no Alterations shall be undertaken until Tenant shall have procured, to the extent the same may be required from time to time, all permits and authorizations of all applicable governmental authorities and Landlord shall have procured, at Tenant's cost, all required consents of any Mortgagee. If Landlord has consented to an Alteration, then Landlord shall agree to join in the application for such permits whenever such action is reasonably necessary and is reasonably requested by Tenant, and shall use reasonable efforts to cooperate with Tenant, at Tenant's expense, in obtaining such permits and Tenant shall cooperate with Landlord respecting consent of the Mortgagee;

(d)    Landlord shall not allow any of its members, or any other Person, to make any alterations to the Project after Part 3 Approval or State Part 4 Approval has been received without the prior written Consent of the Tenant Investor Member if such alterations are inconsistent with (i) the standards for rehabilitation set forth in 36 CFR Part 67.7 or any success provisions, as amended, (ii) the Part 3 Approval, or (iii) State Part 4 Approval,; and

(e)    any Alterations made to the Project shall be made only in a good and workmanlike manner and in accordance with all applicable building, health and safety and other applicable codes and requirements and shall be free from any and all mechanic's materialmen's or other liens, and Tenant shall provide Landlord with such indemnities, escrows of funds to pay for Alterations, or other collateral security reasonably required by Landlord.

8.2.    Fixtures. Any and all Alterations and all other property attached to or otherwise installed as a fixture within the Project by Landlord or Tenant shall,

19

PB0002279

immediately on the completion of their installation, become part of the Project and remain with the Project at the expiration or earlier termination of this Lease.

8.3.    Joinder. Without limiting Landlord's obligations under any other provision of this Lease, Landlord shall, promptly at Tenant's request and expense at any time during the Term (and provided that Landlord thereby assumes no liability or obligation), join in any and all applications for building permits, subdivision plat approvals or certificates of dedication thereon, public works or other agreements and permits for sewer, water or other utility services, other instruments of dedication or other permits or approvals, the granting of or entry into which by any governmental or quasi-governmental authority having jurisdiction over the Project is necessary to permit the subdivision, development, improvement, use and occupancy of the Project for the purposes permitted by this Lease, without violating applicable law; and the dedication to the said governmental or quasi-governmental authority after the Commencement Date of such title to or easements for utility, roadway and slope or storm drainage areas or facilities as are, in Tenant's opinion, necessary or desirable in connection therewith. Subject to the provisions of Section 8.1, Landlord shall, at no expense to Landlord, use its reasonable efforts to cooperate with Tenant in Tenant's efforts to obtain such final approval and recordation.

8.4.    Signs. Tenant shall have the right to erect from time to time about the Project, in accordance with applicable law (including but not limited to the Historic Requirements), such signs as it desires, subject to Landlord's reasonable approval as to size, content and placement.

Section 9.    Repairs and Maintenance.

9.1.    Repairs. Tenant, or Subtenant pursuant to the Sublease, shall, throughout the Term and at their own expense, take good care of the Project and, except as otherwise provided in this Lease or the Sublease, keep it in good order and condition (ordinary wear and tear and casualty and condemnation loss excepted).

9.2.    Maintenance. Tenant and Subtenant shall keep and maintain all of the Project in a clean and orderly condition, free of accumulation of dirt, rubbish snow and ice, and free from waste.

9.3.    Replacements and Capital Repairs. Notwithstanding anything herein to the contrary, Landlord, at Landlord's sole cost and expense, shall perform diligently, promptly and in a good and workmanlike manner and in compliance with all applicable laws, all capital repairs and replacements to (a) the structural components and all utility and other systems of the Building, including without limitation the roof, roofing system, exterior walls, interior walls, bearing walls, support beams, foundations, columns, exterior doors and windows and lateral support to the Building; (b) assure water tightness of the Building (including caulking of the flashings and repairs to the roof, roofing system, curtain walls, windows, and skylights if required to assure water tightness); (c) the plumbing, lawn and fire sprinkler, heating, ventilation and air conditioning systems,

20

PB0002280

electrical and mechanical lines and equipment associated therewith, including without limitation elevators; (d) the common areas of the Project and Building, including their lighting systems; (e) the exterior improvements to the Building, including walkways, shrubbery and landscaping; (f) the glass including replacements; (g) the Equipment; and (h) the Building and Project caused by the gross negligence, intentional acts or willful misconduct of Landlord or its employees, contractors, agents or representatives and not caused in full or in part by Tenant, Tenant Investor Member or Affiliates (as such term is defined in the Tenant Operating Agreement). Landlord covenants and agrees to perform or cause to be performed any and all capital repairs and/or replacements required to be performed by Landlord under this Lease within thirty (30) days after Landlord has received written notice from the Tenant or an applicable governmental authority of the need for such repairs. If Landlord cannot complete such repairs within thirty (30) days after Landlord has received the aforesaid written notice from Tenant or an applicable governmental authority, and provided that Landlord commenced such repairs within thirty (30) days after receipt of the aforesaid written notice and thereafter diligently and continuously prosecuted such capital repairs and/or replacements, then Landlord shall have such additional time as may reasonably be required to complete such capital repairs and/or replacements. If Landlord shall fail to complete any capital repairs and/or replacements required under this Section 9.3 within the aforesaid time periods, then Tenant may, but shall not be required to, prosecute such repairs itself and shall be entitled to reimbursement by Landlord for the reasonable cost of such capital repairs and/or replacements, together with interest at the rate six percent (6%) per annum from the date incurred. If Landlord shall fail to reimburse the aforesaid costs within thirty (30) days of receipt of a written invoice for the same from Tenant, then Tenant shall be entitled to offset and apply the same against the next monthly Base Rent obligations due hereunder.

**Section 10.    Landlord's Right of Entry.**

Landlord and its authorized representatives shall be entitled to enter the Project at any time during Tenant's normal business hours and at any other reasonable time to inspect the Project, upon forty-eight (48) hours' advance written notice and make any repairs thereto, replacements thereof and/or take any other action therein that is required by applicable law, or that Landlord is permitted to make by any provision of this Lease, after giving Tenant at least twenty (20) business days' prior written notice of Landlord's intention to take such action; provided that Tenant does not timely cure same; and further provided that, in any situation in which, due to an emergency involving health or safety of tenants and/or the Project, the physical condition of the Project would be unreasonably jeopardized in Landlord's reasonable judgment unless Landlord were to take such action immediately, Landlord shall give Tenant such written notice as is reasonable under the circumstances, and may enter the same at any time. Nothing in this Section shall be deemed to impose any duty upon Landlord to make any such repair or take any such action, and Landlord's performance thereof shall not constitute a waiver of Landlord's right hereunder to have Tenant perform such work. Landlord may, while taking any such action upon the Project, store therein any and all necessary materials, tools and equipment, and Tenant shall have no liability to Landlord for any damage to or destruction of any such materials, tools and equipment, except if and to the extent that such damage or destruction is proximately caused by the gross negligence of Tenant. Landlord shall not in any event be liable to Tenant for any

21

PB0002281

inconvenience, annoyance, disturbance, loss of business or other damage sustained by Tenant by reason of the making of such repairs or the taking of such action, or on account of the bringing of materials, supplies and equipment onto the Project during the course thereof, and Tenant's obligations under the provisions of this Lease shall not be affected thereby; provided, that Landlord shall be responsible to third parties for any and all loss or damage occasioned by its entrance onto the Project.

Section 11.     <u>Fire and Other Casualties</u>.

Tenant shall give prompt written notice to Landlord after the occurrence of any fire, earthquake, act of God or other casualty to or in connection with the Project or any portion thereof (hereinafter sometimes referred to as a "*Casualty*"). If during the Term the Project shall be damaged or destroyed by Casualty, Landlord shall repair or restore the Project (and will advance any proceeds in excess of available insurance proceeds required to do so), and Tenant hereby consents to same. Upon the occurrence of any such Casualty, Landlord shall promptly and with all due diligence, apply for and collect all applicable insurance proceeds recoverable with respect to such Casualty, and subject to the rights of the Mortgagee, shall deposit same in escrow so that such funds will be available to the Landlord to effect repairs. Notwithstanding the above, Landlord and Tenant shall reasonably determine that it is not economically feasible to restore the Project to substantially the same condition in which it existed prior to the occurrence of such Casualty then this Lease shall thereafter terminate, and Tenant shall surrender possession of the Project to Landlord and assign to Landlord all of its right, title and interest in and to the proceeds from insurance upon the Project, other than insurance proceeds in an amount equal to the replacement cost of Tenant's personal property, if any, damaged or destroyed, directly or indirectly, by such Casualty.

Section 12.     <u>Condemnation</u>.

12.1.     <u>Notice of Taking</u>. Forthwith upon receipt by either Landlord or Tenant of notice of the institution of any proceedings for the taking or condemnation of all or a portion of the Project (a "*Taking*"), the party receiving such notice shall promptly give notice thereof to the other, and such other party may also appear in such proceeding and be represented by counsel, who may be counsel for the party receiving such notice.

12.2.     <u>Allocation of Award</u>. Subject to the rights of the Mortgagee, the full amount of any award for any Taking (the "*Award*"), shall, notwithstanding any allocation made by the awarding authority, be paid and allocated as set forth below. In the event of a Total Taking or a Partial Taking where Landlord elects not to restore the Project, the Award shall be allocated as follows: to Tenant, that portion of the Award allocable to Tenant's personal property and Equipment ("*Tenant's Award*"), and to Landlord, an amount equal to the Award as reduced by the Tenant's Award. In the event of a Partial Taking where Landlord elects to restore the Project, Tenant agrees that the entire Award shall be payable to Landlord to restore the Project and shall execute any documents necessary to furnish evidence of same.

22

PB0002282

12.3.   Total Taking. In the event of a permanent Taking of the fee title to or of control of the Project or of the entire Leasehold Estate hereunder (a *"Total Taking"*), this Lease shall thereupon terminate as of the effective date of such Total Taking, without liability or further recourse to the parties.

12.4.   Partial Taking; Procedures and Criteria for Course of Action. In the event of a permanent Taking of all or less than the entire Project (a *"Partial Taking"*):

    (a)   if Tenant reasonably determines that the continued use and occupancy of the remainder of the Project by Tenant is or can reasonably be made to be economically viable, structurally sound, and otherwise feasible based upon the amount of eminent domain proceeds from and any other available funds (the *"Restoration Proceeds"*), then the entire Restoration Proceeds shall be applied by Landlord to restoration of the Project and Tenant will assign and quitclaim any and all right, title and interest therein; or

    (b)   if the continued use and occupancy of the remainder of the Project by Tenant is not or cannot, in Tenant's reasonable judgment, be made to be economically viable, structurally sound, and otherwise feasible, then this Lease may be terminated by Tenant pursuant to Section 12.5.

12.5.   Termination Upon Non-Restoration. Following a Partial Taking, if a decision is made pursuant to Section 12.4(b) that the remaining portion of the Project is not to be restored, Tenant shall surrender the Project to Landlord and this Lease shall thereupon be terminated without liability or further recourse to the parties hereto.

12.6.   No Waiver. No provisions in this Lease limit the rights of either Landlord or Tenant to seek other compensation from a condemning authority, other than condemnation awards as set forth above, which may be provided by statute, common law, or the United States Constitution, if any.

## Section 13.   Assignment and Transfers.

13.1.   Assignment Prohibited. Tenant hereby agrees for itself and its successors and permitted assigns in interest hereunder that, except for purchase money financing arrangements with respect to equipment, personal property and Alterations entered into, from time to time in the normal course of Tenant's business and otherwise permitted hereby, it will not assign this Lease or any of its rights under this Lease as to all or any portion of the Project, the Building and/or the Equipment, or make or permit any voluntary or involuntary total or partial sale, assignment, conveyance, mortgage, pledge, encumbrance or other transfer of any or all of its interest in the Project, the Building and/or the Equipment, or the occupancy or use thereof, other than in accordance with this Lease and other than Permitted Encumbrances (each of which is hereinafter referred to as a *"Transfer"*) without the prior written consent of the Landlord, not to be unreasonably withheld, delayed or conditioned. Further, upon request of the Landlord, from time to time, the Tenant will deliver to Landlord copies of leases, rent rolls and evidence of

23

PB0002283

funding of security deposit accounts. Notwithstanding anything herein to the contrary, Landlord shall not assign or transfer this Lease if such transfer could cause a disallowance, recapture, or loss of any of the Federal Historic Tax Credits passed through to Tenant.

13.2.   Effect on Obligations. No such Transfer shall alter or impair the obligations hereunder of Tenant or any other person constituting Tenant or holding any interest hereunder before any such Transfer.

13.3.   Benefit and Burden. This Lease shall be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13.4.   Transfers and Mortgages by Landlord.

(a)   Landlord shall not Transfer all or any portion of its interest in the Project other than the Permitted Encumbrances without the prior written consent of Tenant and Tenant Investor Member. Each of Tenant and Tenant Investor Member shall be entitled, to condition its consent to any Transfer upon the entry by such transferee into an agreement with (and in form and substance reasonably satisfactory to) Tenant, providing for reasonable nondisturbance of Tenant's rights hereunder and Tenant will in exchange therefor agree to reasonable attornment to such transferee and to subordinate its rights hereunder to such transferee and, if a Transfer of the leasehold interest in the Property, such transferee's assumption of all of Landlord's obligations hereunder, other than obligations arising or accruing prior to the date of such Transfer. The foregoing covenant shall be deemed to be a covenant running with the land.

(b)   Except for the Mortgage(s) securing the Patriot Loan, Landlord agrees not to encumber or convey any interest in the Project with any mortgage or other form of security instrument, or any other instrument evidencing any other form of security arrangement for any debt, or refinance any Mortgage, without the prior written consent of Tenant and Tenant Investor Member, which consent shall not be unreasonably conditioned, withheld or delayed; provided, however, such other mortgage or security instrument shall be subject and subordinate to this Lease, notwithstanding any agreement hereafter made modifying or amending this Lease.

(c)   Provided that Tenant is not in default under any of the terms, covenants, agreements, provisions, conditions or limitations contained in this Lease on the Tenant's part to be kept, observed and performed, and timely pays all Base Rent and Additional Rent, then Landlord agrees to and shall pay when due to the lenders thereof all monthly installment payments, and all other amounts, due and owing under any Mortgage encumbering Landlord's interest in the Project.

24

PB0002284

Section 14.   Default.

14.1.   Definition. As used in this Lease, each of the following events shall constitute an "*Event of Default*" by Tenant:

(a)   if Tenant fails to pay any Base Rent, Additional Rent or other sum that it is obligated to pay under this Lease, when and as it is due and payable hereunder;

(b)   if Tenant fails to perform any of its obligations under this Lease; or

(c)   if Bankruptcy occurs with respect to Tenant.

14.2.   Notice to Tenant; Cure Period. Anything in this Lease to the contrary notwithstanding, if an Event of Default occurs, Landlord shall not exercise any right or remedy on account thereof that it holds under this Lease or applicable law unless and until:

(a)   Landlord gives written notice thereof to Tenant and to Tenant Investor Member at the addresses set forth in Section 17; and

(b)   if such Event of Default: ·

(i)   consists of a failure to pay money, within ten (10) days after Landlord gives such written notice, Tenant fails to pay all of such money; or

(ii)   consists of something other than a failure to pay money, within thirty (30) days after Landlord gives such written notice to cure such Event of Default (or, if such Event of Default is not reasonably curable within such period, to proceed within such period diligently and in good faith to begin to cure such Event of Default and to continue thereafter to do so until it is fully cured, such longer period as may be necessary to cure, which longer period shall include, without limitation, any time necessary for Tenant Investor Member, at its sole option, to exercise available remedies under the Tenant Operating Agreement, as amended, in order to be able to cause Tenant to cure any such default, but not in excess of such cure period as may be permitted by any Mortgagee under a Mortgage) and Tenant fails to cure same within such period. Notwithstanding the foregoing, in no event shall Tenant (or Tenant Investor Member) have more than ninety (90) days to cure such non-monetary Event of Default.

Following the cure periods set forth in this Section 14.2, Landlord shall be entitled, without giving further notice to Tenant, to take any or all of the actions set forth in Section 14.3 of this Lease (each of which actions, if taken, shall be effective

25

PB0002285

immediately upon the giving of a notice thereof to Tenant, unless otherwise stated in such notice).

14.3.   Landlord's Rights on Event of Default.

(a)   If an Event of Default occurs that is not cured within applicable cure periods, Landlord may (subject to the provisions of Section 14.2 hereof) to take any or all of the following actions:

(i)   reenter and repossess any or all of the Project and any or all improvements thereon and additions thereto;

(ii)   declare the entire balance of the Base Rent for the remainder of the Term to be due and payable immediately, and collect such balance in any manner not inconsistent with applicable law; provided that, if Landlord elects to relet any or all of the Project following such acceleration of Rent, the provisions of Section 14.3(a)(iv) shall be applicable to the rights of Landlord and Tenant. Accelerated payments payable hereunder shall not constitute a penalty or forfeiture or liquidated damages, but shall merely constitute payment of Rent in advance;

(iii)   terminate this Lease by giving written notice of such termination to Tenant, which termination shall be effective as of the date of such notice or any later date therefor specified by Landlord therein (provided that, without limiting the generality of the foregoing provisions of this Section 14.3(a)(iii), Landlord shall not be deemed to have accepted any abandonment or surrender by Tenant of any or all of the Project or Tenant's Leasehold Estate under this Lease unless Landlord has so advised Tenant expressly and in writing, regardless of whether Landlord has reentered or relet any or all of the Project or exercised any or all of Landlord's other rights under this Section or applicable law), and, on the date specified in such notice, Tenant's right to possession of the Project will cease and the Leasehold Estate conveyed by this Lease upon Tenant shall revest in Landlord;

(iv)   in Landlord's own name (but either as agent for Tenant, if this Lease has not then been terminated, or for the benefit of Tenant, if this Lease has then been terminated), relet any or all of the Project with or without any additional premises, for any or all of the remainder of the Term (or, if this Lease has then been terminated, for any or all of the period that would, but for such termination, have constituted the remainder of the Term) or for a period exceeding such remainder, on such terms and subject to such conditions as are acceptable to Landlord in its sole discretion (including but not limited to the alteration of any or all of the Project in any manner that, in Landlord's judgment, is necessary or desirable as a condition to or otherwise in connection with such reletting,

26

PB0002286

and the allowance of one or more concessions or "free-rent" or reduced-rent periods), and collect and receive the rents therefor. Anything in this Lease or applicable law to the contrary notwithstanding, (A) Landlord shall not have any duty or obligation to relet any or all of the Project as the result of any Event of Default, or any liability to Tenant or any other person for any failure to do so or to collect any rent or other sum due from any such reletting; (B) Tenant shall have no right in or to any surplus that may be derived by Landlord from any such reletting, if the proceeds of such reletting exceed any Rent, installment thereof or other sum owed by Tenant to Landlord hereunder; and (C) Tenant's liability hereunder shall not be diminished or affected by any such failure to relet or the giving of any such initial or other concessions or "free-rent" or reduced rent periods in the event of any such reletting. In the event of any such reletting, Tenant shall pay to Landlord, at the times and in the manner specified by Section 4 (unless Landlord has elected to accelerate Rent as provided in Section 14.3(a)(ii), in which event Tenant shall be obligated to pay such accelerated amount as provided in such Section), both (X) the installments of the Base Rent accruing during such remainder (or, if this Lease has then been terminated, damages equaling the amounts of such installments of the Base Rent that would have accrued during such remainder, had this Lease not been terminated, less any monies received by Landlord with respect to such remainder from such reletting of any or all of the Project, plus (Y) the cost to Landlord of any such reletting (including but not limited to any reasonable attorneys' fees, leasing or brokerage commissions, repair or improvement expenses and the expense of any other actions taken in connection with such reletting), plus (Z) any other sums for which Tenant is liable under Section 14.3(d) (and Tenant hereby waives any and all rights that it may have under applicable law, the exercise of which would be inconsistent with this Section 14.3(a)(iv)); and/or

(v)     pursue any combination of such remedies and/or any other right or remedy available to Landlord on account of such Event of Default under this Lease and/or at law or in equity.

(b)     No such expiration or termination of this Lease, or summary dispossession proceedings, abandonment, reletting, bankruptcy, re-entry by Landlord or vacancy, shall relieve Tenant of any of its liabilities and obligations under this Lease (whether or not any or all of the Project are relet), and Tenant shall remain liable to Landlord for all damages resulting from any Event of Default, including but not limited to any damage resulting from the breach by Tenant of any of its obligations under this Lease to pay Rent and any other sums that Tenant is obligated to pay hereunder.

(c)     If any or all of the Project is relet by Landlord for any or all of the unexpired Term of this Lease to a bona fide 3rd party at arms-length, the amount

27

PB0002287

of rent reserved upon such reletting shall be deemed to be the fair and reasonable rental value for the part or the whole of the Project so relet during the term of the reletting.

(d)    Each party hereto hereby waives any right that it may otherwise have at law or in equity to a trial by jury in connection with any suit or proceeding at law or in equity brought by the other against the waiving party or that otherwise relates to this Lease, as a result of an Event of Default or otherwise.

14.4.    Forbearance during Historic Credit Recapture Period.    Notwithstanding anything to the contrary set forth in this Lease, Landlord, for itself and for each and every succeeding owner of Landlord's interest in the Project, agrees that, prior to termination of the Historic Credit Recapture Period, upon any Event of Default hereunder, Landlord's rights and remedies on account of such Event of Default shall be limited (regardless of whether such rights and remedies arise under the terms of this Lease, at law or in equity, Landlord hereby expressly and absolutely waiving such rights and remedies for said period) such that in no event whatsoever shall Landlord have any right or remedy (a) to terminate this Lease or Tenant's right to possession of the Project hereunder, or (b) to accelerate Base Rent hereunder

14.5.    Tenant's Rights on Event of Default. Upon any failure by Landlord to perform any of its obligations hereunder, which are not cured within any applicable cure periods hereunder (and if no cure periods are given, then ten (10) days after written notice as to monetary defaults and thirty (30) days after written notice as to non-monetary defaults, or such longer period as may be necessary to cure, if Landlord diligently commences cure within such thirty (30) day period), Tenant shall be entitled to terminate this Lease and/or to pursue its available remedies at law or in equity, and shall have the right (but no obligation), following thirty (30) days' notice if such failure has not been corrected by Landlord within such period, to perform such obligations and to offset the Base Rent or any Additional Rent, dollar for dollar, by the costs and expenses incurred by Tenant in performing such obligations.

14.6.    Notices. Notices given by Landlord or by Tenant under this Section 14 shall specify the alleged default and the applicable Lease provisions, and shall demand that Tenant or Landlord, as applicable, perform the appropriate provisions of this Lease within the applicable period of time for cure. No such notice shall be deemed a forfeiture or termination of this Lease unless expressly set forth in such notice.

14.7.    Rights of Tenant Investor Member. Notwithstanding any other provision of this Lease to the contrary, Tenant Investor Member, and/or its respective affiliates, successors and assigns shall have the same rights as Tenant to notice and an opportunity, at its sole option, (but not the obligation) to exercise its available remedies to cause Tenant to cure in the event of the occurrence of any Event of Default under this Lease.

28

PB0002288

Section 15.    Estoppel Certificate; Short Form; Memorandum of Lease.

15.1.    Estoppel Certificate. Each party hereto shall, at any time and from time to time within ten (10) days after being requested to do so by the other party and/or any Mortgage, in writing, execute, enseal, acknowledge, and address and deliver to the requesting party (or, at the latter's request, to any existing or prospective Mortgagee, transferee or other assignee of the requesting party's interest in the Project or under this Lease that acquires such interest in accordance with this Lease) a certificate in recordable form:

(a)    certifying that this Lease is unmodified and in full force and effect (or, if there has been any modification thereof, that it is in full force and effect as so modified, stating therein the nature of such modification); that Tenant has accepted possession of the Project and the Commencement Date; as to the dates to which Base Rent and any Additional Rent and other charges arising hereunder have been paid; as to the amount of any prepaid Rent or any credit due to Tenant hereunder; as to whether, to the best of such party's knowledge, information and belief, the requesting party is then in default in performing any of its obligations hereunder (and, if so, specifying the nature of each such default); and as to any other fact or condition reasonably requested by the requesting party; and

(b)    acknowledging and agreeing that any statement contained in such certificate may be relied upon by the requesting party and any such other addressee.

15.2.    Short Form. The parties hereto shall, at the request of Landlord, Tenant or any Mortgagee, execute, and deliver simultaneously with the execution of this Lease or at any time thereafter, in recordable form, a memorandum hereof (in form and substance satisfactory to each party hereto in its reasonable judgment) for recordation in the Land Records, at the expense of the person so requesting.

Section 16.    Covenants of Landlord.

16.1.    Quiet Enjoyment. Landlord hereby:

(a)    covenants and agrees that, at the time of the execution and delivery of this Lease by the parties hereto, it is the owner of leasehold interest in and to the Project, subject to the Permitted Encumbrances, and has the full right, power and authority to enter into this Lease and thereby to lease the Project; and

(b)    warrants that Tenant will have quiet and peaceful possession of the Project during the Term so long as all of Tenant's obligations hereunder are timely performed, subject to Permitted Encumbrances.

29

PB0002289

16.2.   Limitation on Liability. Nothing in this Lease shall be deemed to impose liability on account of any act or failure to act by any person other than Landlord, its agents and employees.

16.3.   Pass-Through of Federal Historic Tax Credits. Landlord hereby covenants and agrees to make valid and timely elections under Code Section 48(d) to pass through to Tenant all Federal Historic Tax Credits otherwise available to Landlord with respect to the Property.

16.4   Landlord Reporting Requirements. Landlord shall cause to be prepared and delivered to Tenant and Tenant Investor Member each of the documents set forth below:

(a)   *Rehabilitation and Cash Flow.* A quarterly report (delivered on or before the 20th of each month for the prior calendar month) on the progress of (1) the construction (during any period prior to the completion of the Project), including, without limitation, any monthly draw requests as and when submitted to the any lenders, any and all inspection reports done by or on behalf of any lenders; all architect's reports; and the minutes of all meetings of Landlord regarding any issue of rehabilitation of the Project, and (2) cash flow, all in a form reasonably acceptable to Tenant;

(b)   *Quarterly Unaudited Financial Statements of Landlord.* Within twenty (20) days of the end of each calendar quarter: unaudited financial statements for the Landlord which may be prepared and certified by the manager(s) or managing member(s) of the Landlord, including a balance sheet, statement of income or loss and statement of cash sources and applications and rent rolls;

(c)   *Annual Reviewed Financial Statements of Landlord.* As soon as available and in any event not later than ninety (90) days after the end of each calendar year, the reviewed financial statements of the Landlord as of the end of each such Fiscal Year, including the balance sheets, related statements of income and retained earnings, and statement of changes in financial positions for such year, in conformity with the financial statements provided to Tenant Investor Member prior to the date hereof;

(d)   *Operating Budget and Capital Budget.* At least forty-five (45) days prior to the beginning of the next Fiscal Year (as such term is defined in the Tenant Operating Agreement), beginning with the 2017 Fiscal Year, the annual operating budget and the capital budget for the Landlord;

(e)   *Property Taxes:* Within sixty (60) days after the expiration of each Fiscal Year, proof of payment of property taxes of the Project;

30

PB0002290

(f) *Landlord Returns in Year(s) Federal Historic Tax Credits are Claimed.* As soon as available and in any event not later than sixty (60) days after the end of each calendar year, all federal and state income tax returns for the Landlord; and

(g) *Notice of Defaults, IRS Proceedings.* Immediately upon receipt thereof (A) notice of any default under any of the Loans or financial obligation of Landlord, (B) notice of any IRS proceeding involving Landlord, (C) any payment or draw made under any operating deficit guaranty, rehabilitation completion guaranty, performance bond or letter of credit, any draw on any reserves of Landlord and any other significant developments affecting Landlord, its business or assets, or the Property, or (D) notice of any default under the Project Documents.

Section 17.   Notices.

Any notice, demand, consent, approval, request or other communication or document to be provided hereunder to Landlord or Tenant shall be in writing, and shall be deemed to have been provided on the earlier of (a) forty-eight (48) hours after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, (b) the next business day after having been deposited (in time for delivery by such service on such business day) with FedEx or another national delivery service, or (c) upon delivery (or first attempted delivery) having been sent by personal delivery, in each case to the address of such party set forth below or to such other address in the United States of America as such party may designate from time to time by notice to each other party hereto, with evidence of delivery, or personal delivery against signed receipt.

All notices required or permitted to be given under this Lease shall be given in accordance with the foregoing paragraph of this Section 17 and addressed as follows:

|  |  |
|---|---|
| If to Landlord: | Wall Street Master Landlord, LLC<br>71 Wall Street<br>Norwalk, Connecticut 06850<br>Attn: Suzanne Cahill |
| with copies to: | Reid and Riege, PC<br>One Financial Plaza<br>Hartford, CT 06103<br>Attention: Christopher J. Rixon<br>Phone: 860.240.1052<br>Email: crixon@rrlawpc.com |
| If to Tenant: | Wall Street Master Tenant, LLC<br>71 Wall Street<br>Norwalk, Connecticut 06850 |

31

PB0002291

Attn: Suzanne Cahill

with copies to:

Reid and Riege, PC
One Financial Plaza
Hartford, CT 06103
Attention: Christopher J. Rixon
Phone: 860.240.1052
Email: crixon@rrlawpc.com

and:

Enhanced Capital HTC Fund I, LLC
201 St. Charles Avenue, Suite 3400
New Orleans, LA 70170
Attn: Shane McCarthy

and:

Stinson Leonard Street LLP
1299 Farnam Street, Suite 1500
Omaha, NE 68102
Attn: David K. Lutz

Section 18.    General.

18.1.    Effectiveness. This Lease shall become effective on and only on its execution and delivery by each party hereto.

18.2.    Complete Understanding. This Lease represents the complete understanding between the parties hereto as to the subject matter hereof, the Project and the rights and obligations of the parties hereto as to the same, and supersedes all prior negotiations, representations, guaranties, warranties, promises, statements or agreements, either written or oral, between the parties hereto as to the same. No inducements, representations, understandings or agreements have been made or relied upon in the making of this Lease, except those specifically set forth in this Lease. Neither party hereto has any right to rely on any other prior or contemporaneous representation made by anyone concerning this Lease that is not set forth herein.

18.3.    Amendment. This Lease may be amended by and only by an instrument executed and delivered by each party hereto and consented to by Tenant Investor Member, which consent shall be at the sole and absolute discretion of Tenant Investor Member.

18.4.    Waiver. No party hereto shall be deemed to have waived the exercise of any right that it holds hereunder unless such waiver is made expressly and in writing (and, without limiting the generality of the foregoing, no delay or omission by any party hereto in exercising any such right shall be deemed a waiver of its future exercise). No such waiver made in any instance involving the exercise of any such right shall be deemed a waiver as to any other such instance, or any other such right. Without limiting

32

PB0002292

the generality of the foregoing, no action taken or not taken by Landlord under any provision of this Lease (including but not limited to Landlord's acceptance of the payment of Rent after an Event of Default occurs) shall operate as a waiver of any right to be paid a late charge or of any other right or remedy that Landlord would otherwise have against Tenant on account of such Event of Default under this Lease or applicable law (Tenant hereby acknowledging that, in the interest of maintenance of good relations between Landlord and Tenant, there may be instances in which Landlord chooses not immediately to exercise some or all of its rights if an Event of Default occurs).

18.5.   Applicable Law. This Lease shall be given effect and construed by application of the law of the State of Connecticut, and any action or proceeding arising hereunder shall be brought in the courts of Connecticut; provided, that if any such action or proceeding arises under the Constitution, laws or treaties of the United States of America, or if there is a diversity of citizenship between the parties thereto, so that it is to be brought in a United States District Court, it shall be brought in the United States District Court for the District of Connecticut or any successor federal court having original jurisdiction.

18.6.   Time of Essence. Time shall be of the essence of this Lease, except that, whenever the last day for the exercise of any right or the discharge of any obligation hereunder falls on a Saturday, Sunday or statutory holiday, the party having such right or obligation shall have until 5:00 p.m. central time on the next succeeding day that is not a Saturday, Sunday or statutory holiday to exercise such right or discharge such obligation.

18.7.   Headings. The headings of the Sections, subsections, paragraphs and subparagraphs hereof are provided herein for and only for convenience of reference, and shall not be considered in construing their contents.

18.8.   Construction. As used herein, all references made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well, and to any Section, subsection, paragraph or subparagraph shall be deemed, unless otherwise expressly indicated, to have been made to such Section, subsection, paragraph or subparagraph of this Lease.

18.9.   Exhibits. Each writing or plat referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto is hereby incorporated herein and made a part hereof.

18.10. Severability. No determination by any court, governmental or administrative body or agency or otherwise that any provision of this Lease or any amendment hereof is invalid or unenforceable in any instance shall affect the validity or enforceability of any other such provision, or such provision in any circumstance not controlled by such determination. Each such provision shall remain valid and enforceable to the fullest extent allowed by, and shall be construed wherever possible as being consistent with, applicable law.

33

PB0002293

18.11. Disclaimer of Partnership Status. Nothing in this Lease shall be deemed in any way to create between the parties hereto any relationship of partnership, joint venture or association, and the parties hereto hereby disclaim the existence of any such relationship.

18.12. Commissions. Each party hereto hereby represents and warrants to the other that it has not dealt with any real estate broker, agent or finder with respect to this Lease, and there is no commission, charge or other compensation due on account thereof. Each party hereto shall defend, indemnify and hold harmless the other against and from any liability, claim of liability or expense arising out of any inaccuracy in such party's representation.

18.13. Prevailing Party. In the event either party hereunder initiates judicial action against the other in order to enforce the terms, covenants and provisions of this Lease, the non-prevailing party in such judicial action shall reimburse the prevailing party in such judicial action for all expenses, fees, costs, including attorneys' fees incurred by the prevailing party in connection with such judicial action.

18.14. Counterparts. This Lease may be executed in counterparts, both of which together shall constitute one and the same instrument. Either party may execute this Lease electronically using an electronic signature service. This Lease may be delivered by email or any other form of electronic transmission. Copies of this Lease shall be admissible as originals for all purposes.

18.15 Publicity. At the request of the Tenant Investor Member, the Landlord shall allow the Tenant Investor Member to display, at or around the Project, reasonable media (including, without limitation, signage and banners) disclosing the Tenant Investor Member's involvement with and investment in the Project. Further, the Landlord grants the Tenant Investor Member and its members access to and permission to use photographic and/or schematic images of the Project obtained by or provided to the Tenant Investor Member and its members in any marketing materials (website, brochures, advertisements, etc.).

The Landlord and representatives thereof shall, at the request of the Tenant Investor Member, use commercially reasonable efforts to (a) acknowledge the contribution of the Tenant Investor Member and its members in Project-related web and print media, and in verbal remarks in public, and (b) invite representatives of the Tenant Investor Member and its members to participate in Project-related public relations opportunities. The Landlord shall not publicize the contribution of the Tenant Investor Member to the Project without the prior written consent of the Tenant Investor Member.

*[Remainder of this page intentionally left blank]*

34

PB0002294

IN WITNESS WHEREOF, each party hereto has executed this Lease or caused it to be executed on its behalf by its duly authorized representatives, the day and year first above written.

**TENANT:**

**WALL STREET MASTER TENANT, LLC,**
a Connecticut limited liability company

By:   Wall Street Manager, LLC,
      a Connecticut limited liability company, its managing member

      By:   Wall Street Managing Member, LLC,
           a Connecticut limited liability company, its sole manager

           By:   Wall Street Theater Company Inc.,
               a Connecticut non-stock corporation, its sole member and manager

               By:  _____
               Name: Suzanne J. Cahill
               Title: President

PB0002295

IN WITNESS WHEREOF, each party hereto has executed this Lease or caused it to be executed on its behalf by its duly authorized representatives, the day and year first above written.

**TENANT:**

**WALL STREET MASTER TENANT, LLC,**
a Connecticut limited liability company

By:   Wall Street Manager, LLC,
      a Connecticut limited liability company, its managing member

      By:   Wall Street Managing Member, LLC,
            a Connecticut limited liability company, its sole manager

            By:   Wall Street Theater Company Inc.,
                  a Connecticut non-stock corporation, its sole member and manager

                  By: _____
                  Name: Suzanne J. Cahill
                  Title: President

## EXHIBIT A

## Legal Description of Land

### FIRST TRACT:

All that certain parcel of land, together with the buildings and other improvements thereon, situated in the City of Norwalk, County of Fairfield and State of Connecticut, shown on a certain map entitled, "Map of Property Prepared for Nutmeg Theatre Circuit Norwalk Connecticut Scale: 1 in. = 10 ft. April 8, 1971" by Leonard Surveyors Norwalk, Connecticut Certified 'Substantially Correct' by Leo Leonard", which map is on file in the Norwalk Town Clerk's Office numbered 7490. Said premises are more particularly bounded and described as follows:

NORTHWESTERLY: 65 feet by Wall Street;

NORTHEASTERLY: 150.50 feet by land now or formerly of the Fairfield County Savings Bank and Nutmeg Theatre Circuit, and by land of the Norwalk Parking Authority; each in part;

SOUTHEASTERLY: 22.88 feet by land now or formerly of the Norwalk Parking Authority;

NORTHEASTERLY

AGAIN: 2.00 feet by land now or formerly of the Norwalk Parking Authority;

SOUTHEASTERLY
AGAIN: 36.31 feet by land now or formerly of the Norwalk Parking Authority;

SOUTHWESTERLY: 10.10 feet by a four foot easement;

SOUTHEASTERLY
AGAIN: 7.60 feet by a four foot easement and by land now or formerly of Paul B. and Mildred Maravnick;

SOUTHWESTERLY
AGAIN: 140.71 feet by land now or formerly of the Fairfield County National Bank.

Together with a right of ingress and egress set forth in Volume 177, Page 190 to Isaacs Street Extension over a strip of land about 4 feet in width running from the southwest corner of the above described premises to Isaacs Street and bounded:

NORTHERLY: by land now or formerly of Nutmeg Theatre Circuit;

EASTERLY: by land now or formerly of the Norwalk Parking Authority;

SOUTHERLY: by Isaacs Street Extension; and,

WESTERLY: by land now or formerly of Paul B. and Mildred Maravnick.

PB0002297

Together with all rights reserved in common with others over land now or formerly of James C. Cunningham as contained in a deed from Samuel Kantor to James C. Cunningham dated May 4, 1926 and recorded on September 4, 1926 in Volume 201, Page 11 of the Norwalk Land Records.

**SECOND TRACT:**

An undivided one-half interest recited by instrument recorded in Volume 167, Page 447 in and to a certain tract of land situated in the City of Norwalk, County of Fairfield and State of Connecticut, and bound and described as follows:

NORTHERLY:        14.77 feet by Wall Street;

EASTERLY:        100.00 feet by land now or formerly of Fairfield County Savings Bank;

SOUTHERLY:        14.80 feet by land now or formerly of the Norwalk Parking Authority; and,

WESTERLY:        100.00 feet by land now or formerly of Nutmeg Theatre Circuit.

PB0002298

# EXHIBIT B

## Base Rent Schedule

| Year | Annual Base Rent to Landlord | Montly Base Rent Payment to Landlord |
|------|------------------------------|--------------------------------------|
| 2016 | 1,295.00 | 1,295.00 |
| 2017 | 155,289.00 | 12,940.75 |
| 2018 | 163,144.00 | 13,595.33 |
| 2019 | 168,039.00 | 14,003.25 |
| 2020 | 173,080.00 | 14,423.33 |
| 2021 | 178,272.00 | 14,856.00 |
| 2022 | 183,620.00 | 15,301.67 |
| 2023 | 189,129.00 | 15,760.75 |
| 2024 | 194,803.00 | 16,233.58 |
| 2025 | 200,647.00 | 16,720.58 |
| 2026 | 206,666.00 | 17,222.17 |
| 2027 | 212,866.00 | 17,738.83 |
| 2028 | 219,252.00 | 18,271.00 |
| 2029 | 225,830.00 | 18,819.17 |
| 2030 | 232,605.00 | 19,383.75 |
| 2031 | 239,583.00 | 19,965.25 |
| 2032 | 515,372.00 | 42,947.67 |
| 2033 | 530,833.00 | 44,236.08 |
| 2034 | 546,758.00 | 45,563.17 |
| 2035 | 546,758.00 | 45,563.17 |

Master Lease Agreement
Wall Street Theater
#130177066

Exhibit B

PB0002299

**EXHIBIT C**

**Form of Pass-Through Election**

This Pass-Through Election is made by [_____] (the "***Landlord***"), and [_____] (the "***Tenant***"), with respect to that certain historic building located at [_____] (the "***Building***"), in accordance with the provisions of Treas. Reg. Section 1.48-4(f):

(i)   LANDLORD:

     NAME:          [_____]

     ADDRESS:     [_____]
                    [_____]
                    Attn: [_____]

     TAXPAYER #:     [__-_____]

   TENANT:

     NAME:          [_____]

     ADDRESS:     [_____]
                    [_____]
                    Attn: [_____]

     TAXPAYER #:     [__-_____]

(ii)   DISTRICT DIRECTOR'S OFFICE WHERE LANDLORD'S TAX RETURNS ARE FILED: [_____]

    DISTRICT DIRECTOR'S OFFICE WHERE TENANT'S TAX RETURNS ARE FILED: [_____]

(iii)   PROPERTY WITH RESPECT TO WHICH ELECTION IS MADE: The building located at [_____].

(iv)   DATE ON WHICH POSSESSION OF THE PROPERTY WAS TRANSFERRED TO TENANT: [_____], 2016.

(v)   ESTIMATED USEFUL LIFE OF THE PROPERTY IN THE HANDS OF THE LANDLORD: [27.5 years for Residential Rental Property and 39 years for Non-Residential Rental Property].

(vi)   AMOUNT FOR WHICH TENANT IS TREATED AS HAVING ACQUIRED THE PROPERTY UNDER PARAGRAPH (c)(2) or (c)(3) OF TREASURY REGULATIONS SECTION 1.48-4:

PB0002300

The Property is not short-term lease property under paragraph (c)(2), and the Tenant is treated as having acquired the Property for its fair market value on the date possession was transferred to the Tenant which pursuant to Treasury Regulation 1.48-12(f) is equal to the Landlord's basis attributable to QREs which is $[_____].

(vii) INFORMATION TO BE PROVIDED IF THE LANDLORD IS ITSELF A TENANT: N/A.

[Signature Page to Follow]

This election is hereby made by Landlord and filed with Tenant on [_____, 20__].

### **LANDLORD:**

[_____]

# EXHIBIT D

## FORM OF SNDA

PB0002303

## SUBORDINATION, NONDISTURBANCE
## AND ATTORNMENT AGREEMENT

This Subordination, Nondisturbance and Attornment Agreement (the *"Agreement"*), is made and entered into effective as of this [___] day of [___], 2016, by and among [___], a [___] (the *"Lessor"*), having a mailing address of: [___]; [___], a [___] (the *"Lessee"*), having a mailing address of: [___]; ENHANCED CAPITAL HTC FUND I, LLC, a Delaware limited liability company (the *"Investor"*), having an address 201 St. Charles Avenue, Suite 3400, New Orleans, LA 70170; and [___], a [___] (together with it successors and assigns, the *"Lender"*) having an address of: [___].

### WITNESSETH THAT:

WHEREAS, Lessor and Lessee have entered into a lease agreement dated effective on or about the date hereof (the *"Lease"*), affecting the real property described in Exhibit A attached hereto (the *"Real Estate"*); and

WHEREAS, the Lender has made a loan (*"Loan"*) to Lessor, and such Loan is evidenced by that certain [Loan Agreement] dated as of the date hereof by and among Lender and Lessor (as amended, the *"Loan Agreement"*), and [other loan documents] (together with the Loan Agreement, collectively, the *"Loan Documents"*); and

WHEREAS, the Loan is secured by that certain [Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing] dated as of the date hereof and recorded on as of the date hereof, [as Recording/Instrument No. _____ of the Records of [___]] (the *"Deed of Trust"*), in favor of the Lender, encumbering the Real Estate and improvements thereto and other property of the Lessor; and

WHEREAS, Lessor and Lessee intend to rehabilitate the Real Estate (*"Project"*) in a manner that qualifies for [___] state historic tax credits and federal historic rehabilitation tax credits allowed for qualified rehabilitation expenditures incurred in connection with the rehabilitation of a historic structure pursuant to Section 47 of the Internal Revenue Code of 1986, as amended from time to time (the *"Code"*), or any corresponding provision or provisions of prior or succeeding law (collectively, the *"Tax Credits"*); and

WHEREAS, pursuant to the Operating Agreement of Lessee, dated on or about the date hereof (*"Lessee's Operating Agreement"*), Investor has acquired a [99]% interest in Lessee and has made or will make a substantial investment therein; and

WHEREAS, Investor has required that the Lender provide certain assurances as to the non-disturbance of Lessee's rights under the Lease.

NOW, THEREFORE, for and in consideration of the premises and the mutual promises herein, the parties hereto agree as follows:

SUBORDINATION.  Subject to the terms of this Agreement, the Lease is hereby made subject, junior and subordinate to the [Deed of Trust] and to all renewals, modifications,

consolidations, replacements and extensions of the [Deed of Trust] so that all rights of Lessee under the Lease shall be subject, junior and subordinate to the rights of the Lender under the [Deed of Trust] and to all renewals, modifications, consolidations, replacements and extensions of the [Deed of Trust] as fully as if such instruments had been executed, delivered and recorded prior to the execution of the Lease or possession of all or part of the Real Estate by the Lessee, or its predecessors in interest.

LENDER'S RIGHT TO RECOGNIZE THE LESSEE'S RIGHTS UNDER THE LEASE. Following the date which is five (5) years after Placement in Service (as such term is defined for purposes of Section 47 of the Code) (the *"Compliance Period"*), and subject to the other provisions of this Agreement, if the interests of Lessor shall be transferred to and owned by Lender, its nominee or assignee or any purchaser by reason of foreclosure or other proceedings brought in lieu of or pursuant to a foreclosure (the *"Lender Parties"*), or by any other manner, the Lender, its nominee or assignee or such purchaser, as applicable, shall have the option either to: (i) terminate the Lease, or (ii) elect to recognize the Lessee's rights under the Lease. In the event that the Lender, its nominee or assignee or such purchaser elects to terminate the Lease, Lessee shall immediately, but in no event more than ten (10) business days after receipt of written notice, vacate the Real Estate and give up possession and all of its right, title and interest in and to the Real Estate under the Lease and the Lease shall be fully terminated; provided that Lessee shall be and remain fully liable for all of Lessee's obligations under the Lease accruing prior to the termination of the Lease. In the event Lender, its nominee or assignee or such purchaser elects to recognize the Lease and provided Lessee is not in default (beyond any period given Lessee to cure such default) under this Agreement, the Lease, including, without limitation, in the payment of rent or additional rent or in the performance of any of the terms, covenants or conditions of the Lease on Lessee's part to be performed, Lessee's possession of the Real Estate and Lessee's rights and privileges under the Lease, or any permitted modifications, extensions or renewals thereof, shall not be diminished or interfered with by Lender, its nominee or assignee, or such purchaser, as applicable, and Lessee's occupancy of the Real Estate shall not be disturbed by Lender, its nominee or assignee, or such purchaser, as applicable, for any reason whatsoever during the remaining term of the Lease or any, permitted modifications, extensions or renewals thereof.

ATTORNMENT.

If the interests of Lessor shall be transferred to and owned by Lender, its nominee or assignee, or purchaser by reason of foreclosure or other proceedings brought in lieu of or pursuant to a foreclosure, or by any other manner, and Lender, or its nominee or assignee, has not exercised any right to terminate the Lease under Paragraph 2 above, Lessee agrees that Lessee shall be bound to Lender, its nominee, assignee, or such purchaser, as applicable, under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining and any permitted modifications, extensions or renewals thereof which may be effected in accordance with any option therefor in the Lease, with the same force and effect as if Lender, its nominee, assignee, or such purchaser, as applicable, were the landlord under the Lease, and Lessee does hereby attorn to Lender, or its nominee, assignee or purchaser, as the case may be, as its landlord, said attornment to be effective and self-operative immediately upon Lender, or its nominee, assignee or purchaser, as the case may be, succeeding to the interest of the Lessor under the Lease without the execution of any further instruments on the part of any of

PB0002305

the parties hereto; provided, however, that Lessee shall be under no obligation to pay rent to Lender, or its nominee, assignee or purchaser, as the case may be, until Lessee receives written notice from Lender, or its nominee, assignee or purchaser, as the case may be, that such party has succeeded to the interest of the Lessor under the Lease, which written notice shall be conclusive. The respective rights and obligations of Lessee and Lender, or its nominee, assignee or purchaser, as the case may be, upon such attornment, to the extent of the then remaining balance of the term of the Lease and any such permitted modifications, extensions and renewals, shall be and are the same as now set forth therein; it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

Lessee waives any and all rights to terminate this Lease by reason of the foreclosure of the Deed of Trust. If any court holds the Lease to be terminated by reason of such a foreclosure and if the Lender, or its nominee, assignee or any purchaser at foreclosure of the Deed of Trust has not exercised any right to terminate the Lease under Paragraph 2 above, this Agreement shall be deemed to be a new lease between the Lender, its nominee, assignee or any purchaser at such foreclosure, as landlord, and Lessee, as tenant, for the balance of the term of the Lease at the same rental therein provided and upon the same terms and conditions as therein provided. Also, in such event and at the written request of the Lender, its nominee, assignee or such purchaser at foreclosure, Lessee shall execute and deliver a new lease for the balance of the term of the Lease at the same rental therein provided and upon the same terms and conditions as therein provided.

LENDER NOT BOUND BY CERTAIN ACTS OF LESSOR. If Lender, or its nominee, assignee or purchaser at a foreclosure sale or proceeding in lieu thereof (a *"Lender Party"*) shall succeed to the interest of Lessor under the Lease, such party shall not be liable for any act or omission of any prior landlord (including Lessor); nor subject to any offsets or defenses which Lessee might have against any prior landlord (including Lessor), which shall be of no force and effect from and after the date a Lender Party succeeds to the interest of Lessor under the Lease; nor bound by any rent or additional rent which Lessee might have paid for more than the then current installment; nor bound by any amendment or modification of the Lease made without its consent; nor bound by any representations or warranties made by Lessor. In the event of a default by Lessor under the Lease or any occurrence that would give rise to an offset against rent or claim against Lessor under the Lease, Lessee will use its best efforts to set off such defaults against rents currently due Lessor (subject to the limits on Lessee's offset rights set forth in this Agreement) and will promptly give Lender written notice of such defaults or occurrence at the address of Lender as set forth above and will give Lender such time as, in Lender's opinion, is reasonably required to cure such default or rectify such occurrence, provided Lender uses reasonable diligence to correct the same. Lessee agrees that notwithstanding any provision of the Lease to the contrary, Lessee will not be entitled to cancel the Lease, or to abate or offset against the rent, or to exercise any other right or remedy until Lender has been given notice of default and opportunity to cure such default as provided herein. Lender shall have the opportunity, but not the obligation, to cure the default, and may elect, in its sole discretion, to not cure the default. If, in Lender's opinion, Lessor's default is not curable by Lender or Lender elects to not cure such default, Lender may at its option assume all of Lessor's right, title and interest in the Lease and all of Lessor's obligations and covenants under the Lease, and thereafter Lessee shall attorn to Lender or Lender's nominee, assignee or purchaser as

PB0002306

the Lessor under the Lease, and if the Lender so elects, Lessee shall not have the right to terminate the Lease as a result of Lessor's default. Notwithstanding the foregoing, Lender hereby agrees that in the event that the interests of Lessor shall be transferred to and owned by Lender, its nominee or assignee or any purchaser by reason of foreclosure or other proceedings brought in lieu of or pursuant to a foreclosure, or by any other manner, after Placement in Service of the Real Estate, if a final certification (Part 3 Approval) of completed work from the Secretary of the United States Department of Interior has not been received with respect to the Real Estate, the Lender, its nominee or assignee or such purchaser, as applicable, shall cooperate with Lessee and Investor to do all things necessary to ensure that the Real Estate will receive a final certification (Part 3 Approval) of completed work from the Secretary of the United States Department of Interior stating that the rehabilitation is consistent with the historic character of the Real Estate. In the event the Lender, its nominee or assignee or such purchaser, as applicable, fails to obtain the Part 3 Approval within 45 days following Placement in Service of the Real Estate, the Lessee (or any one or more of its members) is hereby authorized on behalf of the Lender, its nominee or assignee or such purchaser, as applicable, to take such actions as are necessary on behalf of the Lender, its nominee or assignee or such purchaser, as applicable, to obtain the Part 3 Approval, provided, that any action taken by Lessee (or any one or more of its members) shall not affect or impact the rights of Lender as stated herein. Any such actions taken by the Lessee (or any of its members) shall be at the sole cost of the Lessee (or the member taking such action). The Lender, its nominee or assignee or such purchaser, as applicable, shall cooperate with the Lessee (or any its members) as necessary to obtain the Part 3 provided Lender is reimbursed for reasonable expenses incurred in connection therewith.

LEASE PAYMENTS. If in the future there is a default by the Lessor in the performance and observance of the terms of the Deed of Trust or any other Loan Documents, the Lender may require that all rents and other payments due under the Lease be paid directly to Lender. Upon notification to that effect by the Lender, the Lessor hereby authorizes and directs Lessee and the Lessee agrees to pay any payments due under the terms of the Lease to Lender. The Assignment does not diminish any obligations of the Lessor under the Lease or impose any such obligations on the Lender prior to any foreclosure sale of proceeding or transfer in lieu thereof. Any payments by Lessee to Lender in accordance with this Agreement shall be deemed and shall constitute a payment of rental under the Lease.

SURVIVAL OF LEASE. With respect to the Lease and the leasehold interest created thereby, Lender hereby agrees that if Lender or any of Lender's successors, assigns, or nominees, or any purchaser shall take title to the Real Estate by reason of foreclosure or other proceedings brought in lieu of or pursuant to a foreclosure, or by any other manner, the Lease and Lessee's rights and enjoyment of possession of the Real Estate shall be and remain undisturbed and unaffected by any foreclosure or other proceedings involving the Lender's interests in the Real Estate to the extent necessary to prevent any recapture of the Tax Credits, allocated to Investor under the Lessee's Operating Agreement, regardless of whether or not there is any past, current or future default in the performance by Lessee of any terms, covenants or conditions of the Lease, provided that following any payment default by Lessee under the Lease, which default continues beyond any applicable notice and cure period, Lessee shall comply with the following provisions within ten (10) business days of the written request of Lessor and shall continue to comply with such provisions throughout the term of the Lease:

A property manager selected by Lender or the Lender Parties holding title to the Real Estate (*"Replacement Property Manager"*) shall be engaged to manage the Real Estate pursuant to a management agreement (*"Replacement Management Agreement"*) approved by Lender or the applicable Lender Parties. Pursuant to the Replacement Management Agreement, Lender or the applicable Lender Parties shall have the right to direct the Replacement Property Manager and administer the Replacement Management Agreement and the Replacement Property Manager shall be delegated full authority to lease, operate and manage the Real Estate. Lessee shall irrevocably direct all subtenants of the Real Estate to remit rent and other payments directly to the Replacement Property Manager.

Lessee shall direct the Replacement Property Manager, or prior to the engagement of the Replacement Property Manager, the existing property manager to pay to Lender as rent under the Lease, on a monthly basis on the 1st day of each calendar month, all *"Net Operating Cash Flow"* for the prior month, such monthly payments to continue throughout the term of the Lease or any earlier termination of the Lease permitted under this Agreement. The term *"Net Operating Cash Flow"* shall mean (i) all cash received from operations of the Real Estate and the proceeds of business interruption or loss of rents insurance and casualty insurance in excess of the amounts expended or to be expended to repair or replace the property which suffered the casualty, but excluding capital contributions to Lessee, less (ii) cash expended, reserved, or required for operating debts and expenses of the Real Estate (other than rent and other amounts payable under the Lease) set forth in an operating budget for the Real Estate approved in writing by Lender in its sole discretion and any reserves to be held by the Replacement Property Manager for such applicable expenses as taxes and insurance premiums, capital expenditures and replacements (excluding expenses funded from capital contributions), to the extent approved in writing by Lender in its sole discretion. Lender agrees that any such budget and reserves shall established in good faith to meet the requirements of the landlord under any leases or subleases of the Real Estate and that the Replacement Property Manager shall be obligated under the Replacement Property Management Agreement to use commercially reasonable efforts to satisfy the requirements of the landlord under any leases or subleases of the Real Estate. Lessee hereby authorizes and directs the Replacement Property Manager to make on its behalf the payments required under this Section.

RESTRICTION ON SALE OF REAL ESTATE. Lender agrees that, prior to the date which is five (5) years after Placement in Service (as such term is defined in the Lessee's Operating Agreement), and subject to the other provisions of this Agreement, neither the Real Estate nor any improvements thereon can be sold or otherwise transferred by Lender or by any of Lender's successors, assigns, nominees or any purchaser of the Real Estate to any "Disqualified Transferee," the transfer to which would cause the recapture of the Tax Credits as set forth in Section 6 above. The foregoing shall constitute the sole restriction on transfer (and any other restrictions on transfer or encumbrance of the Real Estate set forth in the Lease shall be of no force and effect) following the date of the acquisition of the Lessor's interest in the Lease by a Lender Party. For the purposes of this paragraph, *"Disqualified Transferee"* means any of the following:

a tax exempt organization described in Section 50(b)(3) of the Code unless the property is used by such organization predominantly in an unrelated trade or business the income of which is subject to tax under Section 511 of the Code;

PB0002308

the United States, any State or political subdivision thereof, any possession of the United States or any agency or instrumentality of any of the foregoing;

a foreign person or entity (as defined in Section 168(h)(2)(C) of the Code) unless more than 50 percent of the gross income derived by the foreign person or entity is subject to U.S. tax or included under Section 951 of the Code in the gross income of a United States shareholder for the taxable year with or within which ends the taxable year of the controlled foreign corporation in which such income was derived;

a mutual savings bank, cooperative bank or domestic building and loan association to which Section 593 of the Code applies;

a regulated investment company or real estate investment trust subject to taxation under subchapter M, Chapter 1 of the Code (but not including a "taxable REIT subsidiary," as defined in Section 856(1) of the Code;

a cooperative organization described in Section 1381(a) of the Code; or

a partnership or other pass-thru entity in which any Disqualified Transferee described in subparts (a) through (f), above, owns a direct or indirect partner or member interest.

OPTION TO PURCHASE LOAN. Lender agrees that at or prior to the time that it initiates legal proceedings to foreclose the [Deed of Trust] or commences a sale pursuant to any power of sale granted in the [Deed of Trust], Lender shall first offer Lessee, in writing, the right to purchase the [Notes], [Deed of Trust], and other Loan Documents (as defined and described in the Loan Agreement, [Notes] and [Deed of Trust]) and all other documents evidencing or relating to the Loan (the *"Loan Purchase Offer"*). The purchase price (*"Purchase Price"*) shall be equal to the then outstanding balance of the [Notes], including accrued and unpaid interest, plus the amount of all other monetary obligations then due and payable under the Loan Agreement, [Notes], [Deed of Trust] and other Loan Documents, plus all other fees and costs associated with the Loan Purchase Offer. The written Loan Purchase Offer sent to Lessee shall set forth the calculation of the Purchase Price as of the date of such Loan Purchase Offer. Lessee shall have ten (10) business days following receipt of Lender's Loan Purchase Offer in which to accept, in writing, the offer to purchase the Loan. If Lessee fails to accept the Loan Purchase Offer in writing within such period, Lessee shall be deemed to have rejected the Loan Purchase Offer. If Lessee accepts the Loan Purchase Offer within such period, Lessee shall purchase the Notes, Deed of Trust and all other Loan Documents on the date which is ten (10) business days following such acceptance (the *"Loan Purchase Date"*). On the Loan Purchase Date, (i) Lender shall assign to Lessee the Loan Agreement, [Notes], [Deed of Trust], and all other Loan Documents evidencing or relating to the Loan, and such assignment (the *"Assignment"*) shall be in writing, in recordable form, and made without recourse, representation or warranty other than as to the amount of the then outstanding balance of the Notes, including accrued and unpaid interest, and the amount of all other monetary obligations then due and payable under the Loan Agreement, [Notes], [Deed of Trust], and other Loan Documents, (ii) Lender shall deliver the original Loan Agreement, [Notes], [Deed of Trust] and other Loan Documents to Lessee, and (iii) as a condition to the execution and delivery of the Assignment and the delivery of the original Loan Agreement, [Notes], [Deed of Trust] and other Loan Documents to Lessee, Lessee

shall pay to Lender, in good funds by wire transfer, the Purchase Price. If, following rejection of any Loan Purchase Offer made to Lessee, Lender does not proceed to commence to exercise its power of sale or other foreclosure remedy within thirty (30) days, or abandons and does not pursue it to completion, Lender shall again be obligated to make a Loan Purchase Offer to Lessee prior to again commencing to exercise any power of sale or other foreclosure remedy.

### REPRESENTATIONS OF LESSOR AND LESSEE.

(a)    The Lease is a commercial lease, is in full force and effect, and has not been amended or modified in any way, and there are no documents or written agreements between Lessee and Lessor with respect to the Lease, except those disclosed herein;

(b)    Neither Lessor's nor Lessee's interests under the Lease have been assigned or transferred, whether for purposes of security or otherwise, and each party has all the requisite power and authority to enter into this agreement with Lender.

(c)    No uncured event of default or breach on the part of either Lessor or Lessee has occurred under the Lease, and no event has occurred which gives either party the right to terminate the Lease.

### COVENANTS.

(a)    Lender may enter upon the Real Estate and inspect the same at any reasonable time.

(b)    Lessor and Lessee will at any time and from time to time execute, deliver, and acknowledge to Lender or to any third party designated by Lender, within ten (10) days following Lender's written request therefor, a statement in writing certifying whether the Lease is in full force and effect, that no party is in default thereunder (or specifying any defaults which either party alleges), specifying any information about the Lease or the Real Estate which Lender or said third party may reasonably request.

(c)    Lessor and Lessee will not assign or amend the Lease without the prior written consent of Lender, and any attempt to do so without prior consent shall be invalid and void.

(d)    Lessor and Lessee will each contemporaneously provide to the Lender a copy of any material communications pertaining to the Lease, whether such communications are with Lessor and Lessee, or with an unrelated third party.

SUCCESSORS AND ASSIGNS.    This Agreement and each and every covenant, agreement and other provisions hereof shall be binding upon the parties hereto and their heirs, administrators, representatives, successors and assigns, including without limitation each and every from time to time holder of the Lease or any other person having an interest therein and shall inure to the benefit of the Lender and its successors and assigns.

CHOICE OF LAW.  This Agreement is made and executed under and in all respects is to be governed and construed by the laws of the State of [____].

CAPTIONS AND HEADINGS.  The captions and headings of the various sections of this Agreement are for convenience only and are not to be construed as confining or limiting in any way the scope or intent of the provisions hereof. Whenever the context requires or permits, the singular shall include the plural, the plural shall include the singular and the masculine, feminine and neuter shall be freely interchangeable.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Lessor has executed this Subordination, Nondisturbance and Attornment Agreement under seal on its behalf on the date set forth in the notarial acknowledgement but to be effective as of the date first set forth above.

Lessor:                          [___], a [___]

                                 By: _____
                                 Name: [___]
                                 Its:    [___]


STATE OF _____    )
                           )  SS.
COUNTY OF _____      )

Personally appeared before me, the undersigned authority in and for the said county and state, on this the _____ day of _____, 2016, within my jurisdiction, the within named [___], who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed in the above and foregoing instrument and acknowledged that he executed the same in his representative capacity, and that by his signature on the instrument, and as the act and deed of said entities upon behalf of which he acted, executed the above and foregoing instrument, after first having been duly authorized so to do.

                                 _____
                                 Notary Public
[AFFIX SEAL]                     My commission expires: _____

IN WITNESS WHEREOF, Lessor has executed this Subordination, Nondisturbance and Attornment Agreement under seal on its behalf on the date set forth in the notarial acknowledgement but to be effective as of the date first set forth above.

Lessor:                                    [___], a [___]


                                           By: _____
                                           Name: [___]
                                           Its:    [___]




STATE OF _____          )
                                  ) SS.
COUNTY OF _____           )

Personally appeared before me, the undersigned authority in and for the said county and state, on this the ____ day of _____, 2016, within my jurisdiction, the within named [___], who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed in the above and foregoing instrument and acknowledged that he executed the same in his representative capacity, and that by his signature on the instrument, and as the act and deed of said entities upon behalf of which he acted, executed the above and foregoing instrument, after first having been duly authorized so to do.


                                           _____
**[AFFIX SEAL]**                           Notary Public
                                           My commission expires: _____

IN WITNESS WHEREOF, Investor has executed this Subordination, Nondisturbance and Attornment Agreement under seal on its behalf on the date set forth in the notarial acknowledgement but to be effective as of the date first set forth above.

Investor:

**ENHANCED CAPITAL HTC FUND I, LLC,**
a Delaware limited liability company

By:    Enhanced Capital HTC Manager, LLC, a
        Delaware limited liability company, its
        manager

        By:    Enhanced Tax Credit Finance, LLC, a
               Delaware limited liability company, its
               sole member

               By:   _____
               Name:  Shane McCarthy
               Title:   Vice President

STATE OF _____   )
                       ) SS.
COUNTY OF _____  )

Personally appeared before me, the undersigned authority in and for the said county and state, on this the _____ day of _____, 2016, within my jurisdiction, the within named Shane McCarthy, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed in the above and foregoing instrument and acknowledged that he executed the same in his representative capacity, and that by his signature on the instrument, and as the act and deed of said entities upon behalf of which he acted, executed the above and foregoing instrument, after first having been duly authorized so to do.

_____
Notary Public
**[AFFIX SEAL]**        My commission expires: _____

IN WITNESS WHEREOF, Lessor has executed this Subordination, Nondisturbance and Attornment Agreement under seal on its behalf on the date set forth in the notarial acknowledgement but to be effective as of the date first set forth above.

Lender:                          [____], a [____]


By: _____
Name: [____]
Its:    [____]



STATE OF _____        )
                               ) SS.
COUNTY OF _____         )

Personally appeared before me, the undersigned authority in and for the said county and state, on this the _____ day of _____, 2016, within my jurisdiction, the within named [____], who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed in the above and foregoing instrument and acknowledged that he executed the same in his representative capacity, and that by his signature on the instrument, and as the act and deed of said entities upon behalf of which he acted, executed the above and foregoing instrument, after first having been duly authorized so to do.


                               _____
                               Notary Public
[AFFIX SEAL]                   My commission expires: _____

**EXHIBIT A**

**Legal Description**

**[___]**

PB0002316

After Recording Return To:
Stinson Leonard Street, LLP
Attn: David K. Lutz
1299 Farnam Street, Suite 1500
Omaha, NE 68102

## NOTICE OF LEASE

Wall Street Master Landlord, LLC, a Connecticut limited liability company ("*Landlord*") and Wall Street Master Tenant, LLC, a Connecticut limited liability company ("*Tenant*"), having entered into that certain Lease Agreement (the "*Lease*") and desiring to provide Notice of the Lease in accordance with Section 47-19 of the Connecticut General Statutes, as amended, hereby give notice of the following on this 29th day of December, 2016:

1. Parties to the Lease:

    (a) Landlord:　　Wall Street Master Landlord, LLC
    　　　　　　　　　 71 Wall Street
    　　　　　　　　　 Norwalk, CT 06860

    (b) Tenant:
    　　　　　　　　　 Wall Street Master Tenant, LLC
    　　　　　　　　　 71 Wall Street
    　　　　　　　　　 Norwalk, CT 06860

2. The Lease between the parties was executed on December 29, 2016.

3. The term of the Lease will commence on the earlier of (i) the Commencement Date (as defined in the Lease) or (ii) December 29, 2017 (the "*Start Date*"). The Lease is for a term of nineteen (19) years, and will expire at 11:59 p.m. central time on the day immediately before the nineteenth (19th) anniversary of the Start Date, unless terminated sooner in accordance with the Lease

4. The premises demised under the lease (the "*Demised Premises*") consist of that certain piece or parcel of land, with the buildings and all other improvements situated thereon, commonly known as 71 Wall Street, Norwalk, Connecticut, a legal description of which is attached hereto as Exhibit A, incorporated herein and made a part hereof as if set forth at length.

PB0002317

6. A copy of the Lease is on file at each of the offices of the Landlord and Tenant, as aforesaid, to which reference may be had.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Notice of Lease to be executed as of the day and year above written.

**LANDLORD**:

**WALL STREET MASTER LANDLORD, LLC,**
a Connecticut limited liability company

By: Wall Street Manager, LLC,
a Connecticut limited liability company, its Manager

By: Wall Street Managing Member, LLC,
a Connecticut limited liability company, its Manager

By: Wall Street Theater Company Inc.,
a Connecticut non-stock corporation, its Manager

By: _____
Name: Suzanne J. Cahill
Title: President

Signed, Sealed and Delivered
In the Presence of Witnesses:

_____
Name: Christopher J. Rixon

_____
Name: Kelly A. Trahan

STATE OF CONNECTICUT : : SS. Stamford
COUNTY OF FAIRFIELD :

On the 20th day of December, in the year 2016, before me, the undersigned, personally appeared Suzanne J. Cahill, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity as President of Wall Street Theater Company Inc., a Connecticut non-stock corporation, as manager of Wall Street Managing Member, LLC, a Connecticut limited liability company, as manager of Wall Street Manager, LLC, a Connecticut limited liability company, as manager of Wall Street Master Landlord, LLC, a Connecticut limited liability company, being authorized to do so, and that by her signature on the instrument, the individual, or the entities upon behalf of which the individual acted, executed the instrument as her free act and deed and the free act and deed of said non-stock corporation and said limited liability companies.

_____
Name: Christopher J. Rixon
Commissioner of the Superior Court or
Notary Public
My Commission Expires: _____

IN WITNESS WHEREOF, the parties hereto have caused this Notice of Lease to be executed as of the day and year above written.

**TENANT:**

**WALL STREET MASTER TENANT, LLC,**
a Connecticut limited liability company

By:   Wall Street Manager, LLC,
      a Connecticut limited liability company, its Managing Member

      By:   Wall Street Managing Member, LLC,
            a Connecticut limited liability company, its Manager

            By:   Wall Street Theater Company Inc.,
                  a Connecticut non-stock corporation, its Manager

                  By: _____
                  Name:  Suzanne J. Cahill
                  Title:   President

Signed, Sealed and Delivered
In the Presence of Witnesses:

Name: Christopher J. Rixon          Name: Kelly A. Trahan

STATE OF CONNECTICUT     :
                         : SS.  Stamford
COUNTY OF FAIRFIELD      :

On the 28th day of December, in the year 2016, before me, the undersigned, personally appeared Suzanne J. Cahill, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity as President of Wall Street Theater Company Inc., a Connecticut non-stock corporation, as the manger of Wall Street Managing Member, LLC, a Connecticut limited liability company, as manager of Wall Street Manager, LLC, a Connecticut limited liability company, as managing member of Wall Street Master Tenant, LLC, a Connecticut limited liability company, being authorized to do so, and that by her signature on the instrument, the individual, or the entities upon behalf of which the individual acted, executed the instrument as her free act and deed and the free act and deed of said non-stock corporation and said limited liability companies.

Name:  Christopher J. Rixon
Commissioner of the Superior Court or
Notary Public
My Commission Expires: _____

## EXHIBIT A

### LEGAL DESCRIPTION OF DEMISED PREMISES

#### FIRST TRACT:

All that certain parcel of land, together with the buildings and other improvements thereon, situated in the City of Norwalk, County of Fairfield and State of Connecticut, shown on a certain map entitled, "Map of Property Prepared for Nutmeg Theatre Circuit Norwalk Connecticut Scale: 1 in. = 10 ft. April 8, 1971" by Leonard Surveyors Norwalk, Connecticut Certified 'Substantially Correct' by Leo Leonard", which map is on file in the Norwalk Town Clerk's Office numbered 7490.  Said premises are more particularly bounded and described as follows:

| | |
|---|---|
| NORTHWESTERLY: | 65 feet by Wall Street; |
| NORTHEASTERLY: | 150.50 feet by land now or formerly of the Fairfield County Savings Bank and Nutmeg Theatre Circuit, and by land of the Norwalk Parking Authority; each in part; |
| SOUTHEASTERLY: | 22.88 feet by land now or formerly of the Norwalk Parking Authority; |
| NORTHEASTERLY AGAIN: | 2.00 feet by land now or formerly of the Norwalk Parking Authority; |
| SOUTHEASTERLY AGAIN: | 36.31 feet by land now or formerly of the Norwalk Parking Authority; |
| SOUTHWESTERLY: | 10.10 feet by a four foot easement; |
| SOUTHEASTERLY AGAIN: | 7.60 feet by a four foot easement and by land now or formerly of Paul B. and Mildred Maravnick; |
| SOUTHWESTERLY AGAIN: | 140.71 feet by land now or formerly of the Fairfield County National Bank. |

Together  with a right of ingress and egress set forth in Volume 177, Page 190 to Isaacs Street Extension over a strip of land about 4 feet in width running from the southwest corner of the above described premises to Isaacs Street and bounded:

| | |
|---|---|
| NORTHERLY: | by land now or formerly of Nutmeg Theatre Circuit; |
| EASTERLY: | by land now or formerly of the Norwalk Parking Authority; |
| SOUTHERLY: | by Isaacs Street Extension; and, |
| WESTERLY: | by land now or formerly of Paul B. and Mildred Maravnick. |

PB0002321

Together with all rights reserved in common with others over land now or formerly of James C. Cunningham as contained in a deed from Samuel Kantor to James C. Cunningham dated May 4, 1926 and recorded on September 4, 1926 in Volume 201, Page 11 of the Norwalk Land Records.

## SECOND TRACT:

An undivided one-half interest recited by instrument recorded in Volume 167, Page 447 in and to a certain tract of land situated in the City of Norwalk, County of Fairfield and State of Connecticut, and bound and described as follows:

| | |
|---|---|
| NORTHERLY: | 14.77 feet by Wall Street; |
| EASTERLY: | 100.00 feet by land now or formerly of Fairfield County Savings Bank; |
| SOUTHERLY: | 14.80 feet by land now or formerly of the Norwalk Parking Authority; and, |
| WESTERLY: | 100.00 feet by land now or formerly of Nutmeg Theatre Circuit. |

#42

Sublease with Master Tenant

N/A

PB0002323